# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| HERON THERAPEUTICS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 24-1363 (WCB) |
| | ) |
| AZURITY PHARMACEUTICALS, INC., | ) |
| AZURITY PHARMACEUTICALS INDIA | ) |
| LLP F/K/A SLAYBACK PHARMA INDIA | ) REDACTED - PUBLIC VERSION |
| LLP, AND SLAYBACK PHARMA LLC, | ) |
| | ) |
| Defendants. | ) |

**HERON THERAPEUTICS, INC.'S OPENING STATEMENT**

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................................................. 1
II. BACKGROUND ............................................................................................................... 2
III. AZURITY WILL FAIL TO SHOW THAT THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION OR ENABLEMENT .............................................................. 4
    A. Azurity Will Fail to Show by Clear and Convincing Evidence That the Asserted Claims Are Not Sufficiently Described ......................................................... 5
        1. Dr. Amiji and Azurity Improperly Focus on the Prior Art to the Exclusion of the Specification as a Whole ......................................................... 5
        2. The Specification Discloses 13 to 20 wt/wt % Emulsifier and About 20:1-25:1 Emulsifier-to-Aprepitant Ratios ........................................................ 6
        3. The Prosecution History Does Not Help Azurity's Position ............................... 10
    B. Azurity Will Fail to Show by Clear and Convincing Evidence That the Asserted Claims are Not Sufficiently Enabled .............................................................. 11
    C. Relevant Evidence of Azurity's Own Work Will Demonstrate Why Azurity's Defenses Must Fail ........................................................................................ 13
IV. CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*,
    745 F.3d 1180 (Fed. Cir. 2014)..................................................................5, 6, 11, 13

*Allergan USA, Inc. v. MSN Lab'ys Private Ltd.*,
    111 F.4th 1358 (Fed. Cir. 2024) ..........................................................................5

*Application of Johnson*, 558 F.2d 1008 (C.C.P.A. 1977) ...............................................11

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010)..........................................................................11

*Atlas Powder Co. v. E.I. du Pont de Nemours Co.*,
    750 F.2d 1569 (Fed. Cir. 1984)..........................................................................14

*Bd. of Trs. of Leland Stanford Junior Univ. v. Chinese Univ. of Hong Kong*,
    860 F.3d 1367 (Fed. Cir. 2017)..........................................................................14

*Gould v. Quigg*,
    822 F.2d 1074 (Fed. Cir. 1987)..........................................................................14

*Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*,
    No. 22-985-WCB, D.I. 193 (D. Del. Dec. 3, 2024)..................................2, 4, 11, 12

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009)...........................................................................6

*Pharmacyclics LLC v. Alvogen Pine Brook LLC*,
    556 F. Supp. 3d 377 (D. Del. 2021).....................................................................12

**Statutes**

35 U.S.C. § 112....................................................................................................1

**I.      INTRODUCTION**

Azurity has already stipulated that its ▮▮▮▮▮▮▮▮▮▮ proposed NDA product infringes the asserted patents in this case (D.I. 112 at ¶ 1) and "[t]he only remaining issue" for this Court to decide at trial is "Azurity's allegation that [the asserted claims] are invalid under 35 U.S.C. § 112." (D.I. 119 at ¶ 6.) Azurity will argue that the asserted claims to aprepitant emulsions with 13 to 20 wt/wt % egg lecithin do not satisfy the written description and enablement requirements. Yet, the asserted patents' specifications expressly disclose aprepitant emulsions with 13 to 20 wt/wt % egg lecithin, provides step-by-step instructions for how to make and use aprepitant emulsions with 13 to 20 wt/wt % egg lecithin, and reports examples of remarkably stable aprepitant emulsions with 11.7, 13.6, 13.8, and 14.3 wt/wt % egg lecithin.

Instead of meaningfully addressing these disclosures and what they teach, Azurity will focus on general statements about emulsion science in the prior art. In effect, Azurity will assert the field was so complex before the patents-in-suit that the only way a patent could have described and enabled the claimed emulsions is by disclosing example formulations with stability data in *every* part of a claimed range. It will even go so far as to argue that the asserted patents teach nothing more than emulsions with up to 14.3 wt/wt % emulsifier. This approach both ignores the explicit statements of the patents-in-suit and that these detailed disclosures taught a paradigm shift in the field, showing POSAs for the first time how to make physically stable aprepitant emulsions.

Although the patent specifications explain that physical stability is a property of the disclosed emulsions, one asserted claim requires this property, and two do not.[1] Azurity cannot credibly dispute that, for claims 5 and 23 of the '255 patent—which do not contain a stability requirement—the specifications' clear disclosures of how to make and use aprepitant emulsions with 13 to 20 wt/wt % egg lecithin are undoubtedly sufficient. Likewise, for claim 8 of the '520 patent, which does require physical stability, Azurity will not be able to meet its heavy burden of proving by clear and convincing evidence that a POSA would not have understood the inventors possessed and enabled physically stable emulsions with 13 to 20 wt/wt % egg lecithin.

## II.   BACKGROUND

There were no stable aprepitant emulsions before the patents-in-suit. The patent application CN102379845 ("CN845" (JTX-27)) disclosed aprepitant emulsions with a variety of ingredients and concentrations, including up to 10 wt/wt % emulsifier. CN845 also disclosed eight preferred embodiments with an emulsifier concentration from 0.5 wt/wt % up to a limit of 10 wt/wt %. After CN845, an article on aprepitant emulsions was authored by the first-listed inventor of CN845, Zhou ("the Zhou article" (JTX-28)), disclosed what it described as "[t]he optimized formulation of aprepitant emulsion" containing 2.5 wt/wt % egg lecithin, among other ingredients. Neither CN845 nor the Zhou article disclosed using emulsifier above 10 wt/wt %, and this Court previously found in a related action that the aprepitant emulsions claimed by Heron were not obvious because, *inter alia*, "a POSA would not have had a motivation to increase the concentration of lecithin above 10%."[2]  (*Fresenius* Opinion (DTX-114) at 40-41.)

---

[1] Heron has limited the asserted claims for trial to claims 5 and 23 of U.S. Patent No. 12,115,255 ("'255 patent") (JTX-2) and claim 8 of U.S. Patent No. 12,290,520 ("'520 patent") (JTX-3).

[2]  U.S. Patent Nos. 9,561,229 ("the '229 patent") (JTX-4) and 9,974,794 ("the '794 patent") (JTX-6) were litigated before this Court with respect to Heron's CINVANTI® product in a

Although various formulations were provided, CN845 did not disclose any stability data. And, while the Zhou article disclosed various stability testing, including for median diameter, it did not include much of the data that would have been needed to determine whether the disclosed emulsions were physically stable, such as aprepitant crystal data. And the aprepitant emulsions disclosed in CN845 or the Zhou article were not physically stable. Examples 4 and 5 of the patents-in-suit show an emulsion with 9.95 wt/wt % egg lecithin that falls within the scope of CN845 and the "optimized formulation of aprepitant emulsion" described in the Zhou article, respectively. Both of these emulsions formed aprepitant crystals within four days. ('520 patent (JTX-3) at 18:51-66, 19:20-34.)

The patents-in-suit disclosed the first-ever physically stable aprepitant emulsions. These aprepitant emulsions used more emulsifier, *e.g.*, 13 to 20 wt/wt %, than any of the prior art aprepitant emulsions. The patents-in-suit disclosed the formulations of these emulsions, how to make them, and remarkably stable examples of them. Compared to the prior art emulsions, which formed aprepitant crystals within four days, the exemplary emulsions with 11.7 to 13.8 wt/wt % egg lecithin did not form aprepitant crystals for two months. And the exemplary emulsion with 14.3 wt/wt % egg lecithin did not form aprepitant crystals for three months. An embodiment of Heron's efforts and patents is Heron's successful CINVANTI® Product, which is used to treat patients for chemotherapy induced nausea and vomiting. Recognizing the success

---

related matter against Fresenius Kabi USA, LLC, in which Heron prevailed on infringement and validity. *See Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*, No. 22-985-WCB, D.I. 193 (D. Del. Dec. 3, 2024). The specifications of the '255 and '520 patents are, in relevant part, the same as those of the '229 and '794 patents and claim similar subject matter. For the Court's convenience, Heron cites only to the '520 patent throughout this Opening Statement, unless otherwise noted. The discussion applies equally to the equivalent portions of the '255 patent.

of Heron's aprepitant emulsion, Azurity used the teachings of Heron's patents to arrive at its own 17.7 wt/wt % emulsifier formulation.

### III. AZURITY WILL FAIL TO SHOW THAT THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION OR ENABLEMENT

Azurity's written description and enablement arguments will both rely on the same, misplaced premise. According to Azurity, the patent disclosures, no matter how clear and direct, are inadequate absent examples of aprepitant emulsions with an emulsifier concentration through the entire claimed range. Azurity will assert that because the patent discloses examples with 11.7 to 14.3 wt/wt % emulsifier and a 20:1 emulsifier-to-aprepitant ratio, the specification fails to provide written description or enablement for claims to 13 to 20 wt/wt % emulsifier and 20:1 to 25:1 emulsifier-to-aprepitant ratio. (D.I. 145, Ex. 3 (Azurity Contested Facts) at ¶¶ 79-80.)

But Heron and its expert, Dr. Steven Little, will show that, in fact, the specification includes sufficient detail from which a POSA would have recognized possession of the claimed emulsions as of the priority date, and further understood how to make and use the same. Dr. Little will explain that the patents-in-suit disclose how the inventors finally overcame the limitations of the prior art to make a stable aprepitant emulsion by, in particular, using an emulsifier concentration "greater than . . . 13 wt/wt % . . . but less than . . . 20 wt/wt %" and using an emulsifier-to-aprepitant ratio of "about . . . 20:1 to 25:1." (*e.g.*, '520 patent (JTX-3) at 11:8-14, 14:23-28.) Azurity will be unable to put on the clear and convincing evidence required to meet its heavy burden.

    **A.**    **Azurity Will Fail to Show by Clear and Convincing Evidence That the Asserted Claims Are Not Sufficiently Described**

        **1.**    **Dr. Amiji and Azurity Improperly Focus on the Prior Art to the Exclusion of the Specification as a Whole**

Azurity's expert, Dr. Amiji, will misapply the law and fail to meaningfully consider the specification. Dr. Amiji focuses only on what a POSA would have understood from the prior art (including with extensive reference to Heron's nonobviousness positions from *Fresenius*)[3] while ignoring the full scope of what a POSA would have learned from the specification itself. Dr. Amiji will not properly account for the portions of the specification that undermine his position. Instead, he will testify that, in effect, the specification would teach a POSA next to nothing beyond the precise formulations of its four worked examples. That is not the right analysis. It is a well-worn principle of patent law that a POSA's understanding of the specification *as a whole* is what guides the written description analysis. The case law is not ambiguous. *Allergan USA, Inc. v. MSN Lab'ys Private Ltd.*, 111 F.4th 1358, 1375 (Fed. Cir. 2024) ("As the 'hallmark' of written description . . . the disclosure must be considered as a whole . . . ."); *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745 F.3d 1180, 1190 (Fed. Cir. 2014) ("[The written description] assessment requires an objective inquiry into the four corners of the specification.").[4]

Although Dr. Amiji will concede at trial that Examples 1, 2, 3, and 6 of the patents-in-suit show physically stable emulsions with between 11.7 and 14.3 wt/wt % emulsifier (D.I. 145,

---

[3] In *Fresenius*, the Court held that the asserted claims were not obvious based on, *inter alia*, lack of motivation to use emulsifier above 10 wt/wt %. To be clear, Azurity is maintaining *Fresenius*'s obviousness assertions. (D.I. 119 at ¶¶ 4, 5.) In other words, Azurity is simultaneously arguing that the field of art was so complex that a POSA would not have understood that the inventors possessed the claimed inventions, while still maintaining that the asserted patents would have been obvious in light of the prior art.

[4] All emphases added and internal citations and quotations omitted unless otherwise noted.

Ex. 3 (Azurity Contested Facts) at ¶ 28), he will still then testify that a POSA "would [purportedly] have no guidance for formulating stable emulsions outside the 13-15 wt/wt % lecithin concentration and/or outside the 18:1-22:1 lecithin:aprepitant ratio disclosed in the patents-in-suit." (*Id*. at ¶ 80.) Dr. Amiji will try to prove that "[a] POSA would understand *from the prior art* and the prosecution history that the destabilizing effects of increasing concentration of emulsifier renders formulations generally inoperable outside of the critical 13-15 wt/wt % lecithin concentration." (D.I. 145, Ex. 3 (Azurity Contested Facts) at ¶ 108.) But this ignores that the asserted patents' disclosures specifically teach a POSA that one can use 13 to 20 wt/wt % emulsifier to achieve physically stable aprepitant emulsions. Azurity cannot so easily sidestep its legal obligation to consider the specification as a whole through misplaced references to the prior art, either alone or with only a partial view of what the patents-in-suit actually disclose. (*See* D.I. 145, Ex. 3 (Azurity Contested Facts) at ¶¶ 93-119, 120-152.)

Moreover, "there is no requirement that the disclosure contain either examples or an actual reduction to practice." *Alcon*, 745 F.3d at 1190. And "a patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1371 (Fed. Cir. 2009). Yet that is precisely what Azurity and Dr. Amiji will assert. Indeed, they seek to impose unduly demanding, legally incorrect standards that would effectively limit every nonobvious patent to its actual examples, regardless of what else the specification describes. That, plainly, is not the law.

### 2. The Specification Discloses 13 to 20 wt/wt % Emulsifier and About 20:1 to 25:1 Emulsifier-to-Aprepitant Ratios

Dr. Amiji will assert that there is only a "single generic reference in the specification to a concentration outside of the 13-15% range," which "is insufficient to provide any sort of affirmation to a POSA that the inventors had possession of a stable aprepitant emulsion with an

emulsifier concentration outside of the 13-15% range." (D.I. 147, Ex. 22 at Ex. 2 (Amiji Opening Report) at ¶ 173 n.5; D.I. 145, Ex. 22 at Ex. 3 (Amiji Reply Report) at ¶ 27 (purporting to further limit the disclosure to the example with the most emulsifier, *i.e.* "14.3 wt/wt %").) In reality, the Court will see that there are multiple descriptions of aprepitant emulsions with, for example, 13 to 20 wt/wt % egg lecithin throughout the patent specification—not just a "single generic reference." Given these explicit and repeated disclosures, a POSA would have understood the inventors possessed such emulsions.

In its "Brief Summary," the specification describes embodiments containing, for example, concentrations of emulsifier, such as egg lecithin, from about "13 wt/wt %" to "20 wt/wt %," including "17 wt/wt %" and "18 wt/wt %":

> In one embodiment, the composition comprises about 10 wt/wt % to 20 wt/wt %, 12 wt/wt % to 17 wt/wt %, 13 wt/wt % to 16 wt/wt %, 13 wt/wt % to 15 wt/wt %, or 13 wt/wt % to 14 wt/wt % emulsifier. In another embodiment, the composition comprises about 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt % or 20 wt/wt % emulsifier. In another embodiment the emulsifier is a lecithin. In another embodiment the lecithin is an egg yolk lecithin.

('520 patent (JTX-3) at 2:66-3:7 (annotated).) This section of the specification also discloses embodiments in which, for example, "the ratio of emulsifier to aprepitant (wt %:wt %) in the composition ranges from about . . . 20:1 to 25:1 . . . ." (*Id.* at 3:43-48.)

Further, in the "Detailed Description," the specification also describes embodiments where, for example, the amount of phospholipid emulsifier, such as egg lecithin, "may be within a range of about . . . 13 wt/wt % to 20 wt/wt %":

- 7 -

> The amount of phospholipids, by weight, in the emulsions of the present disclosure may be within a range of about 10 wt/wt % to about 20 wt/wt %, 11 wt/wt % to 19 wt/wt %, 11 wt/wt % to 15 wt/wt %, 12 wt/wt % to 13 wt/wt %, 13 wt/wt % to 14 wt/wt %, 13 wt/wt % to 20 wt/wt %, or 12 wt/wt % to 18 wt/wt %. In certain embodiments, the phospholipids in the emulsions are at a concentration, by weight, about 11 wt/wt %, 12 wt/wt %, 12.5 wt/wt %, 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, or 15 wt/wt %.

(*Id.* at 9:58-67 (annotated); *id.* at 9:35-57.)

But these are not the only descriptions of the amount of emulsifier in the disclosed aprepitant emulsions. In the "Aprepitant Emulsion and Methods of Making" section, the specification explains that a phospholipid emulsifier, such as egg lecithin, is "added to a concentration of greater than . . . 13 wt/wt % of the emulsion but less than . . . 20 wt/wt % of the emulsion":

> The aprepitant is first mixed with an emulsifier such as a phospholipid emulsifier. Examples 1, 2, 3 and 6 below describe emulsions made using an egg lecithin. The phopholipid emulsifier is added to a concentration of greater than 10 wt/wt %, 11 wt/wt %, 12 wt/wt % or 13 wt/wt % of the emulsion but less than 15 wt/wt %, 17 wt/wt % or 20 wt/wt % of the emulsion.

('520 patent (JTX-3) at 11:8-14; *id.* at 10:14.) This is not simply a "generic" disclosure. Rather, it expressly discloses that the very same methods can be used to make further embodiments of the emulsions of Examples 1, 2, 3, and 6, but with "greater than . . . 13 wt/wt % . . . but less than . . . 20 wt/wt %" emulsifier. The "Methods of Making" also describes "vary[ing]" the emulsifier-to-aprepitant ratio of the disclosed emulsions to, for example, "about . . . 20:1 to 25:1" when making the disclosed emulsions. (*Id.* at 14:23-28.)

- 8 -

Moreover, the specification describes that four of its example formulations—Examples 1, 2, 3, and 6—were made using the disclosed "Methods of Making" and reports data showing that they embody the invention's physical stability property. Examples 1, 2, 3, and 6 include 13.6, 14.3, 11.7, and 13.8 wt/wt % emulsifier, respectively, and a 20:1 emulsifier-to-aprepitant ratio. ('520 patent (JTX-3) at 16:1-20:33.) The 11.7, 13.6, and 13.8 wt/wt % examples showed two months of physical stability, and the 14.3 wt/wt % example showed three months of physical stability. (*Id*. at 20:36-21:10.) The Court will hear Dr. Little explain that these examples further demonstrate possession of the claimed emulsions—including the "physically stable" emulsions claimed in the '520 patent—to a POSA, and that Dr. Amiji is wrong in asserting otherwise. Indeed, there is no dispute that the specifications expressly state that "[t]he compositions of the disclosure are both chemically and physically stable." ('520 patent (JTX-3) at 14:57-58.)

Moreover, the specification's "Methods of Making" tutorial explains in great detail (with over five columns of text) not just which emulsifier amounts and emulsifier-to-aprepitant ratios to use, but also step-by-step instructions for how to make and analyze the claimed emulsions. ('520 patent (JTX-3) at 10:13-15:46.) The Court will see that the specification guides a POSA through, *inter alia*, (1) making the oil phase of the emulsion, (2) making the aqueous phase of the emulsion, (3) mixing the two phases to obtain the emulsion, and (4) measuring stability, including the specific instruments and conditions to use along the way. (*Id*.) The specific steps that were used to make and analyze Examples 1, 2, 3, and 6 are also provided (*e.g.*, *id.* at 16:61-18:20, 19:37-21:10), as well as details on how to evaluate the emulsions' stability (*e.g.*, *id.* at 14:57-15:38, 20:36-21:10).

The Court will hear Dr. Little explain that a POSA would have credited these disclosures, and that, in view of these disclosures and the specification as a whole, a POSA

- 9 -

would understand that the inventors possessed the claimed aprepitant emulsions with 13 to 20 wt/wt % emulsifier and the claimed emulsifier-to-aprepitant ratios.

### 3. The Prosecution History Does Not Help Azurity's Position

The Court may also hear Dr. Amiji discuss prosecution-history statements where Heron argued that pending claims, which recited 13 to 15 wt/wt % emulsifier and/or an emulsifier-to-aprepitant ratio of 18:1-22:1, had unexpectedly improved stability over prior art aprepitant emulsions with less emulsifier. Dr. Amiji will argue that these statements somehow mean that aprepitant emulsions with more than 13 to 15 wt/wt % emulsifier and/or an emulsifier-to-aprepitant ratio over 18:1 to 22:1 were outside the scope of the invention. (*See, e.g.*, D.I. 145, Ex. 3 (Azurity Contested Facts) at ¶¶ 79-80, 138-139.)

This is plainly wrong. When Heron prosecuted claims to different amounts of emulsifier, such as 11 to 15 wt/wt % or 13 to 20 wt/wt %, it argued—just as it had for claims to 13 to 15 wt/wt %—that the claimed aprepitant emulsions were unexpectedly more stable than the prior art emulsions with less emulsifier. The Court will see that, in each instance, the applicants were of course distinguishing prior art that used less emulsifier than the particular claims at issue in the then-pending application and never disclaimed or distinguished the higher amounts and ratios of the presently asserted claims. (*E.g.*, '255 File History (JTX-8) at 161.) Indeed, Azurity has not argued that there was prosecution disclaimer.

\*   \*   \*

At every turn, Azurity and Dr. Amiji will fail to give appropriate weight to the specification. At times, Dr. Amiji will entirely ignore the teachings of the specification and only evaluate whether the inventors possessed the claimed emulsions through a prior-art lens. At others, he will look only to the specification's four worked examples and improperly limit its disclosure to their precise scope. But in *Alcon*, the Federal Circuit rejected a similarly misguided

analysis. There, the specification had "physical data from [only] one compound to support the proposition that PECO enhances the chemical stability of all prostaglandins." *Alcon*, 745 F.3d at 1190. But the specification, here as in *Alcon*, "details the claimed invention and provides a step-by-step description of how a [POSA] may use it. . . . It provides exemplary formulations that embody the claimed invention, reciting concentrations of every ingredient. . . . And the patent describes the various formulation parameters . . . that may be selected when practicing the invention." *Id*. at 1191.

These principles apply to both patents-in-suit, but the logic applies with even more force to the composition claims of the '255 patent, which lack the '520 patent's "physically stable" requirement. *See Fresenius* Opinion (DTX-114) at 55-56. Nor are any asserted claims like the ones in *Ariad*, which were directed towards a "vast scope of [] generic claims" that covered "any compound later actually invented and determined to fall within the claim's functional boundaries." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353, 1358 (Fed. Cir. 2010).

B. **Azurity Will Fail to Show by Clear and Convincing Evidence That the Asserted Claims are Not Sufficiently Enabled**

The Court will also hear Azurity and Dr. Amiji argue the asserted claims are purportedly not enabled because a POSA would still have required undue experimentation to practice any emulsifier concentration outside of 13 to 15 wt/wt % and/or an aprepitant-to-emulsifier ratio outside of 18:1-22:1. As with written description, and for essentially similar reasons, this is wrong on the facts and misapprehends the law.

Azurity will again fail to meaningfully consider the specification as a whole. Instead, Azurity focuses on discounting the four worked examples according to a misplaced theory that enablement requires examples across the entire claim scope. The Court will hear Dr. Amiji discuss prior art regarding the effect of emulsifiers on emulsion stability that are not applicable

- 11 -

in view of the asserted claims and the specification's detailed disclosures. Azurity will identify no concrete evidence—let alone clear and convincing evidence—that a POSA would need to engage in undue experimentation to practice the asserted claims by following the teachings of the specification. And just as for written description, Dr. Amiji and Azurity will also err in focusing on the prior art to the exclusion of the teachings of the specification as a whole. *Pharmacyclics LLC v. Alvogen Pine Brook LLC*, 556 F. Supp. 3d 377, 406 (D. Del. 2021) ("'[T]he specification as a whole must be considered in determining whether the scope of enablement provided by the specification is commensurate with the scope of the claims.'" (quoting *Application of Johnson*, 558 F.2d 1008, 1017 (C.C.P.A. 1977))).

Regardless, as with written description, Dr. Little will explain that the specification's clear disclosure of, *inter alia*, increasing the emulsifier concentration to "greater than . . . 13 wt/wt % . . . but less than . . . 20 wt/wt %" ('520 patent (JTX-3) at 11:8-14) and using an emulsifier-to-aprepitant ratio of "about . . . 20:1 to 25:1" (*id*. at 14:23-28) while following the step-by-step tutorial described above (*id*. at 10:13-15:46) would have enabled a POSA to make and use the claimed emulsions without undue experimentation. Dr. Little will also show the Court how each of the specification's four worked examples was actually made and tested by following these same steps, putting to rest any lingering doubt for a POSA that they could also be made to work—without undue experimentation—when modified to include other emulsifier concentrations from the claimed range. Indeed, the specification itself calls Heron's steps "conventional manufacturing procedures" (*id*. at 13:16-21) and acknowledges that "[a] skilled practitioner could combine these materials in a different order and using different processing equipment to achieve the desired end result" (*id*. at 13:62-64). In particular, as noted for written description, the disclosure includes step-by-step instructions for a POSA attempting to practice

- 12 -

the claimed emulsions that teach exactly how to test whether the emulsions he or she makes are "physically stable," as required by claim 8 of the '520 patent.

*Alcon* is once again instructive, this time to show that the experimentation, if any, required for a POSA to practice the asserted claims is not undue. *See Alcon*, 745 F.3d at 1188-90. Dr. Amiji's take on this issue is particularly puzzling when it would have been simple to make the formulations and run a mere seven-day test for physical stability. The Court will see that, according to the specification's description of testing for compliance with USP <729> and visible-crystal evaluation, such stability tests would be relatively quick and easy for a POSA to conduct. ('520 patent (JTX-3) at 15:12-37.) Additionally, it will not be enough for Azurity to simply argue that inoperable embodiments *might* exist based on generalized statements about emulsifier concentration that do not apply in view of the specification's detailed disclosures. *See id*. That is hardly clear and convincing evidence sufficient to prove Azurity's lack-of-enablement defense.

Azurity will fail to explain why a POSA would be unable to practice the asserted claims without undue experimentation in view of the specification. Azurity's reliance on the prior art over the specification is inappropriate where the patents-in-suit specifically overcame the failures in the prior art and explained in great detail just how they did so. Once again, Azurity is wrong on the facts and imposes unduly demanding, legally incorrect standards to try to limit the asserted patents only to their actual examples, despite the specification's robust disclosure.

**C.     Relevant Evidence of Azurity's Own Work Will Demonstrate Why Azurity's Defenses Must Fail**

Consistent with the above analysis, the Court will also hear how Azurity's own scientists implemented and practiced the asserted patents. This is direct evidence that scientists could prepare aprepitant emulsions across the claimed emulsifier range without undue experimentation.

*See Atlas Powder Co. v. E.I. du Pont de Nemours Co.*, 750 F.2d 1569, 1572, 1577 (Fed. Cir. 1984) (considering the defendants' own post-priority research when assessing enablement); *see also Bd. of Trs. of Leland Stanford Junior Univ. v. Chinese Univ. of Hong Kong*, 860 F.3d 1367, 1378 (Fed. Cir. 2017) (post-filing evidence of art-related facts existing on the filing date may be considered in the written description analysis); *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987) (same for the enablement analysis).

The Court will see that Azurity's scientists prepared a document named ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*Compare* "▇▇▇▇▇▇▇▇" (PTX-76), *with* '229 patent (JTX-4) at 16:1-21:6; Email from A. Dubewar to R. Bhise, dated Nov. 16, 2017 (PTX-75); JTX-4.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (*Compare* Azurity ANDA Submission (PTX-65), *with* '229 patent (JTX-4) at 17:19-33.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (*See* "Impact of Lecithin Content on the Finished Product" (PTX-68).)  The Court will hear how Azurity observed no material differences between these emulsions.  Azurity then proceeded with an aprepitant emulsion with a ▇▇▇▇▇▇▇▇▇▇▇ for its Section 505(b)(2) application, representing to the FDA that this proposed product ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, which has 14.3 wt/wt % egg lecithin.  (*E.g.*, Azurity Basis for Submission (PTX-72).)

The Court will also hear how Azurity scientists, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, had confidence in formulating stable emulsions with 5 to 25 wt/wt % emulsifier for another drug

- 14 -

called meloxicam. (*E.g.*, '008 Patent (PTX-60) at Claim 2.) Among other things, this undermines Azurity's assertion that a POSA reading the patents-in-suit would be concerned that using more than 13 to 15 wt/wt % emulsifier would yield unfavorable droplet size, such as through coalescence—a process that does not implicate the ease or difficulty of solubilizing the emulsion's particular active ingredient. It likewise undermines Azurity's argument that a POSA would have seen no value in the specification beyond the four worked examples. Rather, the Court will hear how Azurity's scientists ███████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████. Indeed, ██████████████████████████ ██████████████████████████████████ that specification in its own meloxicam patents. Azurity copied almost exactly one of the examples in Heron's patents, as well as entire portions of Heron's patent specification—including identical manufacturing parameters throughout, such as stirring speed, stirring time, and temperatures. (Little Appendix (PTX-80); *compare* '229 patent (JTX-4) at 2:59-67, 7:63-8:4, 16:6-36, *with* '008 patent (PTX-60) at 3:34-43, 6:50-59, 13:17-46.)

IV. **CONCLUSION**

The Court will see that, at every step, Azurity will misapprehend the law and the facts of this case. The specification is the "hallmark" of the written description and enablement analyses, but Dr. Amiji will at times ignore it in favor of the prior art and at others focus too narrowly on its worked examples, failing to appreciate the document as a whole. As Dr. Little will explain, a proper analysis considering all available evidence shows why each of Azurity's arguments fail. Azurity will be unable to meet its heavy burden of showing by clear and convincing evidence that the asserted claims lack written description or are not enabled.

Dated: November 14, 2025

*Of Counsel*:

Isaac S. Ashkenazi
Mark Russell Sperling
Stephen W. Kruse
Sydney E. Bruns
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Karthik R. Kasaraneni
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036

By: s/ *Jeremy A. Tigan*
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
jtigan@morrisnichols.com

*Attorneys for Plaintiff
Heron Therapeutics, Inc.*

- 16 -