# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HERON THERAPEUTICS, INC.,  )
          )
    Plaintiff,   )
          )
          ) C.A. No. 24-1363 (WCB)
   v.      )
          )
AZURITY PHARMACEUTICALS, INC., )
AZURITY PHARMACEUTICALS INDIA )
LLP F/K/A SLAYBACK PHARMA INDIA ) REDACTED - PUBLIC VERSION
LLP, AND SLAYBACK PHARMA LLC, )
          )
    Defendants.  )

## HERON'S OPENING POST-TRIAL BRIEF

## <u>CLAIMS AT ISSUE</u>

### U.S. Patent No. 12,290,520:  Claim 8

1. An injectable emulsion, comprising:
> aprepitant;
> 13 wt/wt % to 20 wt/wt % of an egg lecithin;
> 9 wt/wt % to 10 wt/wt % of soybean oil;
> a co-emulsifier which is an alcohol, wherein the alcohol is present in the emulsion at less than 10 wt/wt %;
> a tonicity modifier;
> a pH modifier, wherein the pH modifier is sodium oleate;
> and water;
> wherein the ratio of egg lecithin to aprepitant is between about 20:1 to 25:1;
> wherein the pH of the emulsion ranges from about 7.5 to 9.0; and,
> wherein the emulsion is physically stable.

7. The emulsion of claim 1, wherein the alcohol in the emulsion is ethanol.

**<u>8.</u>** The emulsion of claim 7, wherein the ethanol is present in the emulsion at a concentration of about 2 wt/wt % to 3 wt/wt %.

### U.S. Patent No. 12,155,255:  Claims 5 and 23

1. An injectable emulsion, comprising:
> 0.7-0.8 wt % aprepitant;
> 13 wt/wt % to 20 wt/wt % of an emulsifier;
> an oil;
> a co-emulsifier which is an alcohol;
> a tonicity modifier;
> a pH modifier;
> and water;
> wherein the pH of the emulsion ranges from about 7.5 to 9.0.

**<u>5.</u>** The emulsion of claim 1, wherein the emulsifier is an egg lecithin.

14. The emulsion of claim 1, wherein the alcohol in the emulsion is ethanol.

16. The emulsion of claim 14, wherein the ethanol is present in the emulsion at a concentration of about 2 wt/wt % to 3 wt/wt %.

19. The emulsion of claim 16, wherein the sucrose is present at a concentration of about 5 wt/wt %.

21. The emulsion of claim 19, wherein the sodium oleate is present at a concentration of about 0.4 wt/wt % to 0.5 wt/wt %.

**<u>23.</u>** The emulsion of claim 21, wherein the phospholipid is an egg lecithin.

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................. 1
II.    NATURE AND STAGE OF THE PROCEEDINGS ......................................... 3
III.   BACKGROUND ................................................................................................. 3
       A.    The State of the Art Before the Patents-in-Suit ...................................... 3
       B.    Heron's Research and the Inventions of the Patents-in-Suit ................... 5
       C.    The Disclosure of the Patents-in-Suit ..................................................... 7
       D.    The Patents-in-Suit Changed the State of the Art ................................. 10
             1.    Prior-Art Concerns with High Emulsifier No Longer an Issue in the
                   Disclosed Range ............................................................................ 10
             2.    Azurity's Proposed Product ........................................................... 11
IV.    LEGAL STANDARDS ..................................................................................... 13
       A.    Written Description ................................................................................ 13
       B.    Enablement ............................................................................................ 14
V.     AZURITY FAILED TO PROVE THE ASSERTED CLAIMS LACK WRITTEN
       DESCRIPTION OR ENABLEMENT SUPPORT ............................................ 15
       A.    Azurity Did Not Show That a POSA Would Ignore the Express Disclosures of
             the Specification .................................................................................... 15
             1.    The Specification's Disclosures Are Specific, Not "Generic" ............ 15
             2.    The Patent Examples Provide Extensive Additional Description and
                   Guidance for Using 13 to 20 wt/wt % Egg Lecithin ...................... 18
             3.    The Prosecution History Does Not Show a More Limited Invention ........ 21
             4.    Dr. Amiji Offered No Specific Opinions About Other Claim Elements ........... 22
       B.    Azurity Cannot Show That Unpredictability Precludes Written Description or
             Enablement ............................................................................................ 25
             1.    Azurity Cannot Meet Its Burden for the '255 Patent ......................... 26
             2.    Dr. Amiji Alleges Unpredictability Based on an Outdated Prior-Art
                   Concern That Does Not Apply to the Claimed Range ...................... 26
             3.    The Quantity and Duration of Experimentation Required to Practice the
                   Asserted Claims Is Not Undue ....................................................... 29
       C.    Real-World Evidence Is Consistent with Written Description and Enablement ....... 32
             1.    Heron Created Stable Emulsions with 18 wt/wt % Egg Lecithin ............. 32
             2.    The Azurity Proposed Product's Development History and Variability
                   Corroborate Written Description and Enablement ............................ 33
             3.    Azurity's Meloxicam Patent Corroborates Written Description and
                   Enablement .................................................................................. 35
VI.    CONCLUSION ................................................................................................. 39

# TABLE OF AUTHORITIES

**Cases**                                                                               **Page(s)**

*Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.,*
   745 F.3d 1180 (Fed. Cir. 2014) .................................................................. *passim*

*Allergan USA, Inc. v. MSN Laboratories Pvt. Ltd.,*
   111 F.4th 1358 (Fed. Cir. 2024) ....................................................................14

*Allergan Sales, LLC v. Sandoz, Inc.,*
   717 F. App'x. 991 (Fed. Cir. 2017) ...............................................................14

*Atlas Powder Co. v. E.I. du Pont de Nemours & Co.,*
   750 F.2d 1569 (Fed. Cir. 1984) ...............................................14, 29, 30, 34

*Bayer Healthcare LLC v. Baxalta, Inc.,*
   989 F.3d 964 (Fed. Cir. 2021) .......................................................................24

*Bd. of Trs. of Leland Stanford Junior Univ. v. Chinese Univ. of Hong Kong,*
   860 F.3d 1367 (Fed. Cir. 2017) ....................................................................33

*Capon v. Eshhar,*
   418 F.3d 1349 (Fed. Cir. 2005) ....................................................................13

*Cordis Corp. v. Medtronic AVE, Inc.,*
   339 F.3d 1352 (Fed. Cir. 2003) ....................................................................14

*Endo Pharms. Inc. v. Mylan Pharms. Inc.,*
   No. 11-cv-717 (RMB), 2014 WL 334178 (D. Del. Jan. 28, 2014) ...............28

*Falko-Gunter Falkner v. Inglis,*
   448 F.3d 1357 (Fed. Cir. 2006) .............................................13, 14, 18, 30

*Gould v. Quigg,*
   822 F.2d 1074 (Fed. Cir. 1987) ....................................................................34

*Hybritech Inc. v. Monoclonal Antibodies, Inc.,*
   802 F.2d 1367 (Fed. Cir. 1986) ....................................................................14

*Irise v. Axure Software Sols., Inc.,*
   No. CV08-03601 SJO, 2009 WL 3615075 (C.D. Cal. Sept. 11, 2009) ...............23

*Johns Hopkins Univ. v. CellPro, Inc.,*
   152 F.3d 1342 (Fed. Cir. 1998) ..............................................................2, 14, 29

*Pfizer Inc. v. Teva Pharms. USA, Inc.,*
   555 F. App'x 961 (Fed. Cir. 2014) ..........................................................13, 30

*Pharmacyclics LLC v. Alvogen, Inc.*,
    No. 21-2270, 2022 WL 16943006 (Fed. Cir. Nov. 15, 2022) ................................................26

*Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*,
    714 F.Supp.3d 652 (N.D.W. Va. 2023) ....................................................................24, 31

*Unicorn Energy AG v. Tesla Inc.*,
    740 F. Supp. 3d 930 (N.D. Cal. 2024) ....................................................................23

*Union Oil Co. of Cal. v. Atlantic Richfield, Co.*,
    208 F.3d 989 (Fed. Cir. 2000)................................................................................26

*Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018)..............................................................................13

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988) ........................................................................14, 32

**Statutes**

35 U.S.C. § 112 ............................................................................................................3

## TABLE OF ABBREVIATIONS

| Abbreviation | Term |
|---|---|
| '229 patent | U.S. Patent No. 9,561,229 |
| '255 patent | U.S. Patent No. 12,155,255 |
| '520 patent | U.S. Patent No. 12,290,520 |
| asserted claims | claim 8 of the '520 patent and claims 5 and 23 of the '255 patent |
| asserted patents | '520 patent and '255 patent |
| Azurity | Azurity Pharmaceuticals, Inc., Azurity Pharmaceuticals India LLP f/k/a Slayback Pharma India LLP, and Slayback Pharma LLC |
| Azurity Proposed Product | Azurity's generic version of CINVANTI®, subject of 505(b)(2) NDA No. 218754 |
| CINV | chemotherapy-induced nausea and vomiting |
| CN845 | Chinese Patent Publication No. CN102379845 |
| Heron | Heron Therapeutics, Inc. |
| meloxicam patent | U.S. Patent No. 11,040,008 |
| NDA | New Drug Application |
| patents-in-suit | '520 patent and '255 patent |
| POSA | person of ordinary skill in the art |
| Zhou 2012 | Zhou et al., *Preparation of Aprepitant Emulsion for Intravenous Injection*, 43 CHINESE J. OF PHARMACEUTICALS, 1003 (2012) |

## I.    INTRODUCTION

Heron's invention of the first physically stable aprepitant emulsions was a paradigm shift in the field of emulsion sciences.  The prior art was focused on emulsifier ranges below 10 wt/wt %, and even then could not obtain a physically stable aprepitant emulsion.  Through many experiments and out-of-the-box thinking, Heron determined the upper bound of egg lecithin in its inventive emulsion to be 20% and disclosed that finding to the world in exchange for patent protection. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Despite this and other real-world evidence, Azurity now argues that the field was so unpredictable that the asserted patents' disclosures should be ignored.  Azurity's presentation, however, does not clearly and convincingly overcome the presumption that the specification adequately describes and enables the asserted claims.

The specification expressly discloses aprepitant emulsions with the claimed 13 to 20 wt/wt % egg lecithin, provides step-by-step instructions for how to make and use them, and reports physically stable examples with 11.7, 13.6, 13.8, and 14.3 wt/wt % egg lecithin.  It even explicitly instructs POSAs to modify these examples to utilize the remainder of the up to 20 wt/wt % claimed range.  Azurity does not dispute that a POSA could easily follow the specification's conventional manufacturing steps.  That ends the inquiry—particularly for the '255 patent, which claims emulsions defined only by their components, not any "physically stable" requirement.

Unable to escape these clear disclosures, Azurity tried to side-step them.  *First*, it argued the specification's egg lecithin disclosures are "generic," without explaining what that means, or why that would drive a POSA to dismiss the full scope of the disclosed range.  There is nothing

1

"generic" about the asserted patents' narrow and highly specific disclosed ingredients, ranges, ratios, and instructions, particularly where the specification and working examples provide additional description of the claimed emulsions and how to make them.  *Second*, Azurity set up a strawman by asserting that Heron told the Patent Office during prosecution of a related patent that it possessed only emulsions with 13 to 15 wt/wt % egg lecithin.  But the statements Azurity pointed to merely distinguished that application's then-pending claims from *lower* amounts in the prior art and said nothing at all about higher amounts.

*Third*, Azurity insinuated during trial that the non-egg lecithin claim limitations are so broad as to preclude written description and enablement.  But Heron's expert Dr. Steven Little, corroborated by the inventors, explained that a POSA would see the asserted claims as narrow and specific.  He explained that a POSA would be more than adequately guided by (i) their high level of skill in the art, (ii) their ability to use the working examples as "reference points" for modification, (iii) the use of only standard ingredients in the asserted claims, and (iv) the specification's disclosure of ranges for these ingredients.  Azurity's expert, Dr. Mansoor Amiji, meanwhile, offered no contrary, non-conclusory testimony.

*Finally*, Azurity cites the prior-art concern that increasing emulsifier could decrease stability to suggest that a POSA would not know whether the upper end of the claimed range works without making and testing such emulsions.  But Dr. Little explained why a POSA would understand from the specification that this prior-art concern does not apply to the claimed range, and Dr. Amiji offered no other reason a POSA would disbelieve the patents' disclosure.  And even if the field was so unpredictable (it was not), only *undue* experimentation can support lack of enablement, not the mere need to make, test, or optimize.  *See Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998); *Alcon Rsch. Ltd. v. Barr Lab'ys, Inc.*, 745

F.3d 1180, 1189 (Fed. Cir. 2014).

Azurity's position is nothing more than a demand for more working examples in the claimed range, despite an already-robust disclosure that using 13 to 20 wt/wt % egg lecithin produces physically stable aprepitant emulsions. That is inconsistent with the law. *E.g.*, *Alcon*, 745 F.3d at 1189-90 ("There is no requirement that the disclosure contain either examples or an actual reduction to practice.").[1] Heron respectfully requests that the Court reject Azurity's written description and enablement challenges and find in favor of Heron.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Heron's CINVANTI® product is indicated for prevention of CINV. Azurity developed the Azurity Proposed Product, a generic version of CINVANTI®, filing 505(b)(2) New Drug Application No. 218754 and prompting Heron to file this patent infringement suit. Azurity has stipulated that the Azurity Proposed Product infringes the asserted claims. (D.I. 112, ¶ 1.) The priority dates of the '520 and '255 patents are September 19, 2014 and February 1, 2016, respectively. Azurity challenges written description and enablement of the asserted claims under 35 U.S.C. § 112. (D.I. 157 at 5.) A bench trial was held November 17-18, 2025.

## III.    BACKGROUND

### A.    The State of the Art Before the Patents-in-Suit

In 2014, before Heron filed the applications for the patents-in-suit, "emulsions ha[d] been around for a long period of time" (Tr. at 495:19-21 (Little)) and "[e]mulsion science itself was fairly well established" (Tr. at 494:17-495:18, 560:16-22 (Little)). There were "a number of formulations that were being used with humans," including "a couple of FDA-approved

---

[1]  For convenience, unless otherwise noted, all emphases have been added and all internal citations and quotations have been omitted.

formulations" and "a number of other emulsion-based formulations . . . that had to do with . . . parenteral nutrition." (*Id.*) "And the science behind [emulsions] and understanding of what's going on with the chemistry and the ingredients, those were pretty well established." (*Id.*)

But "there was not a stable aprepitant emulsion that was known in the prior art" (Tr. at 495:22-496:5 (Little)) because "the conventional understanding was that . . . generally the low single digits" of emulsifier was "the region of stability" for an oil-in-water emulsion (Tr. at 496:6-497:12 (Little)). This remained the understanding for aprepitant emulsions in particular, even after Chinese scientist Wei Zhou and colleagues disclosed high-single digit amounts of emulsifier (up to 10 wt/wt %) with aprepitant in CN845, filed November 2011 and published in 2012. (Tr. at 497:2-499:7, 499:24-500:8 (Little); JTX-27.13 at ¶¶ 8-9.) That is because such emulsions were still not physically stable.[2] And later in 2012, Zhou reported a multivariate optimization of his aprepitant emulsions in Zhou 2012. (Tr. at 499:9-22 (Little); JTX-28.) Zhou's optimization relied on two well-known, prior-art techniques called "single factor experiment" and "orthogonal design," which allow POSAs to optimize a multi-component formulation for a given parameter—in Zhou's case, "the centrifugal stability constant ($K_e$)." (Tr. at 500:9-502:6, 502:16-23, 560:23-561:13 (Little); JTX-28.3 ("The smaller the *Ke*, the more stable the emulsion. . . . [T]he size of *Ke* in each group is investigated[.]").) This let Zhou do only a "very . . . small number of experiments . . . to look at [the] space" and ultimately determine that 2.5 wt/wt % was the optimal amount of egg lecithin. (Tr. at 500:9-502:6 (Little).) But like Example 4, the asserted patents' Example 5 showed that even this "optimized" single-digit formulation was not physically stable. (Tr. at 502:24-503:19, 496:20-22 (Little); Tr. at

---

[2] CN845 provided no stability data (Tr. at 500:5-8 (Little)), but the asserted patents' Example 4 shows that even the top end of CN845's range, 9.95 wt/wt %, was not physically stable (Tr. at 502:24-503:19 (Little); 267:1-3, 318:12-319:2, 352:14-23 (Amiji); 218:8-16 (Ottoboni)).

267:1-3, 318:12-319:2 (Amiji).)

That Zhou's aprepitant emulsion optimization led back to a low-single digit amount aligned with contemporary teachings of the broader emulsion prior art at the time. It was understood that increasing the emulsifier concentration beyond the low single digits could decrease stability, as the emulsifier molecules could self-assemble into micelles and, in turn, drive instability mechanisms such as depletion-based flocculation and irreversible coalescence. (Tr. at 252:19-23 (Amiji); Tr. at 507:17-508:23, 517:11-518:24, 521:13-522:19 (Little); JTX-25.4 (explaining flocculation—"the precursor of coalescence"—is driven by excess surfactant forming micelles, and the instability caused by the resulting "depletion effect"), .5 ("A concentration window existed, out of which the emulsion stability is quickly declined. . . . At high emulsifier concentration[3] emulsion instability occurs because of rapid coalescence[.]"); DTX-62 at 216 ("Excess surfactant molecules will tend to self-associate, forming micellar or lamellar structures, which may compromise the effectiveness of the emulsion"), 219 ("Increase in surfactant concentration" has the "[p]robable [e]ffect" of "[i]ncrease in nonemulsion components (namely, micelles, liposomes).").)[4]

## B.    Heron's Research and the Inventions of the Patents-in-Suit

What the inventors discovered and disclosed in the asserted patents is a zone of stability for aprepitant emulsions, unknown to the prior art, that could be achieved by, *inter alia*, increasing emulsifier content above the prior art 10 wt/wt %. (Tr. at 496:6-497:12, 503:20-

---

[3] The article cited in JTX-25 for this statement describes an "optimal" concentration of surfactant to be 0.5% in the studied emulsion when examined over a range of 0.25-2.00%. Gonglun Chen & Daniel Tao, *An Experimental Study of Stability of Oil-Water Emulsion*, 86 FUEL PROCESSING TECH. 499, 502 (2005).

[4] For these and other reasons, the prior art did not provide a POSA with any motivation to increase egg lecithin concentration beyond 10 wt/wt %. *See Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*, No. 22-985-WCB, at *40-41 (D. Del. Dec. 3, 2024).

504:10, 522:15-19 (Little); *see also e.g.*, JTX-3 at 11:8-14; *infra*, § III.C.)  But a POSA, reading such a disclosure, would also understand that the inventors' zone of stability must also have an upper bound.  That is, a POSA would know that "you can [still] create an instability by really jacking up [the emulsifier] concentration" even further; for example, "once you get into the 50s . . . you're going to have . . . phase inversion."  (Tr. at 520:4-19 (Little).)

The inventors "conducted many, many experiments . . . to define a region of . . . composition percentages and weights that would provide for a stable formulation of aprepitant in an emulsion."  (Tr. at 184:18-24, 192:14-22, 217:3-10 (Ottoboni).)  Lead inventor Dr. Thomas Ottoboni recalled experimenting with up to at least 17 or 18 wt/wt % emulsifier (Tr. at 217:11-16, 223:17-22 (Ottoboni)) and having it remain "stable for . . . more than seven days."  (Tr. at 233:23-235:1, 224:8-14 ("I know there were formulations that had levels that were in the 17, plus or minus, range that were stable.") (Ottoboni); *see also* DTX-104 at HER_THER_0031857-62 (Heron's 4/17A & 4/17B emulsions).)  And the sum total of the inventors' work gave Dr. Ottoboni confidence that the emulsifier range for this new zone of stability went from over 10 wt/wt % to at least 20 wt/wt %, their "small range" or "little island of stability."  (Tr. at 171:10-16, 195:17-196:7, 238:10-19 (Ottoboni).)[5]  That is what the inventors went on to disclose to the public in the asserted patents:

> [W]e studied a number of compositions, came up with compositions that were in a range -- in a zone of stability and disclosed those, and they have specific ranges of ingredients.

(Tr. at 174:21-175:1, 193:3-15 (Ottoboni).)  Although the inventors' development focus was on

---

[5]  Along the way, the inventors also noticed "a clear trend of decreasing emulsion stability with decreasing amount of . . . egg lecithin" (Tr. at 181:19-21 (Ottoboni) (quoting DTX-116 at 19)), which a POSA would see reflected in the 14.3 wt/wt % emulsifier Example 2 of the asserted patents remaining stable longer than the 13.6 wt/wt % Example 1, 11.7 wt/wt % Example 3, and 13.8 wt/wt % Example 6 (Tr. at 506:16-507:3, 542:8-544:15 (Little); JTX-3 at tbls. 1-3, 6, 7).

the "amounts" of each component required for stability, they also noted and would go on to disclose the ratios between ingredients, which were "simply one component divided by another." (Tr. at 174:7-175:1 (Ottoboni); *see also* Tr. at 175:13-19 (Ottoboni).)

### C.    The Disclosure of the Patents-in-Suit

The "Brief Summary" of the asserted patents' specification[6] describes the invention as a "composition suitable for intravenous administration" with an "oil phase" that "comprises aprepitant, a surfactant, and a co-surfactant" and an "aqueous phase" that "comprises water, a tonicity agent, and a pH-adjusting agent." (JTX-3 at 2:43-54; Tr. at 524:8-525:5 (Little).) It goes on to describe embodiments of stable aprepitant emulsions that use, in particular, the emulsifier egg lecithin as the surfactant at concentrations of about "13 wt/wt %" to "20 wt/wt %," including "17 wt/wt %" and "18 wt/wt %":

> In one embodiment, the composition comprises about 10 wt/wt % to 20 wt/wt %, 12 wt/wt % to 17 wt/wt %, 13 wt/wt % to 16 wt/wt %, 13 wt/wt % to 15 wt/wt %, or 13 wt/wt % to 14 wt/wt % emulsifier. In another embodiment, the composition comprises about 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/wt %, 19 wt/wt % or 20 wt/wt % emulsifier. In another embodiment the emulsifier is a lecithin. In another embodiment the lecithin is an egg yolk lecithin.

(JTX-3 at 2:66-3:7 (annotated); Tr. at 525:16-526:10 (Little).) This section of the specification also discloses embodiments in which, for example, "the ratio of emulsifier to aprepitant (wt %:wt %) in the composition ranges from about . . . 20:1 to 25:1 . . . ." (JTX-3 at 3:43-48; Tr. at 526:12-527:3 (Little).) The specification's "Detailed Description" section likewise

---

[6] The specifications of the '520 and '255 patents (along with other CINVANTI®-related patents like the '229 patent) are the same for relevant purposes. (Tr. at 574:20-22 (Little).) For convenience, Heron generally cites only the '520 patent (JTX-3) herein when referring to the specification, but such citations apply equally to the equivalent portion of the '255 patent (JTX-2), unless otherwise noted.

describes embodiments where, for example, the amount of phospholipid emulsifier, such as egg lecithin, "may be within a range of about . . . 13 wt/wt % to 20 wt/wt %":

> The amount of phospholipids, by weight, in the emulsions of the present disclosure may be within a range of about 10 wt/wt % to about 20 wt/wt %, 11 wt/wt % to 19 wt/wt %, 11 wt/wt % to 15 wt/wt %, 12 wt/wt % to 13 wt/wt %, 13 wt/wt % to 14 wt/wt %, 13 wt/wt % to 20 wt/wt %, or 12 wt/wt % to 18 wt/wt %. In certain embodiments, the phospholipids in the emulsions are at a concentration, by weight, about 11 wt/wt %, 12 wt/wt %, 12.5 wt/wt %, 13 wt/wt %, 13.5 wt/wt %, 14 wt/wt %, 14.5 wt/wt %, or 15 wt/wt %.

(JTX-3 at 9:58-67 (annotated); *id*. at 9:35-57; Tr. at 527:17-528:17 (Little).)

The specification's "Aprepitant Emulsion and Methods of Making" section is a tutorial that explains in detail not just which egg lecithin amounts and egg lecithin-to-aprepitant ratios to use, but also step-by-step instructions for how to use "conventional manufacturing procedures" to make, filter, and analyze the claimed emulsions. (JTX-3 at 13:16-21, 10:14-15:46; Tr. at 560:16-22 (Little); Tr. at 342:3-24, 345:10-346:4 (Amiji).) Dr. Little explained that the specification guides a POSA through, *inter alia*, (1) making the oil phase of the emulsion, (2) making the aqueous phase of the emulsion, (3) mixing the two phases to obtain the emulsion, (4) filtering the emulsion, and (5) measuring stability, including the specific instruments and conditions to use along the way. (JTX-3 at 10:14-15:46; Tr. at 530:5-14 (Little).)

In particular, the "Methods of Making" tutorial explains that the first step is to make the oil phase by mixing aprepitant and an emulsifier, such as the phospholipid emulsifier egg lecithin. It discloses that its method can be used to make the emulsions of inventive Examples 1, 2, 3, and 6 and variations of those examples where the egg lecithin is "added to a concentration of greater than . . . 13 wt/wt % of the emulsion but less than . . . 20 wt/wt % of the emulsion":

> The aprepitant is first mixed with an emulsifier such as a phospholipid emulsifier. Examples 1, 2, 3 and 6 below describe emulsions made using an egg lecithin. The phospholipid emulsifier is added to a concentration of greater than 10 wt/wt %, 11 wt/wt %, 12 wt/wt % or 13 wt/wt % of the emulsion but less than 15 wt/wt %, 17 wt/wt % or 20 wt/wt % of the emulsion.

(JTX-3 at 11:8-14; *id.* at 10:14-15:46; Tr. at 531:9-24, 533:7-12 (Little); *id.* at 530:16-531:8, 534:17-535:5, 535:19-536:2 (Little); *id.* at 345:9-346:20 (Amiji); *id.* at 532:8-533:6 (Little).) The "Methods of Making" likewise describes "vary[ing]" the egg lecithin-to-aprepitant ratio of the disclosed emulsions, including the examples to, *e.g.*, "about . . . 20:1 to 25:1" in the egg lecithin and aprepitant mixing step. (JTX-3 at 14:23-28; Tr. at 536:3-15 (Little).)

As the next step, the specification describes how to "dissolve [this aprepitant and emulsifier mixture] in a co-emulsifier such as short chain alcohol (1 to 6 carbons)," specifically noting that ethanol will be used in the four inventive examples. (JTX-3 at 11:15-21.) The disclosure then explains how to combine the resulting mixture "with the oil, such as soybean oil . . . to produce the oil phase." (JTX-3 at 11:21-24.) In particular, it "says that the oil can be present in an amount . . . like 9 weight percent, 10 weight percent[, a]nd it lists a number of oils . . . that are commonly used in the art." (Tr. at 528:21-530:4, 481:6-20, 490:10-16, 659:11-14, 659:22-25 (Little); JTX-3 at 2:55-65, 10:47-11:7, 11:31-35.) The specification likewise explains that "[t]he aqueous phase is produced by mixing water with the tonicity agent and sodium oleate as the pH modifying agent," identifying sucrose as first among a list of common tonicity agents and, separately, common pH modifiers and target pH ranges. (JTX-3 at 11:58-12:7; Tr. at 479:8-11, 490:24-492:17, 661:19-23 (Little); Tr. at 345:9-14 (Amiji); *see also id.* at JTX-3 at 5:1-20.) The disclosure details how to combine the oil and aqueous phases into an emulsion—down to specific equipment to use and temperatures, times, pressures, and rotations per minute at which to run it—and how to filter the resulting emulsion, describing these steps as "conventional

manufacturing practices."  (JTX-3 at 13:13-14:2; Tr. at 560:16-22 (Little); Tr. at 342:3-24, 343:12-344:12 (Amiji).)  It provides similarly extensive detail on how to measure the stability of the final, filtered composition.  (JTX-3 at 15:21-38; Tr. at 537:3-9 (Little).)

Examples 1, 2, 3, and 6 provide the specific implementations of the "Methods of Making" steps that were used to make and analyze each example, including specific equipment, temperatures, and other conditions (*e.g.*, JTX-3 at 16:9-18:20, 19:37-20:32; Tr. at 530:5-14, 536:16-537:5 (Little)), and also details how each example's stability was evaluated (*e.g.*, JTX-3 at 14:57-15:38, 20:36-21:10; Tr. at 537:5-9 (Little)).  Examples 1, 2, 3, and 6 include 13.6, 14.3, 11.7, and 13.8 wt/wt % egg lecithin, respectively, and a 20:1 egg lecithin-to-aprepitant ratio. (JTX-3 at 16:1-20:33; *e.g.*, Tr. at 220:18-221:12, 222:15-16 (Ottoboni); Tr. at 542:25-543:11; 647:24-648:2 (Little); Tr. at 290:20-292:18, 301:19-23 (Amiji).)  While the 11.7, 13.6, and 13.8 wt/wt % examples showed two months of physical stability, the 14.3 wt/wt % example remained physically stable for three months.  (JTX-3 at 20:36-21:10; Tr. at 543:12-544:15; 506:18-507:3, 517:11-20 (Little).)  By contrast, the specification also reported that the prior art compositions tested in Example 4 (made according to CN845) and Example 5 (corresponding to the optimized emulsion of Zhou 2012) were not physically stable.  (JTX-3 at 18:23-19:34; Tr. at 502:24-503:19 (Little); Tr. at 267:1-3, 318:12-319:2 (Amiji); Tr. at 218:8-16 (Ottoboni).)

### D.     The Patents-in-Suit Changed the State of the Art

#### 1.     Prior-Art Concerns with High Emulsifier No Longer an Issue in the Disclosed Range

At trial, in the context of the prior art, Dr. Amiji asserted:  "If you have too much emulsifier, that's also bad because you're now going to create a separate component with emulsifiers that are aggregated by themselves and create micelles.  And that also could destabilize the emulsion."  (Tr. at 252:6-23 (Amiji).)  The asserted patents' disclosure, however,

provided a POSA an entirely new frame of reference for aprepitant emulsions from which the POSA would understand that "the scientific basis [(*i.e.*, micelles)] that is being used [in the prior art] for why[,] when you go up [in emulsifier], you would have a problem is now gone." (Tr. at 508:24-509:8 (Little).) It clearly showed that the inventors had made physically stable emulsions, including Example 2 with 14.3 wt/wt % egg lecithin. (JTX-3 at 16:59-17:38, 20:36-21:10; Tr. at 319:3-16 (Amiji).) A POSA would have understood that, in the asserted patents' disclosed egg lecithin range, including 14.3 wt/wt %, "[y]ou would have had those [micelle] structures already," and "[n]one of the reasons that are provided in the prior art deal with a situation where now you already have those structures, and you have stability." (Tr. at 508:24-509:8 (Little).) In other words, "you're well past the point where you have those micelles," and "[t]he mechanisms that are described in the prior art as being of concern, when you're starting at 1.2 or 2 percent going up, are not the concerns you have now because you have a different region of stability." (Tr. at 522:7-19 (Little).) From the asserted patents' disclosure, a POSA would "know [the micelles] aren't causing instability" at 14.3 wt/wt %, "[a]nd, in fact, as you add more [emulsifier], it's getting more stable." (Tr. at 522:20-523:5 (Little).)

### 2.    Azurity's Proposed Product



(Tr. at 441:6-442:23, 414:21-415:15 (testifying as Azurity's corporate designee on development of the Azurity Proposed Product) (Dubewar);



████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

## IV.    LEGAL STANDARDS

### A.    Written Description

To prove lack of written description, a challenger must show, by clear and convincing evidence, that the specification fails to "reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Vanda Pharms. Inc. v. West-Ward Pharms. Int'l Ltd*., 887 F.3d 1117, 1136 (Fed. Cir. 2018); *see also Alcon*, 745 F.3d at 1191 ("[W]ritten description is about whether the skilled reader of the patent disclosure can recognize that what was claimed corresponds to what was described[.]").  "[I]t is unnecessary to spell out every detail of the invention in the specification[.]" *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357, 1366-68 (Fed. Cir. 2006).  The necessary description "varies with the nature and scope of the invention at issue, and with the scientific and technologic knowledge already in existence." *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).

"There is no requirement that the disclosure contain either examples or an actual reduction to practice[.]" *Alcon*, 745 F.3d at 1190; *see also Falko-Gunter*, 448 F.3d at 1366 ("[E]xamples are not necessary to support the adequacy of a written description[.]").  In particular, "[a] claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language." *Falko-Gunter*, 448 F.3d at 1366; *Pfizer Inc. v. Teva Pharms. USA, Inc.*,

555 F. App'x 961, 968 (Fed. Cir. 2014) (nonprecedential) ("[W]ritten description does not require inventors, at the time of their application for a patent, to reduce to practice and be in physical possession of every species . . . of a genus . . . claim."). Rather, "[e]ven a single representative embodiment can support written description of a claimed genus." *Allergan Sales, LLC v. Sandoz, Inc.*, 717 F. App'x. 991, 995 (Fed. Cir. 2017) (nonprecedential). Thus, a specification need not "describe . . . every conceivable and possible future embodiment of [the] invention." *Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003). At the same time, "[a] specification's focus on one particular embodiment . . . cannot limit the described invention where that specification expressly contemplates other embodiments." *Allergan USA, Inc. v. MSN Lab'ys Pvt. Ltd.*, 111 F.4th 1358, 1374 (Fed. Cir. 2024).

### B.    Enablement

To prove lack of enablement, a challenger must show, by clear and convincing evidence, that the specification as a whole fails to teach a POSA how to make and use the claimed invention without undue experimentation, as of the filing date. *See In re Wands*, 858 F.2d 731, 735-37 (Fed. Cir. 1988). Even "a considerable amount of experimentation is permissible, if it is merely routine, or if the specification . . . provides a reasonable amount of guidance." *Johns Hopkins*, 152 F.3d at 1360. "[A] patent need not teach, and preferably omits, what is well known in the art." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986); *Falko-Gunter*, 448 F.3d at 1365.

"Even if some of the claimed combinations [are] inoperative, the claims are not necessarily invalid. It is not a function of the claims to specifically exclude possible inoperative substances." *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 750 F.2d 1569, 1576-77 (Fed. Cir. 1984); *Alcon*, 745 F.3d at 1189 ("[A] patent does not need to guarantee that the invention works.") Instead, "clear and convincing evidence" must show "that the prophetic examples

14

together with other parts of the specification are *not* enabling." *Alcon*, 745 F.3d at 1189-90.

## V.    AZURITY FAILED TO PROVE THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION OR ENABLEMENT SUPPORT

Despite the different legal standards, Azurity's trial presentation relied on the same evidence and arguments for both written description and enablement.  As such, Heron addresses both defenses together, but, where relevant, applies the proper standard to each defense.

### A.    Azurity Did Not Show That a POSA Would Ignore the Express Disclosures of the Specification

#### 1.    The Specification's Disclosures Are Specific, Not "Generic"

Dr. Amiji began by arguing that the asserted patents do not support using more than 15 wt/wt % emulsifier, and that any reference to greater than 15 wt/wt % emulsifier in the specification is simply a "generic disclosure" that does not convey possession or enablement of the asserted claims.[7]  (Tr. at 326:4-10 (agreeing that "14.3 is good enough to loop in 15 percent"), 330:4-332:8 (Amiji).)

Regarding written description, Dr. Amiji dismissed the specification's repeated express recitation of the claimed ranges of "13 wt/wt % to 20 wt/wt %" and "about 20:1 to 25:1" (*supra*, § III.C) as mere "generic" or "general" disclosures.  (Tr. at 278:3-14, 279:6-14, 279:18-280:7, 298:11-14, 299:17-300:11, 301:19-302:8 (Amiji).)[8]  But Dr. Amiji never explained in a non-

---

[7] Dr. Amiji's position on the disclosure's upper limit is unclear.  At first, he was adamant that "there's no evidence to show that anything greater than 14.3 [wt/wt %] works[.]" (Tr. at 300:18-20.)  When the Court questioned if that was really his position, Dr. Amiji switched to 15 wt/wt %.  (Tr. at 326:4-10 (Amiji).)  But he then refused to agree that 14.4 wt/wt % was included, reverting to a 14.3 wt/wt % limit (Tr. at 327:19-329:4 (quoting his reply report)), only to switch back to 15 wt/wt % when the Court caught the reversion (Tr. at 330:4-332:8 (Amiji)).

[8] For the claimed ratios in particular, Dr. Amiji did not even step through them before dismissing them as "generic" without explanation.  (Tr. at 301:19-302:8, 305:5-9 (Amiji).)  The only analysis at trial of how a POSA would view the ratio disclosures was offered by Dr. Little, who explained they are sufficient to convey possession of, and enable, the claimed subject matter.  (*E.g.*, Tr. at 526:12-527:3, 536:3-15, 539:17-23, 688:8-12 (Little).)

circular way what makes that disclosure "generic" versus "non-generic" in his mind, or why being "generic" means a POSA would simply ignore such a narrow and specific disclosure. (*See*, *e.g.*, Tr. at 337:21-338:23 (Amiji).)  Dr. Amiji has no basis to call these disclosures "generic."  (Tr. at 523:6-524:4, 532:2-7 ("It looks pretty specific to me."), 588:9-19 (Little).)

It is undisputed that the claimed ranges of "13 wt/wt % to 20 wt/wt %" egg lecithin and "about 20:1 to 25:1" egg lecithin-to-aprepitant are recited multiple times in the specification. (*Supra*, § III.C.)  No more is required to show possession.  *Alcon*, 745 F.3d at 1191 ("[W]ritten description is about whether the skilled reader of the patent can recognize that what was claimed corresponds to what was described[.]").  Dr. Amiji offered no coherent explanation for why a POSA would simply ignore the patent's most novel disclosures when his or her very purpose in reading it would be to understand how Heron had finally achieved stable aprepitant emulsions. (*See* Tr. 316:16-25 (Amiji) (admitting "the inventive contribution of the asserted patents" is "having sufficient emulsion stability compared to the prior art Zhou reference").)  Azurity itself did not ignore those teachings.  (*Supra*, § III.D.2; *infra*, §§ V.C.2-3.)

Dr. Amiji noted that the "Methods of Making" portion of the specification states "greater than  . . . 13 weight/weight percent of the emulsion but less than . . . 20 weight/weight percent of the emulsion."  (Tr. at 347:6-22 (Amiji); JTX-3 at 11:10-14.)  Apparently attempting to avoid this portion of the specification, Dr. Amiji deployed a tortured reading of "greater than 10 wt/wt %, 11 wt/wt %, 12 wt/wt % or 13 wt/wt % of the emulsion but less than 15 wt/wt %, 17 wt/wt % or 20 wt/wt %" as meaning only "greater than 10 wt/wt % . . . but less than 15 wt/wt %."  (Tr. at 347:6-348:2 (Amiji).)  Dr. Amiji did not explain the logic behind, or any basis for, his use of the broadest possible reading for the lower bound (*i.e.*, "greater than 10 wt/wt %") before switching to the narrowest possible reading (*i.e.*, "less than 15 wt/wt %") for the upper bound.  Such a

16

restrictive reading also renders most of the sentence, including "20 wt/wt %," meaningless.  In short, it "doesn't make sense . . . [because] [h]e's ignoring the rest of the sentence."  (Tr. at 532:8-533:6 (Little) ("I don't see how [a POSA] could read this the way that Dr. Amiji does.").)[9] And even accepting Dr. Amiji's untenable reading, he admitted that a 20 wt/wt % upper bound and the claimed "13 wt/wt % to 20 wt/wt %" (JTX-3 at 9:62) are disclosed verbatim by the specification's other so-called "generic" disclosures.  (Tr. at 321:4-9, 338:14-19, 341:9-13, 340:9-341:1 (Amiji).)

Azurity's nonenablement argument is similarly unsound in the face of the asserted patents' express disclosures.  The specification provides detailed instructions on how to use conventional manufacturing techniques to make and test aprepitant emulsions with the claimed 13 to 20 wt/wt % egg lecithin and about 20:1 to 25:1 egg lecithin-to-aprepitant ratio.  (Tr. at 539:17-23 ("[n]o doubt in my mind" that "upon reading the . . . six columns about aprepitant emulsions and methods of making, . . . a POSA would be able to make the claimed emulsions without undue experimentation"), 558:24-559:10 ("[T]here's a lot of guidance," as the specification is "very detailed" with "guidance given . . . at a level that is beyond what I would typically see.") (Little); JTX-3 at 13:13-21.)  Dr. Amiji's conclusory assertions of unpredictability and undue experimentation are not clear and convincing evidence and cannot overcome the presumption of enablement.  (*Infra*, §§ V.B.2-3.)

---

[9]  Dr. Amiji admitted that, when he "did his initial analysis" of this case, he thought there was only one disclosure of 13-20 wt/wt % egg lecithin in the entire specification, and it was not the "greater than 10%" disclosure in the "Methods of Making."  (Tr. at 334:2-335:16, 338:20-339:3, 351:22-24 (Amiji); *see* JTX-1 at 11:51-56 (Detailed Description).)  He now recognizes there are "many" such references to 20 wt/wt % but, even so, has not changed his opinion.  (*Id.*)  This glaring oversight likely explains why Dr. Amiji resorted to an untenable post-hoc reading of the "Methods of Making" disclosure, as it was the only way not to undermine his prior position.

### 2.    The Patent Examples Provide Extensive Additional Description and Guidance for Using 13 to 20 wt/wt % Egg Lecithin

Dr. Amiji's "generic" disclosure arguments, in effect, improperly heightens the written description and enablement standards to require "see[ing] everything in working examples" at every part of the claimed range.  (Tr. 523:8-21 (Little).)  This is contrary to law.  *E.g.*, *Alcon*, 645 F.3d at 1190 ("There is no requirement [for written description] that the disclosure contain either examples or an actual reduction to practice[.]"); *id*. at 1189 ("[A] patentee is not required to provide actual working examples [for enablement.]").  Nor, where there are working examples, must they be spread throughout the entire claimed range.  *Falko-Gunter*, 448 F.3d at 1365-66 ("A claim will not be invalidated on section 112 grounds simply because the embodiments of the specification do not contain examples explicitly covering the full scope of the claim language.").

Here, the asserted patents' examples and specification provide "quite a bit of guidance . . . that would lead someone knowledgeable . . . to make a stable formulation of aprepitant" as claimed.  (Tr. at 176:12-177:1 (Ottoboni); Tr. at 558:24-559:10 (Little) ("[T]he guidance given is at a level that is beyond what I would typically see.  There's a lot of detail about how to make it, pages and pages of detail with a lot of specifics.").)  As Dr. Little explained, there are at least three reasons why the examples provide sufficient written description and enablement support.

*First*, the patent's four working examples show exactly how to make physically stable aprepitant emulsions with 11.7, 13.6, 13.8, and 14.3 wt/wt % and a 20:1 egg lecithin-to-aprepitant ratio.  (Tr. at 505:16-25, 542:8-11, 647:24-649:7, 649:8-11 (Little); Tr. at 177:15-23, 220:18-221:12, 222:11-16 (Ottoboni); Tr. at 290:20-292:18, 301:19-23, 319:8-16 (Amiji).)  Three of these examples fall squarely *within* the claimed 13-20 wt/wt % egg lecithin and "about 20:1 to 25:1" ratio of egg lecithin-to-aprepitant.  (Tr. at 506:18-22 (Little).)  Given "emulsion science is pretty well-established" (Tr. at 560:16-22, 494:17-495:21 (Little)), the specification

and both experts agree only "conventional" methods are needed to make the disclosed formulations (*id.*; Tr. at 342:19-24 (Amiji); JTX-3 at 13:16-21), and the undisputed "high" level of skill in the art (Tr. at 562:2 (Little); *see* Tr. at 457:3-458:25, 459:1-7 (Little); Tr. 10:10-11:10, 261:19-22 (Amiji)), the specification plainly conveys to a POSA possession of 13-20 wt/wt % emulsions and how to make and use them (*e.g.*, Tr. at 685:11-21, 539:17-23 (Little)).

*Second*, the working example with the most emulsifier also had the most stability—Example 2, with 14.3 wt/wt % egg lecithin, was physically stable for three months, while the other three examples, with 11.7, 13.6, and 13.8 wt/wt %, were physically stable for two months. (Tr. at 506:16-507:3, 517:11-20, 542:8-544:15, 583:9-584:10 (Little).)  From that, a POSA would understand that "[w]hen you go up in the concentration" within the disclosed range, "you see better stability."  (Tr. at 544:6-15 (Little).)  In other words, a POSA reading the specification—and learning for the first time about the dynamics of this "different region of stability" (*supra*, § III.B)—would understand this trend to apply generally over the specification's disclosed range.

In that regard, the disclosure's literal 20 wt/wt % upper bound becomes important.  The inventors formulated successful emulsions at up to about 18 wt/wt % using the methods they would go on to disclose in the specification.  (*Supra*, § III.B; *infra*, § V.C.1.)  Although they do not recall testing concentrations higher than 18 wt/wt %, based on their work, they were confident that up to at least 20 wt/wt % was still within their "zone of stability."  (*Id.*; Tr. at 174:21-175:1, 176:3-7, 238:10-19 (Ottoboni).)  They then relayed that knowledge to the public, conservatively disclosing and claiming only emulsions with up to 20 wt/wt %.  And the concentrations at which a POSA would begin to worry about instability mechanisms like phase inversion "are well beyond the more limited range that the patents-in-suit give[]."  (Tr. at 520:4-

19

521:7 (Little).)  Again, there is no requirement that this disclosure take the form of working

examples for written description or enablement.  *E.g.*, *Alcon*, 645 F.3d at 1189-90.

 *Third*, in the specification, "the inventors literally say . . . how you could take [the four]

examples and you can modify them [to] go up" to 20 wt/wt % egg lecithin (Tr. at 507:4-16

(Little); JTX-3 at 11:8-14), and how to "vary" the emulsifier-to-aprepitant ratio from "about 20:1

to 25:1" (Tr. at 536:3-15 (Little); JTX-3 at 14:23-28).  The examples give a POSA "reference

points" from which to modify the formulation within the claimed range, and to refer back to

along the way.  (Tr. at 540:16-23 (Little).)  As such, "a POSA would believe the examples could

be modified to use up to 20 percent emulsifier, based on this description in the method of

making."  (Tr. at 533:7-12 (Little); Tr. at 221:18-222:3 (Ottoboni).)  A POSA would even

understand this instruction to "range it up from those working examples" as the inventors'

"specific intent" (Tr. at 523:22-524:4 (Little)):

> [I]n the section that's talking about what to do whenever you make
> them[, i]t mentions the specific Examples 1, 2, 3, and 6 . . . [a]nd it
> says that the emulsifier is added to a concentration of . . . greater
> than 10 percent . . . [a]nd the upper limit is 20 percent.  So you would
> add in a concentration of greater than 10 percent, but less than 20
> percent of the emulsion. . . . [I]t's saying I'm giving you these
> examples, but you can vary from those reference points to the
> degrees of the [emulsifier] concentrations that are listed here.

(Tr. 530:16-531:24, 533:1-6, 534:24-535:5 (Little).)

 For example, starting from Example 2, a POSA would only need to increase the egg

lecithin by a small amount to inhabit the rest of the claimed range.  Dr. Little explained that, "if

you wanted to maintain all of the [other] components . . . the same, you could just decrease the

amount of water."  (Tr. at 493:7-494:13 (Little).)  And here, since "the amounts we're talking

about . . . changing would be very small . . . you're [also] only changing the water amount by a

20

very small amount." (*Id*.)[10]

     *Alcon* is instructive. In finding adequate written description, the Federal Circuit noted the specification had "physical data from [only] one compound to support the proposition that PECO enhances the chemical stability of all prostaglandins." *Alcon*, 745 F.3d at 1190. But, as here, the specification also:

> detail[ed] the claimed invention and provide[d] a step-by-step description of how a [POSA] may use it. . . . It provide[d] exemplary formulations that embody the claimed invention, reciting concentrations of every ingredient. . . . And the patent describe[d] the various formulation parameters . . . that may be selected when practicing the invention.

*Id*. at 1191. And, in finding enablement, the Federal Circuit noted:

> "the patents disclose exemplary compositions within the scope of the claims, detail how those example compositions are prepared from commercially-available ingredients, and provide step-by-step procedures for adding [the components] in a way that embodies the claimed invention. . . . The patents also identify the various [components] that can be used and a range of suitable concentrations for [the] components, including narrow preferred embodiments."

*Id*. at 1189.

### 3. The Prosecution History Does Not Show a More Limited Invention

     Dr. Amiji tried to sidestep the specification by arguing that the prosecution of the related '229 patent reveals that the inventors described and enabled only 13 to 15 wt/wt % egg lecithin and/or an 18:1 to 22:1 egg lecithin-to-aprepitant ratio. (*See* Tr. at 263:20-264:8, 266:16-267:13, 268:8-269:7, 292:19-295:19 (Amiji).) Such a contorted reading is unsupported by the patent specification—which not only expressly describes using 15 to 20 wt/wt % egg lecithin, but also

---

10 ███████████████████████████████████████████████

includes an 11.7 wt/wt % working example—as well as by the prosecution history itself.

When prosecuting the '229 patent, Heron and Dr. Ottoboni distinguished *that* application's pending claims of 13 to 15 wt/wt % egg lecithin as having unexpectedly improved stability over prior art with *lower* emulsifier content like CN845.  (Tr. at 545:9-550:13 (Little); JTX-10.40, .333, .337-38.)  They did not in any way distinguish or disclaim the *higher* amounts of the presently asserted claims, which were entirely absent from the prior art.  (Tr. at 548:22-549:3 ("I disagree with the implication that for some reason 13 to 15 percent was . . . all they ever could mean."); *see also* Tr. at 550:14-553:18 (for each application, "in regard to the arguments they're making, they're just citing the language in the instant claims for that discussion"), 587:14-588:8 (Little); *e.g.*, JTX-8.146-48, .161, JTX-9.50-52, .133-34.)  Even Dr. Amiji admitted that "the Ottoboni declaration" did not "address any concentrations of emulsifier above 15 percent."  (Tr. at 270:16-21 (Amiji).)[11]

### 4. Dr. Amiji Offered No Specific Opinions About Other Claim Elements

Dr. Amiji appeared to suggest that the asserted claims of the '255 patent are invalid as overly broad with respect to *other* ingredients (*i.e.*, oil, co-emulsifier, tonicity modifier, and pH modifier).  (Tr. at 275:9-277:7 ("[T]he possibilities, when you start to consider all of the different permutations, it's quite enormous."), 289:21-290:11 (Amiji).)[12]  He extended the same new criticism to claim 8 of the '520 patent with respect to tonicity modifier.  (Tr. at 277:8-22 (Amiji).)  But the trial record is clear:  a POSA would not understand the claimed range of 13-

---

[11]  Unsurprisingly, Azurity has not argued for any clear disavowal or disclaimer in this case, and the Court noted that no such issue is readily apparent.  (Tr. at 103:8-9 (Court).)

[12]  Although any specific grounds have never been part of this case (D.I. 173, Exhibit 19 at Heron's Motion *In Limine* No. 2 Opening and Reply Briefs), out of an abundance of caution, Heron addresses Azurity's failure to put on affirmative evidence regarding these ingredients.

20 wt/wt % egg lecithin as covering thousands of truly different formulations.  (*See* Tr. at 472:7-10, 474:14-17, 475:22-476:8, 632:21-634:6, 662:25-664:24 (Little); Tr. at 138:22-139:16 (Han).)

Dr. Amiji's testimony is unsupported and unexplained by any citations or examples, and such conclusory opinions that the asserted claims cover too many "different permutations" (to the extent Azurity intends to raise that belated post-trial contention) are not clear and convincing evidence that they are insufficiently enabled or described.  *See, e.g., Unicorn Energy AG v. Tesla Inc.*, 740 F. Supp. 3d 930, 956 (N.D. Cal. 2024) (dismissing opinion that "the breadth of the claims contributes to undue experimentation" as "[m]issing . . . any explanation as to what makes the claims broad, and what impact the [relevant claim limitation] has on experimentation," such that the "opinion is conclusory and thus fails as a matter of law"); *Irise v. Axure Software Sols., Inc.*, No. CV08-03601 SJO, 2009 WL 3615075, at *44 (C.D. Cal. Sept. 11, 2009) (dismissing opinion that asserted claim was too broad to have written description support because the expert "provide[d] no citations or references to the specification" but only "conclusory statements" that were "insufficient to meet [d]efendants' burden to show invalidity by clear and convincing evidence").

Dr. Little, on the other hand, explained that "from the standpoint of a person of ordinary skill in the art, [each of the three asserted claims] is specific."  (Tr. at 467:20-468:3, 562:16-20 (Little); *cf.* Tr. at 136:24-137:9 (inventor Dr. Han describing claim 1 of related U.S. Patent No. 9,808,465 as "fairly narrow"); JTX-30.17.)  Dr. Ottoboni, too, testified that what he searched for, invented, and also *disclosed* was but "a small range . . . of components that together provided a stable formulation"—"that little island of stability" (Tr. at 171:10-16, 195:17-196:7 (Ottoboni))—and the "[asserted] claims are a specific recipe" for how to get there (Tr. at 471:4-23 (Little)).  That is, the claims' "level of detail is completely within the level of skill of a

[POSA] to look at this [and] know what [the claim] is talking about." (*Id.*) For example, even Dr. Little's students—with perhaps *less* skill than a POSA—"would know exactly how to make" the claimed emulsions. (*Id.*; Tr. at 457:3-458:25 (Little).)

Given the "high" level of skill in the art (Tr. at 562:2 (Little); Tr. at 10:10-13 (Amiji)), the disclosure is sufficient to convey possession and enablement without the asserted claims reciting every specific ingredient or amount. For written description, the specification discloses well-known options and/or amounts for each of the other claimed ingredients. (*Supra*, § III.C.) *See Regeneron Pharms., Inc. v. Mylan Pharms. Inc.*, 714 F.Supp.3d 652, 752-53 (N.D.W. Va. 2023) (no lack of written description where "[t]he [d]efendants criticize[d] the claims for reciting the structural categories of 'buffer' and 'stabilizing agent' instead of specific chemical structures," but the record "readily identified the handful of buffers that the POSA would consider in a formulation").) And for enablement, as Dr. Little explained, a POSA would "have the ability to work within [his or her] skill" to use the well-known oils, alcohols, and tonicity modifiers listed in the specification and "vary the amount" of each as required to practice and stay within the asserted claims while, *e.g.*, approximating the tonicity of blood. (*See* Tr. at 659:6-662:6 (Little); Tr. at 15:20-17:19 (Amiji).) For example, with respect to even claim 5 of the '255 patent, Dr. Little explained:

> It's using things that fall within the scope of those claim elements that a person of ordinary skill in the art would see commonly in the art, there's compendia of them. You can go look and see. Yes, you can vary it within that . . . . With all due respect, the formulation scientist[], who's a person of ordinary skill in the art, has it within their skill to be able to do that.

(Tr. at 663:19-664:24 (Little).) *See Bayer Healthcare LLC v. Baxalta, Inc.*, 989 F.3d 964, 982 (Fed. Cir. 2021) (not error to rely on fact that POSA's "advanced knowledge concerning amino acids—along with the fact that only a certain subset could be used for [the claimed]

PEGylation—would have aided skilled artisans in applying the teachings in the patent . . . without undue experimentation"). Dr. Amiji offered no contrary testimony on what a POSA would understand about these other ingredients or their amounts from the examples or the specification as a whole, other than to refer off-hand to his unrelated (and unjustified, *see supra*, § V.A.1) criticism that the specification's disclosures of *egg lecithin content* are purportedly "generic." (Tr. at 286:25-287:8 (Amiji).)[13]

These arguments apply with even more force to claim 23 of the '255 patent (which leaves only oil type and amount unrecited) and claim 8 of the of the '520 patent (which leaves only tonicity modifier type and amount unrecited). This is because, as Dr. Little explained, a POSA would not consider any of the claimed ranges for the other ingredients to be broad, making these two claims as a whole even more narrow and specific. (Tr. at 476:12-477:11 (13-20 wt/wt % emulsifier); Tr. at 477:18-19, 478:12-479:7, 686:23-688:2 (0.44-1.25 wt/wt % aprepitant);[14] Tr. at 686:23-688:12 (about 20:1 to 25:1 egg lecithin to aprepitant ratio); Tr. at 479:8-11 (pH modifiers); Tr. at 481:6-20, 490:10-19, 659:11-14, 659:22-660:5 (oil and 9-10 wt/wt % soybean oil); Tr. at 490:24-492:17 (tonicity modifier) (Little).)

### B. Azurity Cannot Show That Unpredictability Precludes Written Description or Enablement

In yet another attempt to sidestep the specification's clear disclosures, Azurity argued that it could not be reasonably predicted whether an emulsion with more than 15 and up to 20 wt/wt % egg lecithin would be physically stable. (Tr. at 312:12-313:18 (Amiji) (reading his

---

[13] Dr. Amiji is also simply incorrect that the specification and examples do not "provide any information" with respect to the other ingredients. (*Compare* Tr. at 286:24-287:8 (Amiji), *with supra*, § III.C, *and* Tr. at 479:8-11, 481:6-20, 490:10-19, 490:24-492:17 (Little).)

[14] Dr. Little calculated this range for claim 8 of the '520 patent using the claim's egg lecithin concentration and the egg lecithin-to-aprepitant ratio limitations. (*Id.*)

demonstrative's summary slide into the record).)[15]  This misguided argument is based on prior-art concerns that a POSA learning from the specification would understand do not apply within the asserted patents' disclosed zone of stability.

### 1.    Azurity Cannot Meet Its Burden for the '255 Patent

To start, there can be no serious question that the '255 patent asserted claims are properly described and enabled.  These are composition claims that lack any (purportedly unpredictable) physical stability requirement.  (Tr. at 102:14-103:7 ("There's a benefit, but it's not a limitation.") (Court).)  And Azurity does not contest that the specification recites each and every claimed ingredient, ingredient range, and pH range.  That ends the written description inquiry—it does not matter what unclaimed properties the resulting composition may have.  *See Union Oil Co. of Cal. v. Atlantic Richfield Co.*, 208 F.3d 989, 992, 997 (Fed. Cir. 2000) (written description found where "the patent claims its inventive [gasoline] in terms of ranges of chemical properties" disclosed in the specification, rather than the unclaimed benefit of "produc[ing] a gasoline that reduces emissions"); *Pharmacyclics LLC v. Alvogen, Inc*., No. 21-2270, 2022 WL 16943006, at *2, *11 (Fed. Cir. Nov. 15, 2022) (nonprecedential) (written description found for a composition claim where "the precise ranges recited in the claims are found in the formulations disclosed in the specification").  Azurity also does not contest that the specification includes a detailed description of how to combine the ingredients as claimed (*e.g.*, Tr. at 342:3-24, 343:12-344:12 (Amiji)), ending the enablement inquiry as well.

### 2.    Dr. Amiji Alleges Unpredictability Based on an Outdated Prior-Art Concern That Does Not Apply to the Claimed Range

In any event, Dr. Amiji's unpredictability-based arguments were premised solely on an

---

[15]  This was the first and only time that Dr. Amiji mentioned any purported "unpredictability" of the art during his direct testimony.

outdated prior-art concern. (*See* Tr. at 297:13-298:10 (Amiji); *supra*, § III.A.) He ignores the paradigm shift that a POSA would understand upon reading the asserted patents' game-changing disclosure (*supra*, § III.D; Tr. at 453:13-456:9, 507:17-509:8, 521:13-523:5, 554:23-556:15, 562:22-565:1, 582:17-583:8 (Little); Tr. at 252:19-23 (Amiji)):

> [Prior art authors] were thinking . . . when you get up to 8, 9, 10, 11, you're sort of in the danger zone. But if you take the point of reference and you say, now we know that the region of stability is not down there, it's up here, . . . that . . . give[s] a [POSA] confidence that [the inventors] had possession of the invention . . . including the emulsifier concentration of 13 percent to 20 percent.

(Tr. at 517:11-518:24 (Little).) This "change in perspective happens with the specification." (Tr. at 564:17-22 (Little).) A POSA would then "know a lot more" (Tr. at 562:22-564:12 (Little))—specifically, that the prior-art concern in question does not apply at 13 to 20 wt/wt % egg lecithin (*supra*, §§ III.A, III.D), and that the inventors possessed the subject matter covered by the asserted claims. That the experts agree the specification discloses that a property of the inventive compositions is their physical stability only strengthens this conclusion. (Tr. at 24:23-25:6 (Amiji); Tr. at 595:22-596:4 (Little); JTX-3 at 14:57-58.)

For enablement, too, Dr. Amiji's position that a POSA would learn nothing new from the specification beyond the working examples is simply "not reasonable" (Tr. at 455:16-456:9 (Little)), particularly when he acknowledges the patents' "inventive contribution" was superior stability (Tr. at 316:16-25, 319:3-7, 319:23-320:3 (Amiji)). An understanding of that stability is precisely what a POSA would be reading the specification to learn about. (Tr. at 562:22-564:22 (Little) (POSA's new "vantage point" is "not just what's disclosed in the specification," but also "what a [POSA] learns" from reading the specification.) For example, a POSA would understand from the successful use of 14.3 wt/wt % egg lecithin in Example 2 that the prior art's concern with increasing emulsifier from the low single digits could cause instability (*i.e.*, the

self-assembly of micelles) is no longer a concern in the disclosed 13 to 20 wt/wt % range. (*Supra*, § III.D.1.)  The POSA would further understand that, while iteratively increasing egg lecithin from, *e.g.*, Zhou 2012's optimal 2.5 wt/wt % up to the claimed range would initially generate the prior art's micelle-based instability, that instability would not be a concern once it was known that physically stable aprepitant emulsions can be obtained with egg lecithin beyond 10 wt/wt %.  (*See id.*; Tr. at 508:24-509:8, 522:7-523:5 (Little).)  Otherwise, Example 2 would not be physically stable.

In raising only a prior-art concern, Dr. Amiji failed to provide any scientific basis for why that concern would still apply above 14.3 and up to 20 wt/wt %, when the asserted patents plainly convey it does not.  Bald and conclusory assertions of "unpredictability" are not clear and convincing evidence of undue experimentation.  *See Endo Pharms. Inc. v. Mylan Pharms. Inc.*, No. 11-cv-717 (RMB), 2014 WL 334178, at *27 n.62 (D. Del. Jan. 28, 2014).  That is particularly true when, as here, they are "contradicted by other evidence in the record[,] including [the expert's] own testimony" that the required "techniques and methods are known in the art . . . [,] even if the results of any [such techniques and methods] may have been unpredictable."  *Id*.

Based on the trial record:  (1) "emulsion science is pretty well-established" (Tr. at 560:16-561:6 (Little)); (2) the specification and both experts agree that only "conventional methods" are needed to make its disclosed formulations (*id*.; Tr. at 342:3-24 (Amiji); JTX-3 at 13:16-21); (3) the level of skill in the art is "high" (Tr. at 562:2 (Little); *see* Tr. at 457:3-458:25, 459:1-7 (Little); *see also* Tr. 10:10-11:10, 261:19-22 (Amiji)); and (4) Dr. Amiji concedes a POSA would be able to make a physically stable claimed formulation (*see* Tr. at 306:19-307:1 (Amiji)).  It was in this context that Dr. Little explained, "here, you actually have reference

points, and you have descriptions in the specification.  You also have an understanding of the mechanisms that could go wrong.  . . . [I]n this particular situation, it is not so unpredictable to cause an issue for me with enablement."  (Tr. at 562:3-15 (Little).)

### 3. The Quantity and Duration of Experimentation Required to Practice the Asserted Claims Is Not Undue

Dr. Amiji is also wrong that because, purportedly, "[t]he only way you can see if you actually have a formulation is to make it and test it . . . [,] this creates undue experimentation" resulting in lack of enablement  (Tr. at 290:8-11, 289:16-290:3 (Amiji).)  *First*, Dr. Amiji's position is contrary to law.[16]  *Johns Hopkins*, 152 F.3d at 1360 (even "a considerable amount of experimentation is permissible, if it is merely routine, or if the specification . . . provides a reasonable amount of guidance").  Just because a disclosed "technique [is] not foolproof, and . . . success with [that] technique commonly require[s] repetition," that does not mean there was a "failure of disclosure" sufficient to support lack of enablement.  *Id*.  And even Dr. Amiji admits that is precisely the situation here:  "[E]ventually, after going through multiple permutations, yes, a person of skill could figure [it] out[.]"  (Tr. at 306:19-307:1 (Amiji).)[17]

Even assuming, *arguendo*, some failures within the asserted claims, that is not enough to invalidate them.  *Atlas Powder*, 750 F.2d at 1576-77 ("Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid.  It is not a function of the claims to specifically exclude possible inoperative substances.").  Likewise, the law requires the specification to enable a POSA to "practice" the invention, not to immediately implement an

---

[16]  Dr. Amiji also fails to explain how his "make and test" opinion was consistent with Dr. Ottoboni's contrary testimony.  (*Compare* Tr. at 280:21-23, 283:12-15, 289:16-290:3 (Amiji), *with* Tr. at 216:9-217:2 (Ottoboni).)

[17]  Indeed, Dr. Amiji refused to directly answer whether a POSA would think even 14.4 wt/wt % would work based on the disclosure, or to rule out that 19.5 wt/wt % would work.  (Tr. at 327:9-329:14 (Amiji).)

optimized formulation.  *Alcon*, 745 F.3d at 1188-90 ("Adjusting variables may be relevant to *optimizing* the stability of a given prostaglandin composition, but [defendant] proffered no evidence that any experimentation, let alone undue experimentation, with those variables would be necessary in order to *practice* the claimed invention.  Without that evidence, there is no foundation for the district court's nonenablement ruling.") (emphasis in original); *Atlas Powder*, 750 F.2d at 1577 ("[O]ptimality is not required for a valid patent.").

In any event, Dr. Amiji did not identify or rely on any actual failures.  Instead, he spoke only in hypotheticals, *e.g.*, that such formulations might be unstable (*see, e.g.*, Tr. at 327:9-330:1 (Amiji); Tr. at 632:4-15, 541:15-19, 560:1-4 (Little)), or asserted without citing any support that the "failure rate is very high" (*see* Tr. at 343:8-10, 349:22-350:9 (Amiji)).  He is in effect making a conclusory assertion of unpredictability (*supra*, § V.B.2) as a basis for demanding that Heron include a working example for *every* operative embodiment of the asserted claims.  That is not the law.  *E.g.*, *Falko-Gunter*, 448 F.3d at 1366; *Pfizer*, 555 F. App'x at 966-67; *Alcon*, 745 F.3d at 1189-90.  (*Supra*, § V.A.2.)

*Second*, even if some experimentation were necessary to practice the asserted claims, Dr. Amiji's conclusory assertion that a POSA would have to do a "fairly large number" of experiments and test "each and every formulation" in the claimed range to practice the claimed inventions (Tr. at 289:16-290:3 (Amiji)) is wrong.  Drs. Little and Ottoboni, each of whom are quite experienced with emulsions, explained that a POSA would not actually need to make *every* permutation within the asserted claims to know that a particular permutation is or can easily be made stable.  (Tr. at 476:3-8, 500:9-501:9, 503:20-504:10, 540:7-542:7, 558:8-23, 560:23-561:13, 633:23-634:24 (Little); Tr. at 216:9-217:2, 238:10-19, 194:20-195:16, 197:18-203:9

(Ottoboni).)[18]  A POSA would "have a lot of ability to manipulate the things you want and not let it just be completely unpredictable."  (Tr. at 492:24-493:13 (Little).)  In this field, a POSA would not need or expect to see thousands of working examples in the specification to know a claim is adequately described and enabled.  (Tr. at 633:23-634:24 (Little) ("What you'd be requiring is thousands of examples.  You just don't see that in patents like this, nor would a person of ordinary skill in the art expect that you would see that.").)

Moreover, a POSA would know that using prior-art optimization techniques (*e.g.*, Zhou 2012's single factor experiment and orthogonal design and/or specialized software) would keep the number of experiments required to optimize the physical stability of the multivariate claimed formulations quite low.  (Tr. at 500:9-501:9, 503:20-504:10, 540:7-542:7, 558:8-23, 560:23-561:13 (Little).)  *See Regeneron*, 714 F.Supp.3d at 753-54, 755-56 (crediting testimony that POSAs would use such "formulation design systems" to avoid "making and testing each permutation of the structural elements of the claim").  A POSA would also know exactly how to run that limited set of experiments, as he or she would need only follow the specification's detailed disclosure of "conventional manufacturing procedures."  (Tr. at 560:16-22 (Little); JTX-3 at 13:16-21.)  Even Dr. Amiji concedes these are "step-by-step instructions" for making the claimed emulsions, down to the specific mixing parameters a POSA should use in carrying out the disclosed "conventional" methods.  (Tr. at 342:3-24 (Amiji); *see also* Tr. at 428:15-23 (Dubewar).)

Nor would it take a POSA very long to run the quantity of experiments needed under his or her choice of experimental design—whether computer-aided or not—to optimize the claimed

---

[18]  That is not inconsistent with saying a POSA would need to make "a range of emulsions" to know whether others are or can easily be made stable.  (Tr. at 139:11-16 (Han).)

formulations.  The undisputed evidence is that it would take a POSA only "on the order of hours" to make a given emulsion (Tr. at 537:17-538:8 (Little)), and that even a single student can make forty emulsions in a day (Tr. at 502:7-12 (Little)).  While a POSA waits the required seven days to test for "physical stability" under claim 8 of the '520 patent (Tr. at 538:12-539:16 (Little)), he or she could thus continue to make dozens or hundreds more emulsions, if needed. The actual physical stability tests—particle size, PFAT5 percentage, and visual observation of crystals—likewise take less than an hour to run.  (*Id*.)

The techniques and tools required for a POSA to replicate or optimize the inventor's work were well within a POSA's skill, would keep the actual number of necessary experiments to a minimum, and would quickly yield "physically stable" examples of the asserted claims. Dr. Amiji, meanwhile, cites no specific evidence about the quantity or duration of experiments that would be required in support of his conclusory, contrary opinion.  (*See* Tr. at 306:19-307:4 (Amiji).)  And Azurity's own aprepitant and meloxicam work is real-world evidence that POSAs had no trouble following the disclosure's guidance, including to make at least stable emulsions with 14, 14.44, 18, and 20 wt/wt % egg lecithin.  (*Supra* § III.D.2; *infra* §§ V.C.2-3.)  There would be "no doubt in [a POSA's] mind" that no "undue experimentation" would be required to practice the asserted claims.  (Tr. at 539:17-23 (Little).)[19]

### C.     Real-World Evidence Is Consistent with Written Description and Enablement

#### 1.     Heron Created Stable Emulsions with 18 wt/wt % Egg Lecithin

At trial, the Court indicated its interest in hearing more about how the inventors' experimental emulsions with 18 wt/wt % egg lecithin are consistent with Dr. Little's written

---

[19]  Dr. Little addressed each of the *Wands* factors for enablement, largely applying as appropriate the evidence discussed above.  (Tr. at 557:23-562:20 (Little).)

description and enablement opinions.  (Tr. at 716:2-10 (Court).)  The inventors "studied a number of compositions, came up with compositions that were . . . in a zone of stability and disclosed those." (Tr. at 174:21-175:1 (Ottoboni).)  Indeed, Dr. Ottoboni recalled notebook entries on stable aprepitant emulsions with up to 17 or 18 wt/wt % egg lecithin.  (Tr. at 217:11-16, 223:17-22, 224:8-14, 233:23-235:1 (Ottoboni).)  For example, Heron reported "after 4 days, no crystals" for its 4/17A and 4/17B emulsions, which were prepared on April 17, 2014 (before the '520 patent's September 19, 2014 priority date).  (DTX-104 at HER_THER_0031860-62.)  In addition, the 4/17A and 4/17B emulsions at pH 8 "after 11 days" still had "no crystals."  (*Id.* at HER_THER_0031859-61.)[20]  Using attorney calculations and non-expert assumptions, 4/17A had ~17.8 wt/wt % egg lecithin and 4/17B had ~18.0 wt/wt % egg lecithin.[21]  Heron's laboratory notebooks thus corroborate Dr. Ottoboni's testimony that the inventors only disclosed and claimed a zone stability that they were confident would work based on the emulsions they had actually made and tested beforehand.  (*Supra*, §§ III.B-C.)

### 2. The Azurity Proposed Product's Development History and Variability Corroborate Written Description and Enablement

Azurity's Proposed Product (and Azurity's meloxicam patent, *infra* § V.C.3) provides additional real-world evidence corroborating Dr. Little's opinions, despite post-dating the patents-in-suit.  *Bd. of Trs. of Leland Stanford Junior Univ. v. Chinese Univ. of Hong Kong*, 860 F.3d 1367, 1378 (Fed. Cir. 2017) ("The [written description] inquiry may include an analysis of

---

[20]  The 4/17A and 4/17B formulations describe a creaming event that occurred before 4 days but disappeared after 4 days.  (DTX-104 at HER_THER_0031857-58.)  Creaming is reversible by shaking and thus does not preclude physical stability within the meaning of the patents.  (Tr. at 14:5-11 (Amiji); 231:24-232:6 (Ottoboni); Tr. at 463:13-464:2, 464:25-465:2 (Little).)

[21]  These figures assume 22.6% ethanol evaporation, consistent with the average seen in the specification's four working examples, *i.e.*, 9.27% (Example 1), 40.1% (Example 2); 30.9% (Example 3); 10.0% (Example 6).  (*See* JTX-3 at 16:1-20:34.)

whether the record contains testimony or evidence . . . showing that any post-filing date publications contain art-related facts . . . existing on the filing date."); *Gould v. Quigg*, 822 F.2d 1074, 1078 (Fed. Cir. 1987) (approving use of a "later dated publication" that "was offered as evidence of the level of ordinary skill in the art at the time of the application and as evidence that the disclosed device would have been operative").[22]

That the specification provided adequate guidance



---

[22]  The Federal Circuit has also made clear when a defendant's own post-priority research supports enablement. *E.g.*, *Atlas Powder*, 750 F.2d at 1571 (patent issued in 1969), 1572 ("*Du Pont's Activities*" in 1976-78), 1577 ("[T]he district court found that one skilled in the art would know which emulsifiers would work in a given system.  Indeed, the district court found that [the defendant]'s own researchers had little difficulty in making satisfactory emulsions with the emulsifying agents, salts, and fuels listed in the [asserted] patent.").

[23]

y)),
particularly as Dr. Dubewar is its relevant corporate designee (Tr. at 415:2-15 (Dubewar)).

[24]  18 wt/wt % ± 9 % variability = 16.4 to 19.6 wt/wt %.

 (Tr. at 402:9-12, 404:11-405:2 (Kodela);

Tr. at 437:17-438:1 (Dubewar); PTX-56.3).)

### 3. Azurity's Meloxicam Patent Corroborates Written Description and Enablement

Azurity claimed stable parenteral emulsions of another drug called meloxicam in

U.S. Patent No. 11,040,008, which lists Dr. Dubewar as an inventor. (Tr. at 417:7-418:24

(Dubewar); Tr. at 565:21-566:2, 575:16-20 (Little), PTX-60.8.) The meloxicam patent is further

real-world evidence of how a POSA would and did read the patents-in-suit. Specifically,

Azurity's meloxicam patent discloses *less* but claims *more* than the asserted patents:

> [H]ere, you have a situation with the same or less disclosure. You
> actually have less working examples. . . . But you have a [POSA],
> using the same description, claiming . . . a broader claimed range
> than we're talking about in the patents-in-suit.

(Tr. at 567:10-24, 669:20-25 (Little).) And for the disclosures that the meloxicam patent does

include, the "similarities" between its language and that of the patents-in-suit are "absolutely

striking." (Tr. at 565:21-566:27 (Little).) In fact, other than substituting "meloxicam" for

"aprepitant," the most relevant portions of each are "almost identical." (*Id*.) This pattern

corroborates Dr. Little's opinion that the asserted patents' disclosure is sufficient for the level of

skill and predictability in the art.  (*Id*.; Tr. at 666:5-20 (Little).)[25]

In particular, Azurity's meloxicam patent has "[o]nly one" example with stability data—a

14.44 wt/wt % egg lecithin emulsion called "Composition A" that also mirrors the other

ingredients and amounts of Example 2 from the asserted patents.  (Tr. at 568:13-570:1 (Little);

PTX-60.8; PTX-80.2.)  By contrast, the asserted patents have Example 2 and *three other*

working examples with between 11.7 and 14.3 wt/wt % egg lecithin.  (Tr. at 570:2-15 (Little).)

Indeed, Dr. Dubewar considered the meloxicam patent's one working example to be only a

"limited" amount of stability information.  (Tr. at 419:4-421:4 (Dubewar).)  Yet, "[the

meloxicam patent's] independent claim is unbounded in the amount of emulsifier," and "one of

the dependent claims even goes . . . up to 25 percent[,] rather than 20 percent" as in the asserted

claims.  (Tr. at 567:25-568:12 (Little).)  The meloxicam patent's manufacturing method is also

"like a copy and paste" of the conventional one disclosed in the asserted patents.  (Tr. at 570:23-

571:15, 572:1-5, 572:25-573:16 (Little); PTX-60.7-8; PTX-80.3.)[26]  Dr. Dubewar likewise noted

that these are "general manufacturing steps for initiating any emulsion product."  (Tr. at 428:15-

23 (Dubewar).)  In view of all these similarities, the meloxicam patent even specifically cites

Heron's related '229 patent on its cover—giving credit where credit was due.  (Tr. at 425:3-18

(Dubewar); PTX-60 at Cover.)[27]

---

[25]  Azurity tried to confuse the record at trial, but Dr. Little did not separately analyze the written
description or enablement of Azurity's meloxicam patent itself.  (Tr. at 668:25-669:4, 670:8-
671:5, 679:5-14 (Azurity & Little).)

[26]  Due to typographical errors, the citations in PTX-80.3 should read "'229 Patent at 16:53-
17:17" and "'008 Patent at 13:17-46."

[27]  Azurity's meloxicam patent does not cite CN845 or Zhou 2012, and Dr. Dubewar does not
remember either reference (Tr. at 424:10-425:2 (Dubewar)), meaning neither was a starting point
or inspiration for Azurity's meloxicam, or aprepitant, emulsions.

Dr. Dubewar (and Azurity, in prosecuting it) certainly believed the meloxicam patent's disclosure was sufficient, despite its "limited" stability data, to support its claims—not just claims identical in scope to the patent's sole 14.44 wt/wt % example.  (Tr. at 418:21-419:7, 420:20-421:19, 423:1-4 (Dubewar).)  They filed for the meloxicam patent and wrote it "from the standpoint of a [POSA]."  (Tr. at 671:6-12, 671:19-24, 673:2-7, 673:12-14 (Little).)  Lack of legal training aside, Dr. Dubewar, as a skilled formulation scientist, is still indisputably a POSA.  (Tr. at 457:3-458:25, 459:1-7 (Little).)  He and Azurity did "not put[] forth to the patent office this disclosure in the [meloxicam] specification and those [unspecified] claims saying 'Oh, I would never do that.'"  (Tr. at 676:11-14 (Little).)  Against this backdrop, Azurity's present arguments that the asserted patents' more robust disclosures are insufficient do not pass muster. Rather, the overlap corroborates Dr. Little's opinion "that the amount of disclosure [in the asserted patents] is something that a [POSA] is not balking at" for claims that only go up to 20 wt/wt % egg lecithin.  (Tr. at 567:10-24 (Little).)  Instead, a POSA would "not think that even the more constrained range in the patents-in-suit, as compared to . . . the meloxicam patent, is something of concern for enablement and written description."  (Tr. at 578:19-579:4 (Little).)

In response, Dr. Amiji argues there were such significant manufacturing advances between the 2014 and 2016 priority dates of the patents-in-suit and the 2018 priority date of the meloxicam patent that the latter is irrelevant to the written description and enablement inquiries. (Tr. at 311:2-16 ("[T]here's always changes that happen, especially in manufacturing[.]"), 312:5-8 (Azurity's meloxicam patent would not "have any bearing") (Amiji).)  But Dr. Amiji offers no examples (beyond a non-specific reference to "microfluidization technology"), citations, or support for this conclusory sentiment.  (*See id*.)  This is likely because, in fact, there had been no "significant change in the field from 2016 or 2014 to 2018" with respect to manufacturing

techniques, including microfluidization.  (Tr. at 572:6-24, 682:2-14 (Little).)[28]  What *is* of record is that the meloxicam patent's manufacturing disclosure is substantively identical to the asserted patents' disclosed "conventional" methods, underlining the lack of any relevant changes from 2014 to 2018.  (Tr. at 570:17-572:5, 670:3-5 ("I just don't think that what Dr. Amiji is saying is reasonable given the disclosure in the meloxicam patent."), 682:2-14 (Little); PTX-80.3.)  Indeed, Azurity performed 8 microfluidization passes at 18,000 psi to make the meloxicam patent's "Composition A" (PTX-60 at 13:36-38), which is squarely within the asserted patents' disclosure of 2 to 20 microfluidization passes at between 5,000 and 30,000 psi (JTX-3 at 13:31-33, 13:45-51).

Dr. Amiji also asserts (without citation) certain differences between the aprepitant and meloxicam molecules, including their chemical structure, pharmacokinetic and other unspecified properties, treatment indications, and clinical indications.  (Tr. at 311:17-312:4 (Amiji).)  But he fails to explain how any of these differently impact the formulation or stability of an aprepitant emulsion versus a meloxicam emulsion.  That is not a surprise, because his purported rationale for why a POSA would question possession and enablement of aprepitant emulsions with 15 to 20 wt/wt % egg lecithin is not specific to *aprepitant*, but rather to the amount of *emulsifier* used.  (*See id*. (Amiji); Tr. at 566:23-567:9 ("[T]he reasons that Dr. Amiji gives for the concern about the stability being a problem are drug inspecific."), 577:13-578:18, 676:25-677:7 ("[Dr. Amiji's] basis . . . has to do with scientific principles that would be exactly the same for these patents-in-

---

[28]  Of course, Dr. Little cannot be faulted, as Azurity may try to do (Tr. at 683:22-684:2 (Azurity)), for not pre-butting in his August 6, 2025 rebuttal report arguments that Dr. Amiji would not express until his subsequent August 26, 2025 reply report, particularly when those arguments were unforeseeable and misguided (Tr. at 670:3-5, 683:12-21 (Little)).  In any event, Dr. Little recalls the state of the art as of the 2014, 2016, and 2018 firsthand, as he has worked continuously with emulsions since at least that time.  (Tr. at 459:8-460:20 (Little); Tr. at 261:23-262:20 (Amiji).)

suit as it would be for the meloxicam patent. So[,] he can't say it for one thing and then just disavow it for the other[.]"), 684:3-685:1 (Little).)



(Tr. at 429:17-19 (Dubewar); PTX-63.2.)

Azurity's written description and enablement challenges to the patents-in-suit cannot be reconciled with its position that its own less robustly disclosed, but more broadly claimed meloxicam patent satisfies those same requirements.

## VI.    CONCLUSION

Azurity has not met the heavy burden of showing invalidity by clear and convincing evidence. The Court should hold that the asserted claims are not invalid for lack of written description or enablement.

---

[29]

Dated:  January 23, 2026

*Of Counsel*:

Isaac S. Ashkenazi
Stephen W. Kruse
Sydney E. Bruns
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Karthik R. Kasaraneni
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036

By:  s/  *Jeremy A. Tigan*
Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff*
*Heron Therapeutics, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 23, 2026, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 23, 2026, upon the following in the manner indicated:

Kenneth L. Dorsney, Esquire                              *VIA ELECTRONIC MAIL*
Cortlan S. Hitch, Esquire
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
*Attorneys for Defendants*

Andrew J. Miller, Esquire                                *VIA ELECTRONIC MAIL*
Constance S. Huttner, Esquire
Robyn Ast-Gmoser, Esquire
Elham F. Steiner, Esquire
Colby A. Davis, Esquire
WINDELS MARX LANE & MITTENDORF LLC
One Giralda Farms
Madison, NJ  07940
*Attorneys for Defendants*

*/s/ Jeremy A. Tigan*
_____
Jeremy A. Tigan (#5239)