# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

HERON THERAPEUTICS, INC.

                Plaintiff,

v.

AZURITY PHARMACEUTICALS, INC.,
AZURITY PHARMACEUTICALS INDIA,
LLP f/k/a SLAYBACK PHARMA INDIA
LLP, and SLAYBACK PHARMA LLC,

                Defendants.

C.A. No. 24-1363 (WCB)

## DEFENDANTS' OPENING POST-TRIAL BRIEF

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Slayback Pharma LLC,*
*Azurity Pharma LLP f/k/a*
*Slayback Pharma India LLP,*
*and Azurity Pharmaceuticals, Inc.*

Dated: January 23, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. iii

I.      INTRODUCTION ..................................................................................................... 1

II.     FACTUAL BACKGROUND ..................................................................................... 3

III.    THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION ...................................... 5

      A.    Legal Standard ................................................................................................ 5

      B.    The Specification Does Not Demonstrate that the Inventors Had Possession of the Full Scope of Asserted Claim 8 of the '520 Patent ................... 6

            1.    Claim 8 of the '520 patent is a broad, functionally-defined claim ............ 7

            2.    Inventor testimony confirms the unpredictability of the claimed invention ...................................................................................... 10

            3.    Extrinsic evidence confirms the inventors did not possess the full scope of claim 8 ................................................................................... 13

            4.    The generic 11-20 wt/wt % emulsifier concentration disclosure in the specifications are arbitrary and not evidence that the inventors were in possession of the full scope of the invention ........................... 15

            5.    Table 7 in the specifications would not make a POSA believe that the inventors were in possession of the full scope of claim 8 .................. 17

            6.    The existing knowledge of aprepitant and its emulsions demanded more robust support for the claimed subject matter................................. 18

      C.    A POSA Would Not Believe that Heron Possessed the Full Scope of Claims 5 and 23 of the '255 Patent .................................................................... 21

            1.    The preamble of claims 5 and 23 is limiting............................................. 23

            2.    The preamble is necessary to describe a structurally complete invention ...................................................................................... 26

            3.    Claims 5 and 23 lack adequate written description .................................. 26

IV.    THE ASSERTED CLAIMS ARE NOT ENABLED......................................................... 28

      A.    Legal Standard ................................................................................................ 28

      B.    Claim 8 of the '520 Patent is Not Enabled .......................................................... 29

      C.    Claims 5 and 23 of the '255 Patent are Not Enabled .............................................. 32

V.     CONCLUSION ......................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014)..................................................................................5

*ALZA Corp. v. Andrx Pharm., LLC*,
  603 F.3d 935 (Fed. Cir. 2010).................................................................................28

*Amgen Inc. v. Sanofi*,
  598 U.S. 594 (2023)................................................................................................30

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) ..................................................... *passim*

*Astrazeneca Pharms., LP v. Mayne Pharma (USA), Inc.*,
  352 F. Supp. 2d 403 (S.D.N.Y. 2004), *rev'd in part on other grounds sub nom.*
  *Abraxis Bioscience, Inc. v. Mayne Pharma (USA) Inc.*, 467 F.3d 1370 (Fed.
  Cir. 2006)................................................................................................................33

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
  750 F.2d 1569 (Fed. Cir. 1984)..............................................................................33

*Azurity Pharms. v. Alkem Labs Ltd.*,
  655 F. Supp. 3d 270 (D. Del. 2023), *aff'd* 2023 WL 5970784 (Fed. Cir. 2023) ....................21

*Baxalta Inc. v. Genentech, Inc.*,
  81 F.4th 1362 (Fed. Cir. 2023) ...............................................................................31

*Bicon, Inc. v Az. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006).................................................................................23

*Bilstad v. Wakalopulos*,
  386 F.3d 1116 .........................................................................................................10

*Biogen Int'l GMBH v. Mylan Pharms. Inc.*,
  18 F.4th 1333 (Fed. Cir. 2021) ...............................................................................15

*Bos. Sci. Corp. v. Johnson & Johnson*,
  647 F.3d 1353 (Fed. Cir. 2011)...........................................................................8, 16

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed. Cir. 2005)...............................................................................31

*Carnegie Mellon Univ. v. Hoffman-La Roche Inc.*,
  541 F.3d 1115 (Fed. Cir. 2008)...........................................................................8, 15

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
    289 F.3d 801 (Fed. Cir. 2002) ..........................................................................23, 25

*Deere & Co. v. Bush Hog, LLC*,
    703 F.3d 1349 (Fed. Cir. 2012) .........................................................................23, 24

*Eli Lilly & Co. v. Perrigo Co.*,
    202 F. Supp. 3d 918 (S.D. Ind. 2016), *aff'd*, 718 F. App'x 953 (Fed. Cir.
    2017) ...............................................................................................................................9

*Evans v. Eaton*,
    20 U.S. 356 (1822) ...........................................................................................................5

*In re Fought*,
    941 F.3d 1175 (Fed. Cir. 2019)..........................................................................................23

*Fujikawa v. Wattanasin*,
    93 F.3d 1559 (Fed. Cir. 1996).............................................................................16, 21

*FWP IP ApS v. Biogen MA, Inc.*,
    749 F. App'x 969 (Fed. Cir. 2018) .................................................................................15

*Heron Therapeutics, Inc. v Fresenius Kabi USA, LLC*,
    Case No. 22-cv-985-WCB, D.I. 193 .........................................................12, 19, 34

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
    941 F.3d 1149 (Fed. Cir. 2019)..................................................................... *passim*

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
    10 F.4th 1330 (Fed. Cir. 2021) .......................................................................................8

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
    541 F. Supp. 3d 435 (D. Del. 2021) (Bryson, J.) ...........................................8, 20, 21

*MagSil Corp. v. Hitachi Global Storage Techs., Inc.*,
    687 F.3d 1377 (Fed. Cir. 2012).......................................................................2, 28, 29

*Medytox, Inc. v. Galderma S.A.*,
    71 F.4th 990 (Fed. Cir. 2023) ...................................................................29, 31, 32

*Nat'l Recovery Techs., Inc v. Magnetic Separations Sys., Inc.*,
    166 F.3d 1190 (Fed. Cir. 1999)........................................................................................28

*Nuvo Pharms. (Ireland) Designated Activity Company v. Dr. Reddy's Labs. Inc.*,
    923 F.3d 1368 (Fed. Cir. 2019)...............................................................6, 13, 27

*Par Pharma., Inc. v. TWi Pharmas., Inc.*,
  120 F.Supp.3d 468 (D. Md. 2015), *aff'd without opinion*, 624 Fed. Appx. 756
  (Fed. Cir. 2015)................................................................................................29

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
  182 F.3d 1298 (Fed. Cir. 1999)........................................................................25

*Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*,
  599 F. 3d 1308 (Fed. Cir., 2010)......................................................................33

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004)..........................................................................28

*In re Wands*,
  858 F.2d 731 (Fed. Cir. 1988)..............................................................28, 29, 31


**Statutes**

35 U.S.C. §112........................................................................................3, 5, 27

## I.    INTRODUCTION

This case is about overreach. Heron's original research and patents were directed to stable aprepitant formulations that utilized a specific combination of ingredients in specific amounts to obtain shelf stable intravenous formulations that could be administered to patients receiving chemotherapy to prevent nausea. In developing these stable formulations, Heron's researchers identified a prior art reference, Zhou, that disclosed injectable aprepitant emulsions with up to 10 wt/wt % emulsifier. Heron recreated the Zhou emulsions and found them to be unstable, forming crystals after only four days. After several years of work, Heron discovered that aprepitant emulsions containing 13-15 wt/wt % emulsifier and a ratio of emulsifier to aprepitant fixed at precisely 20:1provided what inventor Dr. Ottoboni called an unexpected "little island of stability." Heron filed its original suite of patents based on this work.

Heron's original patents are not asserted here. Rather, Heron asserts two patents—U.S. Patent Nos. 12,115,255 ("'255 patent") and 12,290,520 ("'520 patent")—that it hastily applied for after learning of Azurity's proposed 505(b)(2) aprepitant emulsion, ███████████████████ ████████████████████████████████████. The '255 and '520 patents contain broad genus claims to aprepitant formulations that contain up to 20 wt/wt % emulsifier and a ratio of emulsifier to aprepitant of up to 30:1—formulations that Heron never prepared or tested. The specifications of these patents contain no examples of concentrations above 14.3 wt/wt % and ratios other than 20:1 and no disclosure of any scientific or therapeutic rationale for selecting the appropriate concentrations and ratios from the very broad ranges generally identified in the patents. The only mention of an emulsifier concentration above 14.3 wt/wt % or ratios of emulsifier to aprepitant other than 20:1 is in two, or arguably three, generic statements in the "Brief Summary" and "Definitions" sections of the specifications, which list emulsifier

1

concentrations up to 20 wt/wt % and ratios up to 30:1. JTX-002 at 3:49-58; JTX-002 at 11:51-60.[1] There is no evidence whatsoever that the inventors were actually in possession of these ranges as of the effective filing date of the patents.

Indeed, although one of the inventors, Dr. Ottoboni, baldly asserted at his deposition that he tested formulations containing above 14.3 wt/wt % emulsifier (Tr. at 157:16-158:24), Dr. Ottoboni did not and could not specifically identify any such formulations in Heron's laboratory notebooks. Nor did Heron identify any such formulations in Dr. Ottoboni's Inventor Declaration ("Ottoboni Declaration") or in Dr. Little's trial testimony. This omission is telling as it would have been to Heron's advantage to describe any successful formulations with emulsifier concentrations above 14.3 wt/wt % to demonstrate written description support for Heron's asserted claims. Instead, the only relevant evidence in the record, in the form of laboratory notebooks, shows that the inventors failed when they tried to make an aprepitant emulsion with an emulsifier concentration above 15 wt/wt %. Tr. at 187:16-191:24.

To satisfy the written description requirement and prevent precisely the type of overreach that Heron is attempting here, the specification must demonstrate to a person of ordinary skill in the art ("POSA") that the inventors were in possession of the full scope of the claimed invention at the time of filing. *See MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1381 (Fed. Cir. 2012). That requirement is not met where, as here, the specification discloses only limited examples clustered at the low end of the claimed ranges, and the asserted genus claims cover hundreds, if not thousands of species, that were never made or tested by the inventors.

---

[1] Heron also relies on the following passage, the interpretation of which the parties dispute: "A phospholipid emulsifier is added to a concentration of greater than 10 wt/wt %, 11 wt/wt %, 12 wt/wt % or 13 wt/wt % of the emulsion *but less than* 15 wt/wt %, 17 wt/wt % or 20 wt/wt % of the emulsion." JTX-2 at 13:67-14:4 (emphasis added).

The specification must also teach a POSA how to make and use the full scope of the claimed invention without undue experimentation. The asserted claims also fail to meet this burden, as they provide no guidance to a POSA as to how to select the amounts and types of ingredients that will produce the stable or injectable emulsions covered by the claims. Thus, judgement should be entered that the asserted claims of the '255 and '520 patents are invalid under 35 U.S.C. §112.

## II.    FACTUAL BACKGROUND

Heron's stated goal was to develop a stable, injectable aprepitant emulsion for intravenous or parenteral administration.[2] JTX-2 at 1:22-28 and 1:50-53. This goal was complicated by the fact that aprepitant was known to have limited solubility in water and other solvents. Tr. at 165:25-166:6. To overcome aprepitant's poor solubility, the inventors decided to try to develop an aprepitant emulsion, which was a technique described in the prior art Zhou reference. JTX-028.0002. Zhou described aprepitant emulsions with up to 9.9 wt/wt % emulsifier. *See, e.g.*, JTX-10.300 (acknowledging scope of Zhou prior art). The inventors reproduced the Zhou formulations and found that they were unstable, as evidenced by the fact that they crystalized after only four days. JTX-010.0333. The inventors then set out to develop aprepitant emulsions that would be shelf stable for a longer period.

The inventors described their experimental development work in the specifications in the form of six examples of injectable aprepitant emulsions. Four of the examples, Examples 1-3 and 6, had emulsifier concentrations of 13.6, 14.3, 11.7, and 13.8 wt/wt %, respectively. These examples each had the same emulsifier to aprepitant ratio of 20:1. JTX-2 at 16:44-56, 17:25-38,

---

[2] The specifications of the '255 and '520 patents are substantially the same. For ease of reference, citations are provided for the '255 patent and apply equally to the '520 patent.

18:8-20, 20:19-34 (Tables 1-3, 6). The specifications also included stability data for Examples 1-3 and 6, showing them to be stable and in compliance with USP <729> for at least two months when the emulsions were stored at room temperature. *Id.* at 21:1-10 (Table 7).[3]

Heron's original patents claimed the emulsions described in the examples in the specifications. They claimed an emulsifier concentration of 11-15 wt/wt % (or a subset of this range) and/or a ratio of emulsifier to aprepitant of 18:1-22:1. The Examiner initially rejected many of Heron's pending claims as obvious over Zhou, arguing that a POSA would have no reason to think that an emulsifier concentration of 11-15 wt/wt % would function any differently than the 10 wt/wt % emulsifier described in Zhou. JTX-10.300. In response, Heron argued that its claims were not obvious because the inventors were the first to identify that the Zhou formulations were unstable. Heron further argued that the "stability (e.g., the lack of crystal formation) of aprepitant emulsions resulting from a formulation comprising … 13 to 15 wt/wt % egg yolk lecithin demonstrates an unexpected and unpredictable advantage of the claimed pharmaceutical emulsions over the aprepitant formulations of Zhou." JTX-10.0333.

To support these arguments, Heron submitted the Ottoboni Declaration, which averred those emulsions containing 13-15 wt/wt % lecithin (an emulsifier) "possessed unexpected and unpredictable properties relative to Zhou." JTX-10.0337. Heron made no mention of aprepitant formulations containing more than 15 wt/wt % lecithin, even though the specifications generically referenced emulsifier amounts up to 20 wt/wt %, and Dr. Ottoboni testified he had experimented with such formulations during product development. Based on the Ottoboni Declaration, the Examiner allowed Heron's original patents to issue with claims covering formulations with an emulsifier content of 11-15 wt/wt %.

---

[3] The other two examples, Examples 4 and 5, were the reproductions of the Zhou formulations, which the inventors reported to be unstable. *E.g.*, JTX-010.0333.

It was not until Azurity submitted its 505(b)(2) NDA for an injectable aprepitant product with a higher emulsifier concentration that Heron decided to expand the scope of its invention to improperly try to capture Azurity's product and prevent competition. *Compare* D.I. 82 at ¶ 48 (December 12, 2023 receipt of Notice Letter) *with* JTX-2 at (22) (Filing Date January 19, 2024). The '255 and '520 patents relate to injectable aprepitant emulsions with an emulsifier concentration of 13 to 20 wt/wt % and an emulsifier to aprepitant ratio of "about" 20:1 to 25:1. The evidence shows that the inventors did not invent emulsions containing more than 15 wt/wt % emulsifier and that Heron's assertions to the contrary are simply an overreach.

## III.    THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION

### A.    Legal Standard

Under 35 U.S.C. § 112, first paragraph, the specification of a patent must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010) (*en banc*). "[T]he purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.'" *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014) (quoting *Ariad*, 598 F.3d at 1353-54).

An additional objective of the written description requirement is to put the public in possession of what the applicant claims as the invention. *See Evans v. Eaton*, 20 U.S. 356, 401 (1822). "The level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Ariad*, 598 F.3d at 1351. Thus, to determine whether the written description requirement is satisfied, one looks to "the four corners of the specification." *Id*.

5

To satisfy the written description requirement, the specification must describe the claimed invention in sufficient detail such that a POSA can reasonably conclude the inventor had possession of the full scope of the claimed invention. In other words, the disclosure must "'clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Id.* Therefore, "actual 'possession' or reduction to practice outside of the specification is not enough." *Id.* at 1352. It is the specification that must "notif[y] "the public about the boundaries and scope of the invention *and* show [] that the inventor possessed all the aspects of the claimed invention." *Nuvo Pharmas. (Ireland) Designated Activity Company v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1382 (Fed. Cir. 2019) (court's italics).

Here, the parties agree that a POSA is a person with a bachelor's degree in chemistry, pharmaceutics, chemical engineering, or a related field, as well as three to five years of experience in formulating drug products, including parenteral drug products. This person could have an advanced degree in these fields and fewer years of experience. A POSA may also consult with individuals with experience in other disciplines. Such consultation would not alter the 'ordinary' skill of the POSA who is receiving and using the information.

## B. The Specification Does Not Demonstrate that the Inventors Had Possession of the Full Scope of Asserted Claim 8 of the '520 Patent

Heron asserts claim 8 of the '520 patent, which depends from claims 1 and 7. Claim 8, with all limitations, reads:

> An injectable emulsion, comprising: aprepitant; 13 wt/wt % to 20 wt/wt % of an egg lecithin; 9 wt/wt % to 10 wt/wt % of soybean oil; a co-emulsifier which is [ethanol], wherein the [ethanol] is present in the emulsion [at a concentration of about 2-3 wt/wt %]; a tonicity modifier; a pH modifier, wherein the pH modifier is sodium oleate; and water; wherein the ratio of egg lecithin to aprepitant is between about 20:1 to 25:1; wherein the pH of the emulsion ranges from about 7.5 to 9.0; and, wherein the emulsion is physically stable.

JTX-3 at 23:11-41.

### 1.    Claim 8 of the '520 patent is a broad, functionally-defined claim

Considering the nature and scope of the asserted claims, as is evident from the language of the claim, claim 8 is a broad claim that covers a large genus of injectable aprepitant emulsions. These emulsions contain egg lecithin (13-20 wt/wt %), soybean oil (9-10 wt/wt %), ethanol as a co-emulsifier (2-3 wt/wt %), an unspecified amount of *any* tonicity modifier, an unspecified amount of sodium oleate as a pH modifier, an unspecified amount of water, and an amount of aprepitant necessary to obtain an egg lecithin:aprepitant ratio of "about 20:1-25:1."[4] The pH of the claimed emulsions can be between 7.5-9. The number of emulsions covered by this claim runs to hundreds, if not thousands, of species. *See* JTX-3 at 23:11-41; Tr. at 274:10-277:22 (Amiji); JTX-3 at 23:11-41.

Claim 8 also explicitly requires that the claimed emulsions be "physically stable." This Court previously construed "physical stability" to mean: "Meets the criteria under USP<729> for mean droplet size not exceeding 500 nm and PFAT5 not exceeding 0.05%, and no visible aprepitant crystals when viewed at magnification of 4x to 10x, after being stored either at 5° Celsius or at room temperature for a period of at least one week." D.I. 145, ¶ 26. Because claim 8 defines the claimed emulsions by a functional characteristic—namely, physical stability—"the written description 'must demonstrate that the applicant has made a generic invention that achieves the claimed result and do so by showing that the applicant has invented species sufficient to support a claim to the functionally-defined genus.'" *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330, 1335 (Fed. Cir. 2021) (quoting *Ariad*, 598 F.3d at 1349). As discussed below, the

---

[4] The specifications define "about" to mean "±5%, ±10%, or ±20% of the value being modified." JTX-2 at 9:61-62.

specification does not demonstrate that the inventors possessed "physically stable" formulations throughout the full scope of claim 8.

Similarly, "to satisfy the written description requirement for a claimed genus, a specification must describe the claimed invention in such a way that a person of skill in the art would understand that the genus that is being claimed has been invented, not just a species of the genus." *Carnegie Mellon Univ. v. Hoffman-La Roche Inc.*, 541 F.3d 1115, 1124 (Fed. Cir. 2008). "One must show that one has possession, as described in the application, of sufficient species to show that he or she invented and disclosed the totality of the genus." *Id.* at 1126.

"Although examples are not always required to satisfy the written description requirement," the paucity of examples across the breadth of the claimed subject matter has been a basis to find a lack of adequate written description. *See Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364 (Fed. Cir. 2011). This is particularly so when the disclosed examples "abide in a corner" of the claimed genus—*e.g.*, when they are clustered at one end of a claimed range. *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435, 459 (D. Del. 2021) (Bryson, J.) (quoting *AbbVie*, 759 F.3d at 1300).

Claim 8 does not remotely meet these standards for written description. The four examples of the allegedly inventive aprepitant emulsions, show stable aprepitant emulsions with egg lecithin concentrations between 11.7 and 14.3 wt/wt % (Tr. at 543:1-544:3 (Little); *id.* at 291:7-293:19 (Amiji)) and a specific set of excipients in set amounts, including soybean oil, ethanol, sucrose, sodium oleate, and water. *See id.* at 16:1-20:34, 222:4-16, 220:18-221:17. Additionally, all of these examples utilize the same ratio of egg lecithin to aprepitant of 20:1. *See* JTX-3.0015-17 at 16:1-20:34; *see also* Tr. at 222:11-16 ("The examples all show a [Lipoid E 80 to aprepitant] ratio of 20 to 1."). There are no examples of any other aprepitant emulsion made with a different oil, co-

emulsifier, tonicity modifier or pH modifier, and no examples of any emulsifier content above 14.3 wt/wt %. In fact, the emulsifier content in the examples spans only 2.6 wt/wt % (11.7-14.3 wt/wt %), which is nearly three times smaller than the 7 wt/wt % range (13-20 wt/wt %) spanned by claim 8. In other words, at least 71% of the egg lecithin range recited in claim 8 is "untested and unknown" from the patent disclosure. *See* Tr. 274:15-22 (Amiji). Similarly, claim 8 permits lecithin to aprepitant ratios from 16:1 all the way up to 30:1 even though all working examples in the specifications utilize a 20:1 ratio. *See* Tr. at 302:14-303:5 (Amiji); JTX-3.0011 at 8:3-4 (definition of about). Thus, the specifications demonstrates that the inventors had possession of only the bottom of the ratio permitted by claim 8. These facts do not demonstrate that the inventors were in possession of the full scope of claim 8 as of the filing date.

In *Eli Lilly & Co. v. Perrigo Co.*, 202 F. Supp. 3d 918, 997 (S.D. Ind. 2016), *aff'd*, 718 F. App'x 953 (Fed. Cir. 2017), the court was tasked with determining whether there was adequate written description support for a claim to testosterone formulations for transdermal products. The asserted claim allowed for the use of 10-10,000 wt/wt % of octyl salicylate as a penetration enhancer, but the specification only described formulations using 67 wt/wt % penetration enhancer. *See id.* at 940. The court ruled that the upper end of the claimed range lacked adequate written description based on "the absence of information regarding formulations using testosterone and penetration enhancer in an amount anywhere near the upper end of the disclosed range." *Id.* at 997. The court explained: "To satisfy the written description requirement, the specification must do more than merely invite other researchers to discover the upper amount of penetration enhancer that could conceivably work." *Id.*

Here, the specification only discloses four working examples at the bottom end of a broad range, *i.e.* 13-14.3 wt/wt % when the claimed range does to 20 wt/wt %. This is an inadequate

written disclosure because it does not demonstrate that the inventors had possession of the full scope of the invention.

### 2. Inventor testimony confirms the unpredictability of the claimed invention

The unpredictability of the claimed invention also demonstrates the inadequacy of the written description in the specifications. As noted above, claim 8 requires the covered emulsions to possess "physical stability." However, the specifications provide no "meaningful guidance into what compounds beyond the examples and formulas … would provide the same result." *Idenix Pharms. LLC v. Gilead Scis. Inc*., 941 F.3d 1149, 1161 (Fed. Cir. 2019); *see also id.* at 1164 ("The written description requirement specifically defends against such attempts to 'cover any compound later actually invented and determined to fall within the claim's functional boundaries' and thus adequate specification must allow a POSA to 'visualize or recognize' the members of the genus."). "If the difference between members of the group is such that the person skilled in the art would not readily discern that other members of the genus would perform similarly to the disclosed members, *i.e.*, if the art is unpredictable, then disclosure of more species is necessary to adequately show possession of the entire genus." *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004); *see also Ariad*, 598 F.3d at 1351 (unpredictability is a significant factor in determining the sufficiency of a specification's disclosure).

Here, the inventors themselves admitted that they could not predict the stability of any emulsions covered by their claims beyond the "little island of stability" defined by the examples. All that anyone knew was that a "small range" might exist in the effort to "find that little island of stability that would provide a product, and any – any of those components missing would require a new formulation." *See* Tr. at 171:4-172:1; *id*. at 195:17-196:7. For example, Dr. Han testified that she could not predict which aprepitant emulsions within the claimed genus would be stable:

10

"[W]e'll have to reevaluate the concentrations of other excipients in the formulation" because "everything affects each other. ***You cannot just increase one concentration and expect to have the same result.***" *Id.* at 157:7-25 (emphasis added); *see also id.* at 128:22-129:3 (conceding that testing is required to determine if different amounts and ratios of components would produce a stable emulsion); *id.* at 137:1-17 (acknowledging that the identity and amounts of components may or may not impact emulsion stability); *id.* at 137:18-138:6 (testifying that "[y]ou have to test the different emulsifiers, oils, and other excipients to determine if it will make a stable emulsion"); *id.* at 139:11-16 ("You have to make a range of emulsions to determine which one is physically stable").

Dr. Ottoboni's testimony was to the same effect. He readily admitted that he could not predict the impact of altering any one ingredient or its amount, testifying:

> The formulation -- the emulsion formulation of aprepitant was a very complex formulation. And all the components working together are critical for the ultimate stability of the formulation. Finding that we needed more than 10 percent lecithin was one important aspect of that. But everything played together, as it says here. All the components interact with one another, and the concentrations interact with one another to get to a pharmaceutically acceptable formulation.

Tr. 237:7-18, *see also id.* at 169:24-170:20 ("We don't know [the function of soybean oil]. We know it's a component."); *id.* at 171:4-177:1 ("[W]ithout doing the experiment, it's difficult. But given the many, many experiments we did throughout development, we never had success with formulations that were outside the range of stability we identified for Cinvanti."); *id.* at 188:11-22 ("Q. By changing the concentration of aprepitant and increasing it, what impact does that have on the concentration of the other ingredients in the formulation? A. That's a multifaceted question. It could – ***it's almost impossible to predict*** what – how one might do that.") (emphasis added); *id.* at 191:10-17 ("[A]ll the components together solubilize the entire mixture…. I'm not going to identify one role versus another. I don't think it's possible."); *id.* at 210:5-14 ("[Stability] was not

11

predictable…."); *id.* at 239:12-18 (acknowledging that he did not know why some formulations were stable and others were not).

This inventors' testimony directly contradicts Dr. Little's testimony at trial that a POSA would understand "there are no mechanisms" to undermine the stability of the claimed emulsions until the emulsifier content reaches 50% or greater. *See* Tr. at 520:2-19 ("Now, there are no mechanisms where if you went up to – Your Honor used 40. I'm trying to decide whether at 40 this would happen. I think it would happen in the 50s. If you got up to that high, you're going to have, like, phase inversion."). Dr. Little's trial testimony in this case is also quite different from his testimony in the *Fresenius* case. There, Dr. Little told this Court that "if you are working with an emulsifier, you don't just go up, okay, because you could have a stability problem if you go up, as well. And there's lots of scientific reasons as to why that would be the case.". *See* DTX-37 at 1282:8-12; *see also id.* at 1288:7-13 ("As a formulation scientist, what you're doing is you're trying to decrease it, to get the lowest amount that you can for it to be stable. Because if you add any more than that, you're going to cause problems with other design parameters that you have and potentially cause instabilities.").

Simply put, the inventors invented only what was disclosed in the specifications and described in the Ottoboni Declaration, namely "a range of 13-15 wt/wt % [emulsifier that] unpredictably and unexpectedly results in a pharmaceutical emulsion which is more stable (e.g., lack of crystal formation)." JTX-10.0321. As Dr. Ottoboni explained:

> Q. If Dr. Han had changed some or all of these amounts of the components from her experiment here in the laboratory notebook, you don't know if she would have been able to obtain a product that did not have crystals until after seven days, correct?
> A. What I can speak to is what we did. We formulated many, many combinations of these components and, again, over time ***through extensive***

12

> *experimentation found a small range – a range of these components that*
> *together provided a stable formulation*. That's as much as I can really state.

Tr. 171:4-16.[5] "Although inventor testimony cannot establish written description support where none exists in the four corners of the specification, it illuminates the absence of critical description in this case." *Nuvo Pharms.*, 923 F.3d at 1381.

Specifications that fail to provide "meaningful guidance into what compounds beyond the examples and formulas … would provide the same result" are invalid. *Idenix*, 941 F.3d at 1161. That is exactly the case here. The inventors' testimony confirms that the claimed emulsions are difficult and unpredictable. Thus, the specification needed to provide more detail than a few working examples clustered at the lower end of the claimed range. Claim 8 of the '520 patent is therefore invalid for failure to meet the written description requirement.

### 3. Extrinsic evidence confirms the inventors did not possess the full scope of claim 8

While the written description analysis is typically confined to the four corners of the specification, it is also notable that Heron failed at trial to identify any extrinsic evidence that the inventors ever successfully produced an aprepitant emulsion containing more than 15 wt/wt % emulsifier.

Although Dr. Ottoboni testified that his research included examples above 15 wt/wt % (*see* Tr. at 217:3-16, 223:15-22 ("I believe I recall seeing an emulsion at approximately 18 percent emulsifier.")), only one such example was mentioned at trial and it was a failure. *See* DTX-104

---

[5] Heron's statements to FDA about its development efforts also emphasized the interrelatedness of the various excipients and the difficulty of predicting the impact of changes to the formulation: "[T]he solubility of aprepitant is more complex than expected. It is strongly dependent on the concentration of lecithin instead of on the concentration of oil. In addition, increasing the concentration of one component, which effectively decreases the concentration of the other components, can lead to incomplete aprepitant dissolution or aprepitant recrystallization." DTX-0116 at HER_THER_0076300.

(Notebook 1255) at HER_THER_0031975. This example utilized around 17.6 to19.8 wt/wt % egg lecithin and "turned cloudy within 30 min," "creamed in < 6 days," and had "visible particles" under microscope. *Id.* For these reasons, Dr. Ottoboni testified that this experiment was a failure. *See* Tr. at 231:18-233:22; *see also id.* at 119:24-120:3 ("In the case of the aprepitant emulsion that we developed, if we observed creaming, then we determined it to be unstable.").

> Dr. Ottoboni also did not mention any successful experiment above 15 wt/wt % in his declaration about unexpected results of his work. In describing his invention, he stated that: An emulsifier present in a range of 13-15 wt/wt% unpredictably and unexpectedly results in a pharmaceutical emulsion which is more stable (e.g., lack of crystal formation) than an aprepitant emulsion with 0.5-10 or 8-10 wt/wt% emulsifier as taught by Zhou…. [T]he effect of oleate on stability of an emulsion comprising 13-15 wt/wt% emulsifier was not predictable.

JTX-10.0321; DTX-58 at ¶10. Tellingly, Dr. Ottoboni did not identify emulsions containing higher amounts of lecithin as part of his "unexpected" and "unpredictable" invention. *See id.* at JTX-10.0325 ("The Examiner noted the lower ratio of emulsifier to drug in Ex. 4 and 5 when compared to the other examples. Per Dr. Ottoboni, this is an important feature of their invention … The Examiner advised that Applicant's arguments and evidence appear to show criticality of the claimed range for the emulsifier and criticality of the ratio of aprepitant to emulsifier."); *id.* at JTX-10.0329 (alleging unexpected results).

Dr. Little also failed to identify any stable emulsions within the scope of claim 8 that contained more than 15 wt/wt % emulsifier, despite having reviewed the inventors' laboratory notebooks in this and Heron's two prior litigations against Fresenius and Mylan. This omission is telling. The fact that Dr. Little failed to identify any "real world" evidence that the inventors were actually in possession of any successful aprepitant emulsions containing more than 15 wt/wt %

emulsifier is further confirmation that the inventors were not in possession of the full scope of claim 8.

### 4. The generic 11-20 wt/wt % emulsifier concentration disclosure in the specifications are arbitrary and not evidence that the inventors were in possession of the full scope of the invention

The above evidence that claim 8 lacks adequate written description is not rendered any less persuasive by the generic disclosures in the "Brief Summary" and "Definitions" sections of the specifications that the emulsifier content of the claimed invention can be as high as 20 wt/wt % in "some of the embodiments." JTX-2 at 3:49-58 and 11:51-60. As noted above, there simply are no embodiments identified in the specifications that exceed 14.3 wt/wt % and no evidence in the real world that the inventors ever made a successful aprepitant emulsion with an emulsifier content higher than 14.3 wt/wt %. In the absence of such evidence, *ipsis verbis* statements and laundry lists in the specifications do not satisfy the written description requirement. Mere "lists or examples of supposedly [successful options that] do not explain what makes them effective, or why [are inadequate]. As a result, a POSA is deprived of any meaningful guidance into what compounds beyond the examples and formulas, if any, would provide the same result. In the absence of that guidance, the listed examples and formulas cannot provide adequate written description support for undisclosed [formulations]. The written description requirement specifically defends against such attempts to "cover any compound later actually invented and determined to fall within the claim's functional boundaries." *Idenix*, 941 F.3d at 1164–65 (citing *Ariad*, 598 F.3d at 1353); *see, e.g.*, *Biogen Int'l GMBH v. Mylan Pharms. Inc.*, 18 F.4th 1333, 1343 (Fed. Cir. 2021); *FWP IP ApS v. Biogen MA, Inc.*, 749 F. App'x 969, 972, 974-976 (Fed. Cir. 2018); *Carnegie Mellon.*, 541 F.3d at 1126; *Bos. Sci.*, 647 F.3d at 1364; *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1571 (Fed. Cir. 1996).

Further, there is no evidence that the 20% limit of the generic ranges of emulsifier recited in the specifications was based on the inventors' educated view of the scope of their invention. As noted above, there is one failed experiment demonstrating research work above 15 wt/wt % (Tr. at 157:16-158:24), and Dr. Ottoboni conceded that they had never tried formulations above 20% and did not know whether formulations with 21% or 24% emulsifier would be successful:

> Q. Did you ever make a stable aprepitant emulsion formulation with 24 percent emulsifier?
> A. I don't recall that we made an emulsion with that level – with 24 percent of an emulsifier.
> Q. And you don't know if that would be stable; do you?
> A. I – we never made it. So I can't really comment on it, whether it would or wouldn't be stable….
> Q. So you're not sure whether an aprepitant injectable emulsion using 21 percent of emulsifier would be stable; correct?
> A. Our experiments did not go that high – did not go to 21 percent emulsifier
> Q. Okay. And as a result, you're not sure whether a formulation containing 21 percent of emulsifier would be stable; correct?
> A. I wouldn't know either way.

Tr. at 224:15-225:16. There simply is nothing in the specifications or other record evidence that differentiates between the uncertainty Dr. Ottoboni identified for using 21% emulsifier and the uncertainty a POSA would have had for up to the 20%. *See also* Tr. at 350:2-9. *See id*. at 278:8-20 (Amiji).

5.    **Table 7 in the specifications would not make a POSA believe that the inventors were in possession of the full scope of claim 8**

Heron argues that the stability data reported in Table 7 of the specifications would persuade a POSA that the inventors were in possession of the full scope of claim 8. This argument is unpersuasive. Dr. Little testified at trial that a POSA would believe that the inventors were in possession of emulsions containing up to 20 wt/wt % emulsifier because the data in Table 7 (below) purportedly shows "when you go up in the concentration, you see better stability." Tr. at 544:6-15.

TABLE 7

| Sample | PDI | Particle Size as Peak 1 Diameter (nm) | Particle Size as Z-Average Diameter (nm) | Zeta Potential (mV) | pH | Stability at 25° C. per USP <729> (months) | Stability at 5° C. per USP <729> |
|---|---|---|---|---|---|---|---|
| Example 1 | 0.122 | 99 | 87 | −43 | 8.74 | 2 | >10 months |
| Example 2 | 0.200 | 127 | 101 | −47 | 8.77 | 3 | >10 months |
| Example 3 | 0.219 | 88 | 68 | −42 | 8.80 | 2 | >10 months |
| Example 6 | 0.244 | 95 | 70 | −43 | 8.92 | 2 | >10 months |

JTX-3 at 21:1-11.

This data does not show, however, that the enhanced stability of Example 2 (3 months) as compared to Examples 1, 3 and 6 (2 months) is due to any difference in emulsifier content. As an initial matter, Dr. Little's opinion about Table 7 was not in either of his reports in this case. *See* Tr. at 542:14-544:15. More importantly, although Dr. Little is correct that Example 2 (14.3 wt/wt %) has a higher emulsifier content than Example 1 (13.6 wt/wt %), Example 3 (11.3 wt/wt %), and Example 6 (13.8 wt/wt %), Example 2 also has a different pH, a different Zeta Potential, and a different amount of soybean oil. JTX-3.0018. Any of these other differences, individually or collectively, could account for the increased stability of Example 2, not just the small differences in emulsifier content.

Dr. Little himself previously admitted that "you can't just say, for instance, that stability is driven by emulsion concentration. So, what you're going to do is you're just going to increase the

emulsion concentration to get that stability. First of all, that's not an accurate view of how emulsion stability works and emulsifiers work. But you would be looking at that whole thing and what all the components are in terms of how that contributes to stability." DTX-037 at 1318:7-22. This testimony directly undercuts Dr. Little's present suggestion that a POSA would believe the inventors were in possession of aprepitant emulsion containing up to 20 wt/wt % emulsifier merely because Example 2 was stable for one additional month.

Even the Examiner charged with evaluating the '520 patent recognized that emulsifier concentration is not the sole factor that can influence stability. *See* JTX-9.0170-0171. In maintaining his obviousness rejection over Zhou, which contained about 10 wt/wt % egg lecithin, the Examiner explained:

> The Examiner cannot attach particular significance as showing non-obviousness to those examples since the compositions in examples 1-3 and 6 do not have such correspondence that the improved results of lack of crystal formation can be traced, within a reasonable certainty, to the amount of emulsifier alone. It could very well be due to the presence of sodium oleate alone or sodium oleate + sucrose or all the components listed are required to produce the result.

JTX-9.0170-0171. The Examiner's comments are equally applicable to the data in Table. 7. Based on the intrinsic evidence, the inventor testimony, and prior testimony of Dr. Little, it is not credible to assert that a few working examples of stable formulations would be enough to cure the unpredictability in the art, let alone the increased ranges in the new claims.

### 6. The existing knowledge of aprepitant and its emulsions demanded more robust support for the claimed subject matter

The existing knowledge in the field and the content of the prior art are also relevant factors in considering the sufficiency of Heron's written disclosure. *See Ariad*, 598 F.3d at 1351. According to the '520 patent, the technical field is "emulsion formulations and systems for the intravenous or parenteral administration of aprepitant for treatment of emesis." JTX-3.0008 at

1:23-25. Because aprepitant exhibited formidable solubility properties, however, the formation of a stable aprepitant emulsion was complex. *See* JTX-0024 at 44 ("The sparing water solubility of aprepitant precluded its formulation in a vehicle acceptable for intravenous administration in humans."). An emulsion formulation was "very complex." *See* Tr. at 169:25. They needed to be stable. *See id*. at 166:14-20 (acknowledging that it was known that emulsion formulations must be physically stable) and 218:17-219:13 (acknowledging that stability less than 1 week is not physically stable or a viable formulation).

According to Heron, "there was nothing in the prior art that would have directed us as to how to achieve that stability." *Id.* at 213:18-23. And according to Dr. Little, most of the prior art used "low single digit[] amounts of emulsifier" (*id.* at 497:2-8), and "[T]here were a couple of prior art references [like Zhou] that attempted to go up into the higher single digits, but these weren't ultimately successful." *Id*. at 497:9-12. He further opined that "[t]here was no indication anywhere in the prior art that levels above 10 percent would – would improve the stability of the emulsion – of the aprepitant emulsion." *Id*. at 209:7-12. The Court ultimately agreed in *Fresenius* with Dr. Little's conclusion that it was not obvious to a POSA that increasing emulsifier levels would improve stability. *See Heron Therapeutics, Inc. v Fresenius Kabi USA, LLC*, Case No. 22-cv-985-WCB, D.I. 193 at 43.

Dr. Little's argument that a POSA's viewpoint would have done a complete 180 after the '520 patent issued is not persuasive. *See* Tr. at 454:4-456:9, 556:3-15. The mere fact that the inventors discovered a few stable embodiments that were "not in the conventional range that was thought of before," but rather in the 13-15 wt/wt % emulsifier claimed in the earlier patents, does not mean that a POSA would have suddenly deemed it obvious to increase the emulsifier content to levels above 15 wt/wt %. *See id*. at 454:8-12, 455:11-15, 503:23-504:10, 556:3-15, 582:8-583:8.

The specification only identifies four examples of a stable aprepitant emulsions over a range of ±2.6% emulsifier using a ratio of 20:1 emulsifier to aprepitant. The inventors could not explain why these examples were stable, nor predict whether other aprepitant emulsions with a different emulsifier content and/or different excipients would also be stable. A POSA would have no better ability to "read the tea leaves" than the inventors after the publication of the '520 patent and would not believe that the inventors were in possession of the full scope of claim 8 merely because of the examples in the patent.

Indeed, Dr. Little previously testified that a POSA would be concerned that increasing the emulsifier content "could have a stability problem." DTX-37 at 1281:9-21, 1282:8-12. There is nothing in the specification of the '520 patent that would alleviate this concern for formulations with an emulsifier content exceeding the 14.3 wt/wt % emulsifier content used in Example 2. A POSA still would not know how high the emulsifier content could go without disrupting stability.

Example 4 containing 9.95 wt/wt % egg lecithin failed to result in a stable aprepitant emulsion. *See* JTX-3 at 18:25-66. Increasing the emulsifier content by approximately 0.35 wt/wt % to 11.3 wt/wt % in Example 3 and changing the amount and identity of certain excipients was successful. And therein lies the problem: nothing in the specification teaches a POSA why these differences do or should matter, and the inventors readily admitted that they had no idea what other formulations would work. Absent an explanation that would enable a POSA to fill in the gaps, Heron should not be permitted to stretch its claims to an emulsifier concentration of 20 wt/wt %.

In *Lipocine*, 541 F. Supp. 3d at 439, the Delaware District Court considered claims that covered compositions containing between 14% and 35% testosterone undecanoate ("TU") by weight. These claims were supported by "Composition Examples" containing 18%, 15%, and 15% TU, respectively. As in this case, the specification contained a generic disclosure that "TU can be

present in different percentage amounts in the composition, such as from about 15 wt % to about 30 wt %, from about 18 wt % to about 25 wt %, or from about 14 wt % to about 18 wt % of the total composition." *Id.* at 441.

The court found the claims invalid because "the TU concentration in those Composition Examples (18%, 15%, and 15%, respectively) are near the bottom of the 14-35% TU concentration range recited in those claims." *Id.* at 459. The court explained:

> In this case, the claims of the asserted patents are very broad, and the number of operative species disclosed in the specification is very small. And there is no evidence in the patents, or otherwise in the record, that the few operative species are representative of the broad genus that the inventors sought to cover with each claim. In short, the claims are directed to a forest, and the specification contains very few blaze marks identifying the particular formulations that can be used to satisfy the functional limitations of the claims. What is more, the species that are shown to be operative are not representative of the entire claimed genus; in effect, the blaze marks are confined to a few trees at one edge of the forest.

*Id.* at 458; *see also, e.g.*, *Azurity Pharms. v. Alkem Labs Ltd.*, 655 F. Supp. 3d 270, 304 (D. Del. 2023), *aff'd* 2023 WL 5970784 (Fed. Cir. 2023) ("The specification describes a large variety of ways to combine ingredients but does not say which combinations that use paraben preservatives are stable. That is, if a POSA were to combine ingredients from the specification, they would not know whether they would have the claimed invention."); *Fujikawa*, 93 F.3d at 1571 (explaining "It is easy to bypass a tree in the forest, even one that lies close to the trail, unless the point at which one must leave the trail to find the tree is well marked."). The court's conclusion in *Lipocene* is equally applicable here. The specification requires more disclosure than it contains to demonstrate possession of the entire claim scope

## C.    A POSA Would Not Believe that Heron Possessed the Full Scope of Claims 5 and 23 of the '255 Patent

Claim 5 of the '255 patent is even broader than Claim 8 of the '520 patent. Claim 5 depends from claim 1 and, with the included limitations, reads:

21

> An injectable emulsion, comprising: 0.7-0.8 wt% aprepitant; 13 wt/wt % to 20 wt/wt % of [egg lecithin]; an oil; a co-emulsifier which is an alcohol; a tonicity modifier; a pH modifier; and water; wherein the pH of the emulsion ranges from about 7.5 to 9.0.

JTX-2 at 32:48-65. Notably, claim 5 does not require a specific ratio of egg lecithin to aprepitant nor an express requirement for physical stability. It also does not specify (1) the type of alcohol that should be used as a co-emulsifier; (2) the amount of water; or (3) the type or amount of required oil, tonicity modifier, or pH modifier.

Claim 23 of the '255 patent also covers a broad genus of possible emulsions. Claim 23 depends from claim 1 as well as each of claims 14, 16, 19, and 21. With the included limitations of claims 1, 14, 1, 19, and 21 (including those lacking antecedent basis), claim 23 reads:

> An injectable emulsion, comprising: 0.7-0.8 wt% aprepitant; 13 wt/wt % to 20 wt/wt % of [egg lecithin]; an oil; a co-emulsifier which is [ethanol at a concentration of about 2 wt/wt % to 3 wt/wt %], a tonicity modifier [which is sucrose at a concentration of about 5 wt/wt%]; a pH modifier [which is sodium oleate at a concentration of about 0.4 wt/wt % to 0.5 wt/wt %]; and water; wherein the pH of the emulsion ranges from about 7.5 to 9.0.

JTX-2.[6]

The Court has provisionally ruled that claims 5 and 23 do not require "physical stability." Tr. at 102:8-104:19. Notwithstanding, the preamble of claims 5 and 23 requires the claimed formulations to be in the form of "injectable emulsions." The specification defines an "emulsion" as "a colloidal dispersion of two immiscible liquids in the form of droplets, whose diameter, in general, is between 10 nanometers and 100 microns." JTX-2 at 9:63-66. As discussed below, there

---

[6] Claim 23 recites a "phospholipid", "sucrose" and "sodium oleate." However, these excipients, are not recited in any of the preceding claims in the dependency chain—claims 1, 14, 16, 19, and 21. This lack of antecedent basis is a further reason why claim 23 should not stand since it makes claim 23 indefinite.

is nothing in the specification to indicate to a POSA that the inventors were in possession of aprepitant emulsions meeting this criterion across the full scope of claims 5 and 23.

### 1.    The preamble of claims 5 and 23 is limiting

The preamble of claims 5 and 23 of the '255 patent is clearly limiting. The issue of "[w]hether to treat a preamble as a limitation is determined on the facts of each case in light of the overall form of the claim, and the invention as described in the specification and illuminated in the prosecution history." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1357 (Fed. Cir. 2012) (internal quotation marks omitted). A preamble is limiting when, as here, it "recit[es] additional structure or steps underscored as important by the specification." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (citations omitted); *Bicon, Inc. v Az. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) ("However, the preamble is regarded as limiting if it recites essential structure that is important to the invention or necessary to give meaning to the claim.").

In *Deere*, the Federal Circuit ruled that the term "rotary cutter deck" was a claim limitation despite the fact that it only appeared in the preamble. *See Deere*, 703 F.3d at 1357. In reaching this decision, the Court analyzed three "guideposts" it indicated were relevant to determining whether a preamble is limiting. *See id*. at 1357-1358. The first "guidepost" looked to whether the specification identified the structure recited in the preamble as important. *See id*. The second "guidepost" was whether the structure in the preamble provided an antecedent basis for a claim limitation, in which case it "generally limits the scope of the claim." *See id*. at 1358; *see also In re Fought*, 941 F.3d 1175, 1178 (Fed. Cir. 2019). Lastly, the Federal Circuit indicated that "if the body of the claim describes a structurally complete invention, a preamble is not limiting where it 'merely gives a name' to the invention, extols its features or benefits, or describes a use of the invention." *Id.*; *see also Catalina*, 289 F.3d at 809 ("preamble language merely extolling benefits

23

or features of the claimed invention does not limit the claim scope without clear reliance on those benefits or features as patentably significant.").

Applying the *Deere* "guideposts," the Federal Circuit observed that the specification repeatedly referred to the "present invention" as "an improved deck for a rotary cutter," or a "rotary cutter deck." *See Deere*, 703 F.3d at 1357. Moreover, the "rotary cutter deck" "describe[d] a fundamental characteristic of the claimed invention that informed one of skill as to the structure of the claim." The Federal Circuit further observed that the "rotary cutter deck" of the preamble provided the antecedent basis for the term "said deck" in claim 5. *See id*. at 1357-1358. Finally, the "rotary cutter deck" was required to provide a "structurally complete invention" because the "rotary cutter deck" term in the preamble "inform[ed] the meaning of the "torsional stiffness" limitation—the claimed structure must possess sufficient stiffness to withstand the torsional loads imposed by the operation of a rotary cutter." *Id*. at 1358.

The analysis in *Deere* is equally applicable to the preamble in claims 5 and 23 and compels the conclusion that "injectable emulsion" must be limiting. The specification of the '255 patent repeatedly emphasizes the importance of the term "emulsion" and confirms that it is structural because it tells a POSA how to arrange the recited ingredients of the formulation—aprepitant, emulsifier, oil, alcohol, tonicity modifier, pH modifier, and water. The specification further indicates that the claimed "injectable emulsions" are those with "a very small droplet size to circulate in the bloodstream without causing capillary blockage and embolization. These size limits are typified by [<USP729>]... The droplet size limits defined in USP <729> apply throughout the assigned shelf life." JTX-2 at 1:64-2:10.

Without the preamble term "emulsion," claims 5 and 23 could encompass any arrangement of the recited ingredients, including solutions, suspensions, or colloids and versions of emulsions

which are not suitable for injection due to droplet size. Such a result would directly contradict the intent of the inventors and ignore the clear description of the invention in the specification.[7]

The preamble phrase "injectable emulsion" is also the sole antecedent basis for the claim limitation that "the pH *of the emulsion* ranges from about 7.5 to 9.0." JTX-2 at 32:48-57 (emphasis added). This counsels in favor of finding that the preamble is limiting because it imparts "life, meaning, and vitality" to a claim. *See Catalina*, 289 F.3d at 808. In *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, the preamble of the asserted claim recited that the claimed method of or apparatus was for "producing on a photoreceptor an image of *generated shapes* made up of spots." 182 F.3d 1298, 1306 (Fed. Cir. 1999). The Court held the preamble "necessary to give life, meaning, and vitality" and that it was limiting for at least the reason that the statement is intimately meshed with the ensuing language in the claim. *Id*. For example, both independent claims conclude with the clause "whereby the appearance of smoothed edges are given to *the generated shapes*" – and thus the antecedent basis for a claim limitation was found in the preamble. *Id*.

Here, the importance of the preamble's recitation of "emulsion" also was not lost on the Examiner, who referred to the "emulsion" no less than four times when allowing the '255 patent's claims to issue. JTX-8 at 0160-161.

---

[7] Even Dr. Little agreed that "the disclosure relates generally to emulsion formulation" (Tr. at 460:25-461:3), and the claims were a list of ingredients "of a recipe for the emulsion." Tr. at 467:1-8; 475:10-21. Without the preamble's recitation of "[a]n injectable emulsion," there is no emulsion requirement, and there is no longer any "recipe" for an "emulsion." There is only a disparate list of ingredients that no longer need be combined in any particular fashion.

### 2. The preamble is necessary to describe a structurally complete invention[8]

Lastly, the body of claim 1 does not set forth a structurally complete invention. Ignoring the preamble's recitation of "[a]n injectable emulsion" improperly distances the claims from the specification's actual disclosure and ignores what the inventors regarded as their invention. If the preamble's recitation of "injectable emulsion" was not intended to impart structure to claim 1, there was no need for the inventors include the term "emulsion" in the body of the claims. The specification makes clear that the inventors regarded their invention as "identify[ing] a formulation and process that will allow an NK-1 receptor antagonist compound to be incorporated into *an emulsion for intravenous injection* and remain stable during the shelf like of the formulation." *See* JTX-2 at 2:36-41. The preamble language is a direct reference to this purpose and makes clear that the inventors' definition of "emulsion" was intended to limit the type and structure of the emulsions covered by the claims.

### 3. Claims 5 and 23 lack adequate written description

Claims 5 and 23 of the '255 patent recite the same 13 wt/wt % to 20 wt/wt % of an emulsifier as claim 8 of the '520 patent. This limitation lacks adequate written description for the same reasons discussed above with respect to claim 8. In fact, the lack of written description is

---

[8] Azurity recognizes that the Court ruled that the asserted claims of the '255 patent do not include "a limitation directed to physical stability." Tr. at 102:8-104:19. Azurity reserves the right to appeal from that bench ruling.

    If the preamble of independent claim 1 of the '255 patent reading "an injectable emulsion, comprising" is held to be limiting, the resulting claimed formulations must inherently have a stability requirement. This is true because the specification limits an "injectable emulsion" to those emulsions with "a very small droplet size to circulate in the bloodstream without causing capillary blockage and embolization. These size limits are typified by [<USP729>]…Emulsion formulations must be physically stable. The droplet size limits defined in USP <729> apply throughout the assigned shelf life." JTX-2 at 1:64-2:10.

even more clear with respect to these claims because claims 5 and 23 of the '255 patent are significantly broader than claim 8 of the '520 patent. *See* Tr. at 276:14-277:22.

As noted above, claim 5 does not specify any particular "oil," "alcohol," "tonicity modifier," or "pH modifier," or any quantities for these excipients or water. *See, e.g.*, JTX-2 at 32:48-65; *see also* Tr. at 275:9-277:7. Although the specification provides many options for each of these components, the claims are not limited by these options and would cover any ingredient that a POSA would identify as an "oil," "alcohol," "tonicity modifier," or "pH modifier". *See* JTX-2 at 13:37-57 (non-limiting oil options, e.g. "vegetable oils" and listing 18 such oils), 3:19-41 (non-limiting pH modifier options, such as 5 expressly listed modifiers), 14:52-55 (non-limiting tonicity modifier options, such as 4 expressly listed modifiers and mixtures thereof). "So the possibilities, when you start to consider all of the different permutations, it's quite enormous." Tr. at 275:14-16 (Amiji).

The support for these many permutations is limited to the four working examples in the specification. There is no disclosure in the specification or real-world evidence proving or even suggesting that the inventors ever prepared any other species covered by these claims. Moreover, there is no evidence that all species covered by these claims are capable of forming an "emulsion," let alone an emulsion meeting the definition of "emulsion" in the specification— "a colloidal dispersion of two immiscible liquids in the form of droplets, whose diameter, in general, is between 10 nanometers and 100 microns." JTX-2 at 9:63-66. In this regard, the specification provides no guidance or "blaze marks" that would guide a POSA in selecting the appropriate combination of ingredients to achieve the emulsions defined in the specification and required by the claims.

This is important, because the evidence at trial was uncontroverted that changing a component or its concentration can affect everything else, and a POSA would not know the impact

27

of any change unless and until they formulated and tested them to see if a suitable emulsion was obtained. Indeed, as Dr. Amiji testified, "[t]hat's the only way you can tell if the emulsion is being formed." *Id*. at 287:11-288:7 (Amiji); *see also id*. at 137:18-138:6 (inventor testifying that "[y]ou have to test the different emulsifiers, oils, and other excipients to determine if it will make a stable emulsion."); *id*. at 139:11-16 ("You have to make a range of emulsions to determine which one is physically stable").

In sum, Heron's claims invite POSA to "check" if the full scope of what is claimed will afford an emulsion of any duration that meets the definition of emulsion in the specification. That is not possession within the meaning of Section 112. *See Nuvo*, 923 F.3d at 1381; *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 923 (Fed. Cir. 2004) ("It is not a question whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure of the application. Rather, it is a question whether the application necessarily discloses that particular device.").

## IV.    THE ASSERTED CLAIMS ARE NOT ENABLED

### A.    Legal Standard

"To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir. 2010) (quoting *Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997)). Thus, "[t]he scope of the claims must be less than or equal to the scope of the enablement." *Nat'l Recovery Techs., Inc v. Magnetic Separations Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999). "The scope of enablement, in turn, is that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation." *Id.* at 1196.

In determining whether the amount of experimentation that would be required to practice a claimed invention would be "undue," courts consider several factors: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims." *ALZA Corp.*, 603 F.3d at 940 (quoting *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988)); *see also Enzo*, 188 F.3d at 1371-76 (applying *Wands* factors in affirming district court's finding of invalidity based on lack of enablement).

"[A] patentee chooses broad claim language at the peril of losing any claim that cannot be enabled across its full scope of coverage." *MagSil*, 687 F.3d at 1381. "The specification must contain sufficient disclosure to enable an ordinarily skilled artisan to make and use the entire scope of the claimed invention at the time of filing." *Id.; see also Par Pharma., Inc. v. TWi Pharmas., Inc.*, 120 F.Supp.3d 468, 475-79 (D. Md. 2015) (claims invalid because broad enough to read on inoperative particle sizes), *aff'd without opinion*, 624 Fed. Appx. 756 (Fed. Cir. 2015).

### B.  Claim 8 of the '520 Patent is Not Enabled

As discussed above, claim 8 of the '520 patent covers a large genus of stable injectable aprepitant emulsions with egg lecithin (13-20 wt/wt %), soybean oil (9-10 wt/wt %), co-emulsifier (which is ethanol at 2-3 wt/wt %), *any* tonicity agent, a pH modifier (which is sodium oleate), pH (about 7.5 to 9.0), *any* amount of water, and aprepitant to achieve an egg lecithin:aprepitant ratio of "about 20:1-25:1." *See* JTX-3 at 23:11-41; Tr. at 274:10-277:22 (Amiji). Claim 8 also requires that the claimed formulations be "physically stable", as defined by the Court.

In this case, the most compelling of the *Wands* factors are unpredictability, the amount of experimentation required to determine physical stability under the Court's definition, and the lack of guidance in the specification for how a POSA could identify physically stable formulations

within the broad scope of the claims without preparing and testing each one of them. The inventors uniformly testified that they were unable to predict stability despite spending several years making and testing various aprepitant formulations and there is no reason to believe that a POSA would have any better luck. The inventors also uniformly acknowledged that changes in any one ingredient could have an impact on stability because "everything affects each other. ***You cannot just increase one concentration and expect to have the same result***." Tr. at 157:7-25 (emphasis added). Specifications that fail to provide "meaningful guidance into what compounds beyond the examples and formulas … would provide the same result" are not enabling. *Idenix*, 941 F.3d at 1161. In *Medytox, Inc. v. Galderma S.A.*, 71 F.4th 990, 998–99 (Fed. Cir. 2023), the asserted claims were construed to be direct to a "responder rate" between 50% to 100%. But there were "at most three examples of responder rates above 50% at 16 weeks: 52%, 61%, and 62%." *Id.* at 998–99. The Court acknowledged that "caselaw may not require disclosure of every possible working example of responder rates," but the mere three working examples at the lower end of the range was inadequate.  "[H]ere, there are at most three examples of responder rates above 50% … A skilled artisan, reading the specification, would not have been able to achieve higher than 62% for the responder rate limitation without undue experimentation." *Id*. at 996.

Given the very large number of aprepitant formulations covered by the full scope of claim 8, there can be little doubt that a POSA would need to conduct many experiments to identify stable aprepitant emulsions outside of the "little island of stability" that the inventors identified in the Examples. Although Dr. Little attempted to minimize the amount of effort required for this purpose by testifying "[t]hey're not long experiments" and that "[t]he range that you're given here is pretty constrained," the sheer number of experiments a POSA would need to conduct unquestionably would constitute "undue experimentation." *See* Tr. at 558:8-23.

"[E]nablement is *not* measured against the cumulative time and effort it takes to make every embodiment within a claim." *Amgen Inc. v. Sanofi*, 598 U.S. 594, 615 (2023) (holding examined patents invalid for lack of enablement). The issue is the absence of any "general quality [that] may reliably enable a person skilled in the art to make and use all of what is claimed, not merely a subset." *Id.* at 611. The patent cannot merely offer persons skilled in the art little more than advice to engage in "trial and error." *See id.* at 614. Yet, that is the case here. Dr. Amiji and the inventors agreed that a trial-and-error approach is required to practice the full scope of the claims. *See* Tr. at 288:1-290:11; *see also id.* at 128:22-129:3, 137:18-138:6, 139:11-16, 157:7-25, 188:11-22, and 237:6-18.

Dr. Little's testimony did little if anything to counter this evidence. He claimed, without support, that if a POSA began with the Examples as a reference point and modified them, one could "see what the properties are" and use "knowledge and skill in the art to hypothesize what's going on and make corrections to it by modifying things." *See* Tr. at 559:16-25; *see also id.* at 560:5-10 ("[I]f something did [go wrong], you have the ability to use those reference points in order to hypothesize design experiments and test them."). The inventors went through exactly the process that Dr. Little described and after two years of steady laboratory work were only able to identify the four physically stable formulations described in the Examples. And they still were unable to say whether any formulation they had not made and tested would be stable. This is evidence of undue experimentation—not enablement. *See Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362, 1367 (Fed. Cir. 2023) ("This is the definition of trial and error and leaves the public no better equipped to make and use the claimed [emulsions] than the inventors were when they set out to discover the [formulations] over which they now have an exclusive right."); *see also Medytox*, 71 F.4th at 998–99 (specification describing three working examples at bottom of range not enabling).

Courts have noted "written description and enablement often rise and fall together." *Ariad*, 598 F.3d at 1352; *Capon v. Eshhar*, 418 F.3d 1349, 1360 (Fed. Cir. 2005). Azurity addressed the remaining *Wands* factors that support a finding of lack of enablement for the full scope of claim 8 above in addressing the lack of written description for this claim, including the presence or absence of working examples, the nature of the invention, the state of the prior art, and the relative skill of those in the art. These arguments apply with equal force to the lack of enablement of claim 8. *See In re Wands*, 858 F.2d at 737.

### C.    Claims 5 and 23 of the '255 Patent are Not Enabled

Claims 5 and 23 of the '255 patent also cover a broad genus of aprepitant formulations which, while not expressly required to be "physically stable," must nonetheless be "emulsions." The specification provides a specific definition of "emulsion" as "a colloidal dispersion of two immiscible liquids in the form of droplets, whose diameter, in general, is between 10 nanometers and 100 microns." JTX-2 at 9:63-66. The four working examples in the specification--at the bottom end of the claimed range—do not offer the POSA any meaningful guidance regarding whether all formulations which fall within the scope of claims 5 and 23 of the '255 patent would be successful in forming colloidal dispersions with nano or micron size droplets suitable for intravenous administration. Therefore, the specification provides no guidance on how to identify such formulations from among the many species covered by these claims, and there is no evidence in the record that they could be identified in any way apart from making and testing many additional species. Thus, the specification is not enabling for the broader claim ranges because it is an invitation for trial and error, the definition of undue experimentation. *See Medytox*, 71 F.4th at 998–99 (Fed. Cir. 2023) (specification describing three working examples at bottom of range not enabling). This is particularly true in view of the inventors' testimony that changing an

excipient or its concentration affects everything else. Tr. at 157:7-25. This evidence demonstrates that claims 5 and 23 of the '255 patent are not enabled.

## V.    CONCLUSION

For all the above reasons, Defendants respectfully request the Court to issue judgment in their favor.

Dated: January 23, 2026

*Of Counsel:*

Andrew J. Miller
Contance H. Huttner
Robyn As-Gmoser
Elham F. Steiner
Colby Davis
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
(973) 966-3200

*/s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Azurity Pharmaceuticals, Inc.,*
*Azurity Pharmaceuticals India LLP, and*
*Slayback Pharma LLC*