**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| HERON THERAPEUTICS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 24-1363 (WCB) |
| | ) | |
| | ) | |
| AZURITY PHARMACEUTICALS, INC., AZURITY PHARMACEUTICALS INDIA LLP F/K/A SLAYBACK PHARMA INDIA LLP, AND SLAYBACK PHARMA LLC, | ) | [redacted] |
| | ) | REDACTED - PUBLIC VERSION |
| | ) | Original filing date: February 6, 2026 |
| | ) | Redacted filing date: February 13, 2026 |
| Defendants. | ) | |

**<u>HERON'S RESPONSIVE POST-TRIAL BRIEF</u>**

## CLAIMS AT ISSUE

### U.S. Patent No. 12,290,520: Claim 8

1. An injectable emulsion, comprising:
aprepitant;
13 wt/wt % to 20 wt/wt % of an egg lecithin;
9 wt/wt % to 10 wt/wt % of soybean oil;
a co-emulsifier which is an alcohol, wherein the alcohol is present in the emulsion at less than 10 wt/wt %;
a tonicity modifier;
a pH modifier, wherein the pH modifier is sodium oleate;
and water;
wherein the ratio of egg lecithin to aprepitant is between about 20:1 to 25:1;
wherein the pH of the emulsion ranges from about 7.5 to 9.0; and,
wherein the emulsion is physically stable.

7. The emulsion of claim 1, wherein the alcohol in the emulsion is ethanol.

**8.** The emulsion of claim 7, wherein the ethanol is present in the emulsion at a concentration of about 2 wt/wt % to 3 wt/wt %.

### U.S. Patent No. 12,155,255: Claims 5 and 23

1. An injectable emulsion, comprising:
0.7-0.8 wt % aprepitant;
13 wt/wt % to 20 wt/wt % of an emulsifier;
an oil;
a co-emulsifier which is an alcohol;
a tonicity modifier;
a pH modifier;
and water;
wherein the pH of the emulsion ranges from about 7.5 to 9.0.

**5.** The emulsion of claim 1, wherein the emulsifier is an egg lecithin.

14. The emulsion of claim 1, wherein the alcohol in the emulsion is ethanol.

16. The emulsion of claim 14, wherein the ethanol is present in the emulsion at a concentration of about 2 wt/wt % to 3 wt/wt %.

19. The emulsion of claim 16, wherein the sucrose is present at a concentration of about 5 wt/wt %.

21. The emulsion of claim 19, wherein the sodium oleate is present at a concentration of about 0.4 wt/wt % to 0.5 wt/wt %.

**23.** The emulsion of claim 21, wherein the phospholipid is an egg lecithin.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. AZURITY FAILED TO PROVE THAT THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION OR ENABLEMENT SUPPORT ........ 2

- A. Azurity Failed to Prove That ’520 Patent Claim 8 Lacks Written Description ........ 2
  - 1. Claim 8 Is Not Functionally Defined ........ 2
  - 2. Azurity Does Not Read the Specification as a Whole ........ 5
  - 3. Azurity Failed to Show the Examples, in the Context of the Specification as a Whole, Do Not Convey Possession ........ 8
  - 4. Azurity Failed to Show the Physical Stability of Claim 8’s Narrowly Drawn Formulation Is Sufficiently Unpredictable ........ 11
- B. Azurity Failed to Prove That ’520 Patent Claim 8 Lacks Enablement ........ 15
  - 1. Azurity Has Not Shown Even One Inoperable Embodiment ........ 15
  - 2. Azurity Has Not Shown a Large Quantity of Experimentation ........ 16
  - 3. Azurity Has Not Shown Insufficient Guidance in the Specification ........ 18
- C. Azurity Failed to Prove That ’255 Patent Claims 5 and 23 Lack Written Description or Enablement ........ 18

III. CONCLUSION ........ 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Alcon Rsch. Ltd. v. Barr Laby's, Inc.*,
745 F.3d 1180 (Fed. Cir. 2014)............................................................................... *passim*

*Allergan USA, Inc. v. MSN Lab'ys Private Ltd.*,
111 F.4th 1358 (Fed. Cir. 2024) ...............................................................................5

*Amgen Inc. v. Sanofi*,
598 U.S. 594 (2023)...............................................................................................17, 18

*Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) ..............................................................3, 5, 12

*Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*,
720 F.2d 1569 (Fed. Cir. 1984)...............................................................................16

*Azurity v. Alkem*,
655 F. Supp. 3d 270 (D. Del. 2023 ..........................................................................9

*Baxalta Inc. v. Genentech, Inc.*,
81 F.4th 1362 (Fed. Cir. 2023) ...............................................................................17

*Bilstad v. Wakalopulos*,
386 F.3d 1116 (Fed. Cir. 2004)...............................................................................11, 12

*Capon v. Eshhar*,
418 F.3d 1349 (Fed. Cir. 2005)...............................................................................4

*Cordis Corp. v. Medtronic AVE, Inc.*,
339 F.3d 1352 (Fed. Cir. 2003)...............................................................................4

*Eli Lilly & Co. v. Perrigo Co.*,
202 F. Supp. 3d. 918 (S.D. Ind. 2016),
*aff'd on other grounds* 718 F. App'x 953 (Fed. Cir. 2017) .....................................3, 9

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
435 F.3d 1366 (Fed. Cir. 2006)...............................................................................20

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
276 F. Supp. 3d 629 (E.D. Tex. 2017).....................................................................20

*Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*,
No. 22-985-WCB (D. Del. Dec. 3, 2024) ..............................................................10, 14

*Idenix Pharms. LLC v. Gilead Scis. Inc.*,
941 F.3d 1149 (Fed. Cir. 2019)........................................................................... *passim*

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*,
10 F.4th 1330 (Fed. Cir. 2021) .............................................................................3

*Lipocine Inc. v. Clarus Therapeutics, Inc.*,
541 F. Supp. 3d 435 (D. Del. 2021).....................................................................1, 8, 9

*Medytox, Inc. v. Galderma S.A.*,
71 F.4th 990 (Fed. Cir. 2023) ..............................................................................18

*Par Pharms., Inc. v. Twi Pharms., Inc.*,
120 F. Supp. 3d 468 (D. Md.),
*aff'd without opinion*, 624 F. App'x 756 (Fed. Cir. 2015)................................................15, 16

# TABLE OF ABBREVIATIONS

| Abbreviation | Term |
|---|---|
| ’229 patent | U.S. Patent No. 9,561,229 |
| ’255 patent | U.S. Patent No. 12,155,255 |
| ’465 patent | U.S. Patent No. 9,808,465 |
| ’520 patent | U.S. Patent No. 12,290,520 |
| ABr. | Azurity’s Opening Post-Trial Brief (D.I. 189) |
| asserted claims | claim 8 of the ’520 patent and claims 5 and 23 of the ’255 patent |
| asserted patents | ’520 patent and ’255 patent |
| Azurity | Azurity Pharmaceuticals, Inc., Azurity Pharmaceuticals India LLP f/k/a Slayback Pharma India LLP, and Slayback Pharma LLC |
| Azurity Proposed Product | Azurity’s generic version of CINVANTI®, subject of 505(b)(2) NDA No. 218754 |
| CN845 | Chinese Patent Publication No. CN102379845 |
| HBr. | Heron’s Opening Post-Trial Brief (D.I. 187) |
| Heron | Heron Therapeutics, Inc. |
| patents-in-suit | ’520 patent and ’255 patent |
| POSA | person of ordinary skill in the art |
| TU | testosterone undecanoate |
| Zhou 2012 | Zhou et al., *Preparation of Aprepitant Emulsion for Intravenous Injection*, 43 CHINESE J. OF PHARMACEUTICALS, 1003 (2012) |

# I. INTRODUCTION

Faced with the specification's clear disclosure of the claimed 13-20 wt/wt % egg lecithin, Azurity failed to present clear and convincing evidence at trial that the asserted claims are invalid for lack of written description or enablement. Azurity tries to sidestep Heron's detailed disclosure by applying a series of incorrect legal standards, factual mischaracterizations, and unsupported attorney argument. But that cannot overcome the presumption of validity.

*First*, Azurity tries to elevate the written description standard for claim 8 of the '520 patent by analogizing it to the claims in unrelated functionally defined genus cases like *Idenix Pharmaceuticals LLC v. Gilead Sciences Inc.*, 941 F.3d 1149 (Fed. Cir. 2019). But claim 8 is not functionally defined, and its precise ingredient-by-ingredient, amount-by-amount limitations bear no resemblance to the structurally unlimited claims in those cases. *Second*, Azurity improperly ignores the specification as a whole. Instead, it focuses on only the working examples, which are not even required. *Alcon Rsch. Ltd. v. Barr Laby's, Inc.*, 745 F.3d 1180, 1190-91 (Fed. Cir. 2014). Azurity is also wrong that the inventors never made any physically stable emulsions with over 15 wt/wt % emulsifier. And even if that were true (it is not), written description is a "four corners" inquiry and does not require actual reduction to practice. *Id.*

*Third*, Azurity's analysis of the working examples is also flawed. It again analogizes to distinguishable case law, including *Lipocine Inc. v. Clarus Therapeutics, Inc.*, 541 F. Supp. 3d 435 (D. Del. 2021). Azurity improperly frames the written description inquiry by focusing on how a POSA would see the unpredictability of increasing egg lecithin in view of only the prior art, without the benefit of the specification. And the criticisms it raises about a POSA's view of Example 3 or the increasing stability in Table 7 are either supported only by Azurity's own attorney argument, rebutted by contrary fact and expert testimony, or both. *Fourth*, Azurity's enablement arguments for claim 8 of the '520 patent essentially recycle its written description

assertions and fail for the same reasons. It cannot point to a single failed embodiment of claim 8 to counter the working embodiments of, *e.g.*, Example 2 and the Azurity Proposed Product, and likewise cites no evidence of undue experimentation.

*Finally*, despite this Court's repeated finding that claims 5 and 23 of the '255 patent have no stability requirement, Azurity's only written description and enablement arguments for those claims appear to rely on yet another newly proposed stability requirement. Such component-by-component limitations recite a structurally complete invention. Regardless, Azurity presents no evidence that the specification did not enable or convey possession of the claimed "emulsions."

## II. AZURITY FAILED TO PROVE THAT THE ASSERTED CLAIMS LACK WRITTEN DESCRIPTION OR ENABLEMENT SUPPORT

### A. Azurity Failed to Prove That '520 Patent Claim 8 Lacks Written Description

#### 1. Claim 8 Is Not Functionally Defined

Azurity tries to elevate the written description required for claim 8 by shoehorning its "physically stable" requirement into an unrelated line of "functionally defined" genus cases. (ABr. at 7.) But physical stability, as construed by this Court, is a claimed "feature" or "benefit" of the formulation that merely requires certain particle size, PFAT5, and crystallization limits. (*See* Tr. 102:14-103:7 (Court); D.I. 136 at 5-7 (collecting cases).) Those properties are nothing like the complex therapeutic or biochemical "functions" in Azurity's cases. Moreover, claim 8 covers structurally complete compositions, defined by specific ingredient-by-ingredient recipes (Tr. at 471:4-23 (Little)), not merely a function they perform. That is, they have clear structural limits and do not cover any and every hypothetical "physically stable" aprepitant emulsion.

For example, Azurity relies heavily on *Idenix* (ABr. at 10, 13, 15), where the claim "encompasse[d] any β-D nucleoside meeting both the structural limitations (including a methyl

group at 2'-up) and the functional limitations (efficacy in treating HCV)." 941 F.3d at 1155-56.[1] The claim did impose *some* structure, but "allow[ed] nearly any imaginable substituent at the 2'-down position," creating "billions of potential . . . nucleosides." *Id*.[2] The question at issue was "whether [the patent showed] possession of those . . . nucleosides that fall within the boundaries of the claim (*i.e.*, are effective against HCV) but are not encompassed by the explicit formulas or examples provided in the specification." *Id*. at 1163. The claim was invalid because there was "no method of distinguishing effective from ineffective compounds for the [claimed] compounds reaching beyond the formulas disclosed in the . . . patent." *Id*. at 1164.

Here, by contrast, there are *no* claimed structures that "fall within the boundaries of the claim" but "are not encompassed by the explicit formulas or examples provided in the specification." *Id*. at 1163, 1164. Example 2 is a clear embodiment of claim 8, and the specification expressly instructs that it can be modified to use the claimed 13-20 wt/wt % egg lecithin, along with its other limitations. (HBr., §§ V.A.2, V.A.4.) In that way, *Idenix* actually supports claim 8; there, too, "[t]he . . . patent provide[d] adequate written description for the compounds within its formulas" (*e.g.*, emulsions with the disclosed 13-20 wt/wt % egg lecithin).[3]

Moreover, Azurity's criticism that claim 8 covers a formulation with "hundreds, if not

---

[1] All emphases added and internal citations and quotations omitted, unless otherwise noted.

[2] Azurity's citation of *Juno Therapeutics, Inc. v. Kite Pharma, Inc.*, 10 F.4th 1330 (Fed. Cir. 2021) and *Ariad Pharmaceuticals, Inc. v. Eli Lilly and Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (*en banc*) (ABr. at 7) is distinguishable for essentially the same reasons as *Idenix*.

[3] *Idenix* noted that "the [accused] compound in question was conspicuously absent" from the specification's "tens or hundreds of thousands of possible nucleosides . . . with dozens of distinct stereochemical structures." *Id*. at 1165; *id*. at 1163-64 ("The parties focus in particular on . . . possession of . . . the nucleosides that are the basis for Gilead's accused product."). Here, there is no question that the 18 wt/wt % egg lecithin of Azurity's Proposed Product (and each of its other ingredients and amounts) is plainly within the "formulas disclosed in the . . . patent." *Id*. at 1164. (D.I. 112, ¶ 1; *infra*, n.5.)

thousands, of species" (ABr. at 7) does not compel finding insufficient written description. *See, e.g.*, *Alcon*, 745 F.3d at 1190-92; *see also Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1365 (Fed. Cir. 2003) (specification need not "describe every conceivable and possible future embodiment"). Azurity suggests the mere ability to vary an ingredient within a claimed range means the claim is "discretize[d]" into multiple distinct formulations, the more of which there are, the less likely there is to be possession. (*See, e.g.*, Tr. at 656:24-658:17 (Azurity).) That arbitrary (*see id.*) approach is not the law, as the required description "varies with the nature and scope of the invention at issue, *and* with the scientific and technologic knowledge already in existence." *Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).

In the emulsion sciences, the mere fact that there is flexibility to vary common ingredients within a given formulation does not mean a POSA would view each possible variation as an entirely *different* formulation. (*E.g.*, Tr. at 471:4-472:10, ("absolutely not" "an enormous number of different permutations for [the '255 patent asserted claims]"), 474:14-17, 475:22-476:8, 632:21-634:6 ("[A] list of every permutation covered by the claims" is not "how a [POSA] looks at this specification."), 662:7-663:18 (disagreeing that claim is "thousands of formulations, enormous numbers of formulations.") (Little); Tr. at 138:22-139:4 (just because "a range of *emulsions*" can fit within a claim does not mean there are "thousands of different *formulations*," or even "a very large number") (Han).)[4] (HBr., § V.A.4.)

Citing *Idenix*, Azurity criticizes the specification for not disclosing "any scientific or

---

[4] Only the "tonicity modifier" limitation of claim 8 does not recite a specific ingredient and amount. A POSA, however, would have understood the inventors possessed using tonicity agents and varying the amount as required to practice and stay within the asserted claims while, *e.g.*, approximating the tonicity of blood. (*See, e.g.,* Tr. at 659:6-662:6 (Little); Tr. at 15:20-17:19 (Amiji); JTX-3 at 11:60-62.) In any event, Azurity points to no evidence that the amount of tonicity modifier affects physical stability.

therapeutic rationale for selecting the appropriate concentrations and ratios" from among those in the specification. (ABr. at 1, 15, 20.) But the law is clear that it is not "a requirement of patentability that an inventor correctly set forth, or even know, how or why the invention works." *Cf. Alcon*, 745 F.3d at 1189-90. Regardless, the disclosed and claimed ingredients and amounts, including 13-20 wt/wt % egg lecithin, are precisely "what makes [the claimed emulsions] effective" and "why." (ABr. at 15 (quoting *Idenix*, 941 F.3d at 1164-65).) The patent explains that following its instructions to stay within the disclosed ranges would lead a POSA to "the same result" (*id.*) as the working examples.

**2. Azurity Does Not Read the Specification as a Whole**

Azurity repeatedly asserts that a POSA would think only the working examples matter, to the exclusion of everything else the inventors disclosed about their inventive work. (*E.g.*, ABr. at 1, 3 ("The inventors described their experimental development work in the specification in the form of six examples[.]"), 20 ("A POSA . . . would not believe that the inventors were in possession of the full scope of claim 8 merely because of the examples in the patent.").) But as "the 'hallmark' of written description . . . the disclosure must be considered as a whole[.]" *Allergan USA, Inc. v. MSN Lab'ys Private Ltd.*, 111 F.4th 1358, 1375 (Fed. Cir. 2024). Indeed, Azurity's myopic focus on working examples cannot be reconciled with the lack of any "requirement that the disclosure contain either examples or an actual reduction to practice." *E.g.*, *Alcon*, 745 F.3d at 1189-90.

Here, the specification recites the claimed 13-20 wt/wt % egg lecithin in just the "full, clear, concise, and exact terms" that Section 112 demands. (ABr. at 5 (quoting *Ariad*, 598 F.3d at 1344); HBr., § III.C.) And lead inventor Dr. Thomas Ottoboni was referring to the *entire disclosure*—including 13-20 wt/wt % for egg lecithin and the disclosed ranges for the other limitations—as the "little island of stability" that Heron discovered (HBr., § III.B), not just the

working examples, as Azurity now insists (*e.g.*, ABr. at 10 ("the 'little island of stability' defined by the examples")). Indeed, none of the testimony in question was elicited by asking about, or otherwise pertained only to, the working examples. (*See* ABr. at 10-11, 12-13.)[5]

Azurity dismisses the disclosure of 13-20 wt/wt % under the "Brief Summary" and "Definitions" as "generic" without explaining what "generic" means or, more importantly, why a POSA would simply ignore those teachings. (ABr. at 1, 4, 15-16; HBr., § V.A.1.) The closest Azurity comes is to say "there simply are no embodiments identified in the specifications that exceed 14.3 wt/wt %." (ABr. at 15.) But this is plainly wrong. For example, the Brief Summary's disclosure states: "In another *embodiment*, the composition comprises . . . 15 wt/wt %, 16 wt/wt %, 17 wt/wt %, 18 wt/t %, 19 wt/wt % or 20 wt/wt % emulsifier." (JTX-3 at 3:2-5.)[6] And regardless of what Azurity means by "generic," it concedes in a footnote that the contested "Methods of Making" disclosure is *not* generic. (*See* ABr. at 1, 2 n.1.)

In view of these clear disclosures, Azurity instead faults the inventors for having "never prepared or tested" aprepitant emulsions with more than 14.3 and up to 20 wt/wt % egg lecithin (ABr. at 1), arguing they could thus not have been "actually in possession of these ranges as of the effective filing date" (ABr. at 2, 15). Not only is actual reduction to practice not required (*Alcon*, 745 F.3d at 1190), but the inventors *did* actually make physically stable emulsions with ~18 wt/wt % egg lecithin before the priority date. (HBr., §§ III.B, V.C.I; Tr. at 224:8-14 ("I

---

[5] Azurity has not shown that any of claim 8's narrow component limitations are outside the inventors' disclosed "little island of stability." (*E.g.*, JTX-3 at 14:10-13 (disclosing 0.44-1.25 wt/wt % aprepitant), 9:58-63 (disclosing 13-20 wt/wt % egg lecithin), 2:62-65 (disclosing 9-10 wt/wt % soybean oil), 4:29-35 (disclosing 2-3 wt/wt % ethanol), 5:9-20 (disclosing tonicity modifier), 5:1-8 (disclosing enough sodium oleate as pH modifier for a pH of about 7.5 to 9.0).)

[6] Azurity criticizes such "*ipsis verbis*" recitations of the claimed amounts as a mere "laundry list" (ABr. at 15), but Heron could not have recited the six integers from 15 to 20 wt/wt % in more "full, clear, concise, and exact" terms. It is a narrow, single-component range, not an infinite "laundry list" of undisclosed, hypothetical structures like in *Idenix*. (*Supra*, n.3.)

know there were formulations that had levels that were in the 17, plus or minus, range that were stable."), 233:23-235:1 (Ottoboni).) They were confident in the full scope of what their specification told a POSA would work, even without needing to make and test each emulsion:

> When you're starting out, you have less confidence. . . . [A]s you go through the process, you begin to develop more confidence. . . . You may not have the ultimate formulation, but you may know that I can develop a stable formulation and modify something and still have a stable formulation further along in the development program.

(Tr. at 238:10-19, 174:21-175:1 (Ottoboni).) The inventors' internal Formulation Development Report likewise reported "a clear trend of decreasing emulsion stability with decreasing amount of . . . egg lecithin." (Tr. at 181:19-21 (Ottoboni) (quoting DTX-116.19).) This was control, not mere aspiration. (*See* Tr. at 713:7-714:2 (Court).)[7]

Azurity is also simply wrong that Heron's laboratory notebooks only "show[] that the inventors failed when they tried to make an aprepitant emulsion with an emulsifier concentration above 15 wt/wt %." (ABr. at 2, 13, 15.) Azurity ignores that at least Heron's 4/17A emulsion and 4/17B emulsion, identified in a Heron interrogatory response, had ~18 wt/wt % egg lecithin and no crystals after 11 days at pH 8. (HBr., § V.C.I.; Tr. at 238:20-239:7 (Ottoboni).) Moreover, the purportedly failed experiment Azurity cites (*i.e.*, Heron's 6/10 emulsion) (ABr. at 14) does not embody claim 8. (DTX-104 at HER_THER_0031975-76 (having 8.82 wt/wt % ethanol instead of about 2-3 wt/wt %;[8] 12.0 wt/wt % soybean oil instead of 9-10 wt/wt %; no

---

[7] It is irrelevant that the inventors did not know "either way" whether 21 or 24 wt/wt % would be physically stable. (ABr. at 16.) That is why the disclosure stops at 20 wt/wt %. That upper limit is what "differentiates between the uncertainty Dr. Ottoboni identified for using 21% emulsifier and the uncertainty a POSA [purportedly] would have had for up to the 20%." (*Id.*)

[8] The specification presents a POSA with decreasing ethanol amounts, suggesting a narrowing toward lower concentrations such as about 2-3 wt/wt %. (*See* JTX-3 at 4:29-35.)

sodium oleate; no tonicity modifier).)[9]

Azuity and Dr. Amiji had the underlying laboratory notebooks and Dr. Ottoboni's testimony, but Dr. Amiji offered no opinion on the 6/10 emulsion. This belies its newfound importance to Azurity. And Azurity's attempt to magnify a single deposition designation about this emulsion (ABr. at 14 (citing Tr. at 231:18-233:22 (Ottoboni)) to improperly shift the burden of proof to Dr. Little is improper. (*Id*. ("Dr. Little . . . failed to identify any stable emulsions within the scope of claim 8 that contained more than 15 wt/wt % emulsifier, despite having reviewed the inventors' laboratory notebooks[.]").) Dr. Little's task was to respond to Dr. Amiji.[10] It is Azurity's burden to overcome the presumption of validity by clear and convincing evidence, not Heron's to prove it is warranted. *Alcon*, 745 F.3d at 1188.

Finally, Azurity's discussion of the prosecution history (ABr. at 4-5, 14) continues to ignore the simple fact that Dr. Ottoboni stated 13-15 wt/wt % in prosecution because the then-pending claims recited 13-15 wt/wt %. (HBr., § V.A.3.)[11]

### 3. Azurity Failed to Show the Examples, in the Context of the Specification as a Whole, Do Not Convey Possession

Azurity has also failed to show that a POSA would not find written description in the working examples when viewed in the context of the specification as a whole. As an initial matter, contrary to Azurity's assertion, *Lipocine* (ABr. at 8-9, 20-21) is inapplicable. Its method of treatment claims were "largely defined by functional limitations," including "to achieve a designated PK result," yet "contain minimal formulation restrictions." 541 F. Supp. 3d at 448,

---

[9] The figures assume the working examples' 22.6% ethanol evaporation. (HBr., n.21.)

[10] And Dr. Little did, in fact, testify at trial that he recalled seeing a successful 18 wt/wt % emulsion in the lab notebooks. (Tr. at 653:3-655:10 (Little).)

[11] Azurity also ignores that the 11.7 wt/wt % in working Example 3, on which it elsewhere relies (ABr. at 20), shows that the inventors' disclosure was not limited to just 13-15 wt/wt %.

462. Even the most excipient-specific claim was much less specific than claim 8:

> [E]ven that claim is not highly specific with respect to its formulation, because it covers any composition that includes oleic acid and Cremophor RH 40, and at least one of a monoglyceride, a diglyceride, and an antioxidant. . . . And . . . the claimed excipients can be in any quantity, . . . so long as the formulation achieves effective treatment of hypogonadism with an initial daily TU dose between 360 mg and 480 mg and . . . between [14-35 wt/wt %] TU in the composition.

*Id*. at 450. "The[se] claims are very broad[.] *Id*. at 458, 448-451. Claim 8, by contrast, is not functionally defined and recites not just 13-20 wt/wt % egg lecithin, but also a specific selection of other ingredients and concentrations. (*Supra*, § II.A.1 & n.4; HBr., § V.A.4.)

And as in *Idenix*, the *Lipocine* specification "contains a long list of TU formulations[, b]ut with very few exceptions . . . does not identify which of those formulations can satisfy the recited functional limitations when administered in the amounts specified in the claims." *Id*. at 451. (*Supra*, § II.A.1.) Here, by contrast, each of the working examples are physically stable and the specification specifically instructs that they are modifiable up to the claimed 20 wt/wt % egg lecithin. (HBr., §§ III.C., V.A.2.)[12] These prophetic modified examples certainly do not "abide in a corner" of the claimed genus, and prophetic examples cannot simply be ignored. *Alcon*, 745 F.3d at 1190-91. This is a not a case where "blaze marks are confined to a few trees at one edge of the forest." (ABr. at 21.)

Similarly, in *Eli Lilly & Co. v. Perrigo Co.*, the claimed method of treatment used any "effective amount" of testosterone and an amount of penetration enhancer octyl salicylate that is 10-10,000% the amount of testosterone. 202 F. Supp. 3d. 918, 939 (S.D. Ind. 2016), *aff'd on*

[12] *Azurity v. Alkem* (ABr. at 21) is distinguishable for essentially the same reason. "No example [in *Alkem*] is preserved using only parabens" as claimed, and "the specification draws no conclusion that any tested formulations are stable" for the claimed period. 655 F. Supp. 3d 270, 305 (D. Del. 2023). Here all the working examples are physically stable, do use egg lecithin, and the specification expressly states they can be modified to use up to the claimed 20 wt/wt %.

*other grounds* 718 F. App'x 953 (Fed. Cir. 2017) (nonprecedential). But the specification listed ~700 active ingredients, and testosterone was not one "for which the inventors believed 10,000% of penetration enhancer may be required." *Id*. at 939-40, 996-97. Moreover, "the examples . . . [taught] a POSA that testosterone is effectively delivered using *less* penetration enhancer than testosterone." *Id*. (emphasis original).[13] Here, claim 8 is not functionally defined (*supra*, § II.A.1) and spans only 7 wt/wt %, not three orders of magnitude. Also, the patent expressly says that modifying Example 2 with up to 20 wt/wt % egg lecithin will be physically stable—not that only the disclosed range's lower end would be effective for the claimed combination. (HBr., §§ III.C, V.A.2.) That is, it does not "merely invite other researchers to discover the upper amount of [egg lecithin] that could conceivably work," as Azurity asserts. (ABr. at 9.)

Azurity also criticizes Dr. Little's testimony that Table 7 shows that "when you go up in concentration, you see better stability." (ABr. at 17.) But it cites no testimony asserting that "[a]ny of [the working examples'] other [ingredient] differences, individually or collectively, could account for the increased stability of Example 2." (*See id.*) At bottom, Azurity does not dispute that the specification shows 9.95 wt/wt % egg lecithin lacked physical stability, 11.7-13.8 wt/wt % was physically stable for two months, and 14.3 wt/wt % was physically stable for three months. And the only expert testimony about that trend is Dr. Little's.[14,15]

---

13 The only example with both ingredients, like the other testosterone ones, used 67%. *Id.*

14 Dr. Little's testimony in *Fresenius* about how a POSA would view the prior art (ABr. at 17-18), without the benefit of the specification, necessarily must not take Table 7 into account and in no way "undercuts" (*id.*) what he says a POSA would learn upon reading the specification.

15 Azurity's attorney argument about the examiner's prosecution comment (ABr. at 18) is self-defeating, as any written description concerns were necessarily overcome for claim 8 to issue. (JTX-9.190-94.) If anything, that the examiner expressly acknowledged the working examples have other differences and nonetheless found written description support for "the increased ranges in the new claims" (*id.*) of up to 20 wt/wt % only supports validity.

Moreover, Dr. Amiji never testified about the working examples' use of any ingredient besides egg lecithin. (*See* ABr. at 8 (citing only Tr. 220:18-221:17, 222:4-16 (Amiji)).) There is thus no evidence that their use of "a specific set of excipients in set amounts, including soybean oil, ethanol, sucrose, sodium oleate, and water" with an "egg lecithin to aprepitant ratio of 20:1" is insufficient written description. (*Id.*) Nor is there any evidence that a POSA would need working examples with "a different oil, co-emulsifier, tonicity modifier or pH modifier" over his or her knowledge and skill in the art. (ABr. at 8-9.) This pure attorney argument cannot overcome Dr. Little's contrary testimony, or the presumption of validity. (HBr., § V.A.4.)

#### 4. Azurity Failed to Show the Physical Stability of Claim 8's Narrowly Drawn Formulation Is Sufficiently Unpredictable

Azurity argues "[t]he unpredictability of [claim 8] also demonstrates the inadequacy of the written description." (ABr. at 10.) It quotes dicta from *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004), that "the art is unpredictable" where "[a POSA] would not readily discern that other members of the genus would perform similarly to the disclosed members." (ABr. at 10.) But Azurity cites no concrete evidence that some species of claim 8 (*e.g.*, Example 2 and the Azurity Proposed Product) would work, while others would not, or that a POSA could not readily discern those members. (*See infra*, § II.B.1.) Instead, it relies only on mischaracterizations of inventor testimony and an outdated prior art concern. And Dr. Amiji offered no scientific basis for why a POSA with the benefit of the patent's disclosure would still expect any of the claimed emulsions to be unstable. (*Infra*, § II.A.4.ii.) Absent such evidence, "the general rule that disclosure of a species provides sufficient written description support for a later filed claim directed to the genus" applies. *Bilstad*, 386 F.3d at 1125.[16]

[16] Azurity also cites *Ariad* and *Idenix* in service of this argument. (ABr. at 10.) There, the plaintiffs did not dispute they involved new and unpredictable fields. (*Idenix*, 941 F.3d at 1159,

### i. Azurity Mischaracterizes the Inventor Testimony

Azurity mischaracterizes inventor testimony to distort what a POSA would learn from the specification. (ABr. at 10-11, 20 ("The inventors could not . . . predict whether other aprepitant emulsions with a different emulsifier content and/or different excipients would also be stable."), 20 ("[T]hey had no idea what other formulations would work.").) But Dr. Han did not "testif[y] that she could not predict which aprepitant emulsions within the claimed genus would be stable." (ABr. at 10.) Azurity omits that she was specifically asked about her "expectation" if her "goal was to increase the aprepitant concentration." (Tr. at 156:16-157:25 (Han).) Azurity also cites Dr. Ottoboni's testimony that, for an unspecified increase in aprepitant amount, "it's almost impossible to predict" "what impact . . . that [would] have on the concentration of the other ingredients in the formulation." (ABr. at 11 (quoting Tr. at 188:11-22 (Ottoboni)).) He, too, was asked what he had "expect[ed]" and discussed his "goals" during the project. (*See* Tr. at 188:7-22 (Ottoboni).) That is, this testimony is about the inventors' perspective before identifying the aprepitant range they would go on to disclose in the patent. And with that specification, a POSA would have the guidance needed (*i.e.*, the inventors' disclosed "little island of stability") to practice claim 8. (HBr., § III.D.1 (citing Drs. Ottoboni & Little); *supra*, § II.A.2.)[17]

Azurity also cites Dr. Han's testimony about non-asserted claim 1 of the '465 patent. (ABr. at 10-11 (quoting Tr. at 135:23-139:16 (Han)).) Despite having a physical stability requirement, that claim was significantly less specific than claim 8. (Tr. at 137:1-9, 138:7-20

1161; *Ariad*, 598 F.3d at 1354, 1358.) But here, Dr. Little explained emulsion science is "pretty well established" and there is "high" level of skill in this art. (HBr., §§ III.A, V.B.II.)

[17] That the inventors' testimony was about an unspecified increase in aprepitant makes it irrelevant to claim 8, which specifies 0.44-1.25 wt/wt % aprepitant, only slightly wider than the working examples' 0.59-0.71 wt/wt %. (Tr. at 477:18-19, 478:12-479:7 (Little); JTX-3 at tbls. 1-3, 6.) A POSA would not consider the claimed range broad. (*Id.*)

(Fresenius).)[18] Dr. Ottoboni, with more formulation experience than his deputy Dr. Han (Tr. at 197:2-202:25 (Ottoboni); Tr. at 110:25-111:14 (Han)), agreed with this understanding. He did not "readily admit[] that he could not predict the impact of altering any one ingredient or its amount." (ABr. at 11.) Azurity ignores that, like Dr. Han, Dr. Ottoboni would not agree that "before you made . . . an emulsion with any particular formulation, you don't know if it's going to be stable." (Tr. at 216:9-217:2 (Ottoboni).) Quite the opposite, he testified "we knew it would be stable" when "we were changing some other parameters to optimize a different aspect of the invention." (*Id.*) And "many, many times we had confidence that the formulation would be fine." (*Id.*; Tr. at 237:19-238:19 ("[Y]ou may know that I can develop a stable formulation and modify something and still have a stable formulation[.]") (Ottoboni).)[19] (*See also* HBr., § V.A.2 (citing Tr. at 176:12-177:1, 221:18-222:3 (Ottoboni)).)[20]

**ii. The Prior-Art Micelle Concern No Longer Applies**

Azurity also asserts the specification was insufficient for a POSA to overcome "existing knowledge" in the field and "predict whether other aprepitant emulsions with a different emulsifier content and/or different excipients would also be stable." (*See* ABr. at 18-20.) The

---

[18] Regardless, that Dr. Han would "make a range of emulsions" within '465 patent claim 1 "to determine which one is physically stable" (ABr. at 11 (quoting Tr. at 139:11-16 (Han)) is not the same as making and testing *every* conceivable permutation of the claim. She specifically did not agree that she would need to make "thousands and thousands and thousands of formulations and test each one of those to see if they're physically stable," saying only that she would "test the different emulsifiers, oils, and other excipients" for stability. (*See* Tr. at 137:18-139:2 (Han).)

[19] Azurity also misquotes Dr. Ottoboni as saying "[stability] was not predictable." (ABr. at 11-12 (quoting Tr. at 210:5-14 (Ottoboni)).) But it is clear from context that he said "[*the increase in* stability] was not predictable," referring to predictability upon increasing egg lecithin above 10 wt/wt % *before* the patents-in-suit. (Tr. at 210:5-14 (Ottoboni).) That is not the correct vantage point for the Section 112 inquiry. (HBr., § V.B.2.)

[20] Azurity does not explain how the inventor testimony, which does not mention instability "mechanisms" at all, "directly contradicts" Dr. Little's phase inversion testimony. (ABr. at 12.)

single reason Dr. Amiji offered for why a POSA might question possession of 13-20 wt/wt % egg lecithin is that, in the prior art, increasing emulsifier from the low single digits could create micelles that destabilize the emulsion. (*See* Tr. at 252:19-23 (Amiji).) But it is not proper for Dr. Amiji to ignore how the specification advanced the state of the art. (HBr., § V.B.2.)

Dr. Little explained that a POSA reading the specification would no longer be concerned that micelles could destabilize the emulsion in the claimed range. (HBr., §§ III.D.1, V.B.2.) Example 2 showed that an emulsion with 14.3 wt/wt % egg lecithin (and embodying the rest of claim 8) had already overcome the micelle concern, and the rest of the disclosure conveyed physical stability is maintained through 20 wt/wt %. (*Supra*, § II.A.2; HBr., § V.A.2.) Azurity criticizes Dr. Little for allegedly contradicting his *Fresenius* testimony (ABr. at 12, 19), but there he merely opined on the perspective of a POSA *without* the benefit of the specification and its physically stable examples. (Tr. at 562:22-565:1 (Little).) It is precisely because "a POSA's viewpoint would have done a complete 180" (ABr. at 19-20) after reading the disclosure that the claims were inventive over the prior art. Just because an invention may be unpredictably nonobvious over the prior art does not mean it remains unpredictable after the fact.[21]

Azurity also tries to rebut this testimony by pointing to the differences in egg lecithin and stability between the emulsion of CN845 in Example 4 and working Example 3. (ABr. at 20.) Azurity asserts (without any support) that these differences show a POSA would think physical stability remained unpredictable from 15-20 wt/wt % even after reading the specification. (*Id.*) First, the egg lecithin difference between Example 4 (9.95 wt/wt %) and Example 3 (11.7 wt/wt %) is not 0.35 wt/wt %, but 1.75%—a full *five times* larger than Azurity contends.

[21] That a formulator may try to keep the amount of any given ingredient as low as possible (ABr. at 12) may suggest a lack of motivation to increase that amount, but it does not mean they would ignore or question the scientific basis for an affirmative teaching of using a higher amount.

In any event, the relative stability and egg lecithin differences, particularly when there was no motivation to exceed 10 wt/wt %, is exactly why the benefit was unpredictably nonobvious *before* Heron's disclosure. In disclosing that these same properties hold through 20 wt/wt %, Heron conveyed to the public its certainty that no unpredictable drop-off in physical stability exists between 13 and 20 wt/wt %. (HBr., § V.B.2.)

Azurity's argument is also contrary to the specification's disclosure of stability continuing to increase with more emulsifier (*i.e.*, from Example 4 (9.95 wt/wt % without physical stability) to Example 3 (11.7 wt/wt % with two months physical stability) and on to Example 2 (14.3 wt/wt % with three months physical stability).) (HBr., § V.A.2; *supra*, § II.A.3.) [redacted]

**B. Azurity Failed to Prove That '520 Patent Claim 8 Lacks Enablement**

Despite the different legal standards, Azurity essentially recycles its written description arguments for enablement. They fail for the same reasons discussed above and those that follow.

**1. Azurity Has Not Shown Even One Inoperable Embodiment**

Azurity cites *Par Pharms., Inc. v. TWi Pharms., Inc.*, to suggest claim 8 is not enabled due to inoperative embodiments. 120 F. Supp. 3d 468 (D. Md. 2015), *aff'd without opinion*, 624 F. App'x 756 (Fed. Cir. 2015). In *Par*, "roughly two-thirds" of the claimed particle size range was inoperative, *i.e.*, "scientific phenomena made [broad portions of it] practically impossible." (*Id*. at 476.) Here, by contrast, despite a record replete with both parties' aprepitant emulsion

work, Azurity has not identified even a single emulsion of claim 8 that is not physically stable or any other expert testimony that could be clear and convincing evidence of enough inoperative embodiments to invalidate the claim. (*See supra*, § II.A.2 (explaining Heron's 6/10 emulsion does not embody claim 8).) *Atlas Powder Co. v. E.I. du Pont de Nemours & Co.*, 720 F.2d 1569, 1576-77 (Fed. Cir. 1984) ("Even if some of the claimed combinations [are] inoperative, the claims are not necessarily invalid. It is not a function of the claims to specifically exclude possible inoperative substances."); *id*. ("Optimality is not required for a valid patent."); *Alcon*, 745 F.3d at 1189.[22] Instead, there is substantial evidence showing that emulsions within the claimed 13-20 wt/wt % range are stable, *e.g.*, the patent's examples; the inventor testimony; Heron's laboratory notebooks; Azurity's Proposed Product; and Azurity's own development work. (*E.g.*, HBr., §§ III.D, V.C.) It strains credulity for Azurity to contend the specification "leaves the public no better equipped to make and use the claimed [emulsions] than the inventors were when they set out to discover the [inventive formulations]" (ABr. at 31), when Azurity itself followed the patent's instructions to do just that. (HBr., §§ III.D.2, V.C.2.)

**2. Azurity Has Not Shown a Large Quantity of Experimentation**

Azurity again mischaracterizes Dr. Ottoboni's testimony to argue that "a POSA would need to conduct many experiments to identify stable aprepitant emulsions outside the 'little island of stability' that the inventors identified in the Examples." (ABr. at 30.) As noted, this testimony referred to the entire disclosure, including 13-20 wt/wt % egg lecithin, not just the working examples. (*Supra*, § II.A.2.) And following the specification's instructions to modify Example 2 to use the remainder of the claimed range would require little to no—let alone

[22] In addition, in *Par*, a POSA could not achieve broad portions of the claimed ranges because "scientific phenomena made that practically impossible." 120 F. Supp. 3d at 476. Azurity cites no evidence of any such scientific impossibility here. (*Supra*, § II.B.1.)

undue—experimentation. (HBr., §§ V.A.2, V.B.3.)

In that regard, Azurity does not (and cannot) dispute Dr. Little's testimony that any required testing would span only a "pretty constrained" experimental range and not take "long" to run. (ABr. at 30.) Instead, Azurity, citing nothing, asserts only that "the sheer number of experiments a POSA would need to conduct unquestionably would constitute 'undue experimentation.'" (*Id.*) But this unsupported attorney argument cannot rebut Dr. Little's contrary testimony that even "the actual quantity [of experiments] itself is not that high" given known optimization software and techniques. (Tr. at 558:8-23 (Little); HBr., § V.B.3.)

Azurity instead points to *Amgen Inc. v. Sanofi*, 598 U.S. 594 (2023), where the claims lacked any "general quality that may readily enable a [POSA] to make and use all of what is claimed, not merely a subset," and the patent merely advised "trial and error." (ABr. at 31.) But unlike the complex antibody claims in *Amgen*, claim 8 is not functionally defined. 598 U.S. at 613. (*Supra*, § II.A.1.) It has the missing "general qualit[ies]" *i.e.*, the ingredients and quantities to use to achieve physical stability. *Amgen*, 598 U.S. at 611. (*Supra*, § II.A.1.)[23] And Heron's inventors never "agree[d] that a trial-and-error approach is required to practice the full scope of the claims." (ABr. at 31; *supra*, § II.A.4.i.) Rather, as Dr. Little explained, a POSA would start from Example 2 as a "reference point" and use his or her "knowledge and skill in the art" to maintain physical stability while increasing the lecithin content to 15-20 wt/wt % (just as the specification instructs), without resorting to any impermissible trial-and-error. (*See* ABr. at 31; HBr., §§ V.A.2, V.B.3; *id.*, § III.D.2, V.C.2.)

Azurity criticizes Dr. Little's "reference point" opinion by asserting the inventors (i)

---

[23] *Baxalta Inc. v. Genentech, Inc.*, 81 F.4th 1362, 1367 (Fed. Cir. 2023), is nearly identical on its facts to *Amgen* and is distinguishable for the same reasons. (ABr. at 31.)

"went through exactly the process that Dr. Little described," but were (ii) "only able to identify the four physically stable formulations described in the Examples" and (iii) "unable to say whether any formulation they had not made and tested would be stable." (ABr. at 31.) All three assertions are wrong. (*Supra*, §§ II.A.2-4.ii.) And Azurity again ignores that the inventors were working from the prior art, whereas enablement considers the specification as well.

**3. Azurity Has Not Shown Insufficient Guidance in the Specification**

Azurity relies on *Medytox, Inc. v. Galderma S.A.*, 71 F.4th 990, 998-99 (Fed. Cir. 2023), where there were "three working examples at the lower end of the range," to argue the specification lacks sufficient guidance. (ABr. at 30, 31.) But *Medytox*'s functionally defined method of treatment claims required 16-week clinical trials with a responder rate of 50-100%. *Medytox*, 71 F.4th at 998-99. The example formulations achieved 52, 61, and 62%, but, like *Amgen*, the specification failed to "disclos[e] a general quality of the class that may reliably enable a POSA" to modify the examples to achieve the full therapeutic range. *See id*. Here, any purported uncertainty over the specification's assertion that an aprepitant emulsion with 15-20 wt/wt % egg lecithin is physically stable is unlike that of whether *Medytox*'s (or *Idenix*'s) claimed compositions are therapeutically effective. (*Supra*, §§ II.A.1, II.A.4.) Claim 8 is not functionally defined (*supra*, § II.A.1), and, as Dr. Little explained, the specification provides all the guidance a POSA would need, including that only "conventional" methods are required to modify Example 2 to practice the rest of claim 8. (HBr., §§ III.C., V.A.1-2, V.B.3.)

**C. Azurity Failed to Prove That '255 Patent Claims 5 and 23 Lack Written Description or Enablement**

Without any physical stability requirement, there is no serious question of written description or enablement for claims 5 and 23 of the '255 patent—a POSA would just need to combine the claimed ingredients. (HBr., § V.B.1.) Azurity says only that its arguments for

’520 patent claim 8 apply with more force to ’255 patent’s claims because they are broader with respect to ingredients other than egg lecithin. (ABr. at 26-28.) But even setting aside that these claims are not broad (HBr., § V.A.4), each of Azurity’s arguments for claim 8 turned on a POSA questioning the claimed physical stability. (*See supra* §§ II.A-B.) They do not apply to the ’255 patent’s pure composition claims. (HBr., § V.B.1.)

The Court has repeatedly rejected that claims 5 and 23 have any physical stability requirement. (Tr. at 102:14-103:7 (Court); Nov. 12, 2025 Hr’g Tr. at 39:19-40:11 (Court); ABr. at 26 n.8.) Azurity nonetheless calls the Court’s latest ruling “provisional” and reargues its position with yet another interpretation of the preamble—its fourth. (ABr. at 22.)[24] It reads in a less stringent particle size limitation of “in general, . . . between 10 nanometers and 100 microns” (*id.*) for “any duration” (*id.* at 28), arguing “there is nothing in the specification to indicate to a POSA that the inventors were in possession of aprepitant emulsions meeting this criterion” (*id.* at 22-23). That fails because, as the Court has already noted, claims like claims 5 and 23 define structurally complete inventions where any additional unclaimed “features” or “benefits” are not at issue. (*See* Tr. at 102:16-103:7 (Court); D.I. 136 at 5-7 (collecting cases).) Azurity’s new arguments do nothing to alter that conclusion. (*See* ABr. at 21-28, 32-33.)[25] Dr. Little also previously explained that this language—qualified by “in general”—does not actually convey a particle size or stability requirement. (D.I. 144, Ex. 1 (¶ 14).) Thus, Azurity’s new restriction is especially lenient, such that Azurity must now take the position that the inventors’ detailed

---

[24] Azurity’s first position was that claims 5 and 23 do not need to meet USP<729> because they do not recite “physically stable.” (*See, e.g.*, D.I. 125, Ex. H, ¶ 91.) Azurity then changed course, arguing they did need to meet USP<729>. (D.I 144, Ex. 6, ¶ 67.) Its third position morphed into the emulsions only needing better stability than the prior art “by not exhibiting crystal formation for more than four days when stored at room temp.” (D.I. 173, Ex. 3, ¶ 84.)

[25] Indeed, Azurity does not address any of the Court’s actual claim construction findings or analysis (*e.g.*, claim differentiation, collected cases). (D.I. 136; Tr. at 102:14-103:7 (Court).)

disclosure conveyed possession of no aprepitant "emulsions" with 15-20 wt/wt % egg lecithin of *any* particle size and duration. That is plainly incorrect. (*See, e.g.*, Tr. at 71:6-72:17 (Amiji).)

Regardless, Azurity's untimely new position—absent from its contentions, Dr. Amiji's opinions, or the Pretrial Order—is waived. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 653-54 & n.8 (E.D. Tex. 2017). Raising it in an opening brief two months after trial is unfairly prejudicial. Heron has only limited space for rebuttal and lacks the benefit of any targeted expert opinions, direct testimony, or cross-examination. The Court has granted Azurity repeated, ample opportunity to argue and reargue multiple contradictory claim constructions. There is no time left to cure Azurity's most recent attempt to flout the Scheduling Order and undermine the orderly management of this case. It should not be condoned.

Azurity's brand new antecedent-basis indefiniteness argument for claim 23 (ABr. at 22 n.6) has been waived for all of the same reasons. Azurity's failure to provide any prior notice precluded Heron from conducting relevant expert discovery and examination. Heron also relied on Azurity's properly disclosed positions to narrow claims for trial and could have advanced differently worded claims if needed. In any event, Azurity's argument has no legal basis where, as here, a POSA would understand exactly what the claim means. *E.g.*, *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006) (no antecedent basis issue "[w]hen the meaning of the claim would reasonably be understood by [POSAs] when read in light of the specification"). Even Azurity's own non-POSA attorneys had no trouble understanding it. (ABr. at 22 (assembling block quote from claims on which claim 23 depends).)

## III. CONCLUSION

There has been no "overreach." (ABr. at 1.) The asserted patents narrowly claim Heron's significant contribution to the art. (HBr., § III.D.) Azurity has not met its heavy burden to show invalidity by clear and convincing evidence. The Court should deny its requested relief.

Dated: February 6, 2026

By: s/ *Jeremy A. Tigan*

Jeremy A. Tigan (#5239)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff*
*Heron Therapeutics, Inc.*

*Of Counsel*:

Isaac S. Ashkenazi
Stephen W. Kruse
Sydney E. Bruns
PAUL HASTINGS LLP
200 Park Avenue
New York, NY 10166
(212) 318-6000

Karthik R. Kasaraneni
PAUL HASTINGS LLP
2050 M Street NW
Washington, DC 20036