**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

HERON THERAPEUTICS, INC.

Plaintiff,

v.

[redacted]

AZURITY PHARMACEUTICALS, INC., AZURITY PHARMACEUTICALS INDIA, LLP f/k/a SLAYBACK PHARMA INDIA LLP, and SLAYBACK PHARMA LLC,

C.A. No. 24-1363 (WCB)

[redacted]

Defendants.

**DEFENDANTS' RESPONSIVE POST-TRIAL BRIEF**

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants Slayback Pharma LLC, Azurity Pharma LLP f/k/a Slayback Pharma India LLP, and Azurity Pharmaceuticals, Inc.*

Dated: February 6, 2026

**Table of Contents**

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 1

A. The Full Scope of the Asserted Claims is Neither Disclosed Nor Enabled ..... 1

1. The only working examples are in the bottom of the claimed range and do not allow a POSA to practice the invention across the full range without undue experimentation ..... 2

2. The specifications' prophetic or generic disclosures are insufficient ..... 3

3. The claimed formulations of the '255 patent must be "emulsions" ..... 6

4. The claimed formulations of the '520 patent must be "physically stable" ..... 6

5. Heron belittles the changes that it previously characterized as significant ..... 7

B. Heron's Research and Development Work Demonstrates that the Inventors Did Not Have Possession of the Full Scope of the Asserted Claims ..... 8

C. The Inventors Confirmed that the Claimed Emulsions are Unpredictable ..... 9

D. Azurity's Post-Filing Conduct Is Irrelevant ..... 12

1. Azurity's Meloxicam Patent is Irrelevant ..... 12

2. Azurity's development activity and statements to FDA are equally irrelevant ..... 14

III. CONCLUSION ..... 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009)....................15

*Ariad Pharms., Inc. v. Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (*en banc*)....................1, 5

*Atlas Powder Co. v. EI Du Pont De Nemours & Co.*,
588 F. Supp. 1455 (N.D. Tex. 1983)....................15

*Biogen Int'l GmbH v. Mylan Pharm. Inc.*,
18 F.4th 1333 (Fed. Cir. 2021)....................13

*Falko-Gunter Falkner v. Inglis*,
448 F.3d 1357,1365-66 (Fed. Cir. 2006)....................3

*Heron Therapeutics, Inc. v Fresenius Kabi USA, LLC*,
Case No. 22-cv-985-WCB, 2024 WL 5317378 D.I. 193 (D. Del. Dec. 3, 2024)..........3, 11, 13

*In re Entresto*,
125 F.4th 1090 (Fed. Cir. 2025)....................13

*In re Hogan*,
559 F.2d 595 (CCPA 1977)....................13

*Medytox, Inc. v. Galderma S.A.*,
71 F.4th 990 (Fed. Cir. 2023)....................2

*Nuvo Pharms. (Ireland) Designated Activity Company v. Dr. Reddy's Labs. Inc.*,
923 F.3d 1368 (Fed. Cir. 2019)....................4

*Unicorn Energy AG v. Tesla Inc.*,
740 F. Supp. 3d 930 (N.D. Cal. 2024)....................4, 5, 10

**Statutes**

35 U.S.C. § 112....................1, 2, 3 7

**Other Authorities**

21 CFR 601.12(d)....................15

# I. INTRODUCTION

Heron's opening post-trial brief ("Heron Br.") attempts to distract from the basic fact that the specification of Heron's asserted patents—U.S. Patent Nos. 12,115,255 ("'255 patent") and 12,290,520 ("'520 patent")—only demonstrate and teach how to make aprepitant emulsions up to 14.3 wt/wt % and with the specific emulsifier to aprepitant ratio of 20:1. Those working examples are at the bottom of the ranges of the asserted claims and therefore do not demonstrate that the inventors had possession of the full scope of the asserted claims or that the specification teaches how to make the full scope of the asserted claims. The experts disagree on whether the specifications' disclosure of broad lists of ranges or ingredients reasonably convey to a POSA that the inventors had possession of the full scope of the asserted claims or teach a POSA how to make and use the claimed inventions of the asserted claims without undue experimentation—Azurity submits that they do not. Notably, only Dr. Amiji, Azurity's expert, is in line with the opinions of the inventors, who were clear that any changes in the proposed formulation would require testing and success could not be predicted. Thus, as explained by Dr. Amiji and the inventors, a higher level of disclosure and teaching was required.

# II. ARGUMENT

## A. The Full Scope of the Asserted Claims is Neither Disclosed Nor Enabled

Pursuant to 35 U.S.C. § 112, first paragraph, the specification of a patent must "contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1344 (Fed. Cir. 2010) (*en banc*). The specifications of the asserted patents do not meet the enablement requirement or the written description requirement.

### 1. The only working examples are in the bottom of the claimed range and do not allow a POSA to practice the invention across the full range without undue experimentation.

Heron is incorrect that there is "an already-robust disclosure" in the specification that teaches how to make physically stable aprepitant emulsions. Heron Br. at 3. In reality, the disclosure is directed to the work that the inventors actually did and were thus confident in—the formulations disclosed in working examples 1, 2, 3, and 6. Those examples are restricted to a specific set of excipients in set amounts, including soybean oil, ethanol, sucrose, sodium oleate, and water. *See* JTX-003. at 16:1-20:34, 222:4-16, 220:18-221:17. Moreover, each of these examples utilizes the exact same ratio of egg lecithin to aprepitant, namely 20:1. *See* JTX-3.0015-17 at 16:1-20:34. The only difference among the working examples is the concentration of the selected ingredients.

The working examples demonstrate a narrow band of successful formulations (11.7 to 14.3 wt/wt % and 20:1 ratio) that are much smaller than the full scope of the asserted claims (13-20 wt/wt % and 16:1 to 30:1 ratio (when the "about" is applied)). Heron's assertion that the working examples are "*within*" the claimed ranges is misleading. Heron Br. at 18. Rather, the working examples only cover the lower portion of the claimed range. Similarly, the 20:1 ratio of emulsifier to aprepitant in the working examples is not truly "*within*" the claimed range of "about 20:1-25:1," but rather a mere single datapoint at the start of the range.

While, in some circumstances, a specification need not provide working examples corresponding to every possible permutation of the full scope of the asserted claims, the working examples in the '255 and '520 patents fall far short of such a benchmark and are instead clustered at the low end of the claimed range. Under established case law, specifications which only include working examples for some of the claimed range, but not all, can be insufficient and fail to meet the requirements of 35 U.S.C. § 112. *See* Azurity Br. at p. 30 (discussing *Medytox, Inc. v. Galderma S.A.*, 71 F.4th 990, 998–99 (Fed. Cir. 2023) (finding specification describing 50-62% rate inadequate support for claim directed to 50-100% rate)).

Heron's reliance on *Falko-Gunter* on this point is unpersuasive. Heron Br. at p. 18. Although *Falko-Gunter* discusses that working examples may not need to cover the full scope of the claim, that court did still agree that "enough must be included to convince a person of skill in the art that the inventor possessed the invention and to enable such a person to make and use the invention without undue experimentation." *Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357,1365-66 (Fed. Cir. 2006). Moreover, *Falko-Gunter* involved a different area of technology and the ruling on written description was focused on a different question: whether the specification had to disclose all the genes and nucleotide sequences on which the proposed vaccine was useful. *See id.* at 1368. The court held that "where, as in this case, accessible literature sources clearly provided, as of the relevant date, genes and their nucleotide sequences... satisfaction of the written description requirement does not require recitation or incorporation by reference" because listing the DNA sequences for known genes did not add to the public knowledge or available information for a POSA. *See id.* In contrast, in the Heron formulation patents, this Court has previously held that the use of more than 10 wt/wt% emulsifier to form an aprepitant injectable emulsion was nonobvious, which necessarily means that such information could not have been in the prior art at the time of the patent filing. *See Heron Therapeutics, Inc. v Fresenius Kabi USA, LLC*, Case No. 22-cv-985-WCB, D.I. 193 at 43. Dr. Little continues to hold that same belief regarding the state of the prior art as of the priority date, testifying that "[t]here was no indication anywhere in the prior art that levels above 10 percent would – would improve the stability of the emulsion – of the aprepitant emulsion." Tr. at 209:7-12. Therefore, *Falko-Gunther's* holding is not persuasive because disclosing successful formulations above 14.3 wt/wt % or ratios other than 20:1 would have added to the public knowledge, demonstrated possession of the invention, and enabled a POSA to prepare the claimed invention without undue experimentation, which the DNA sequences discussed in *Falko-Grunther* would not have.

**2. The specifications' prophetic or generic disclosures are insufficient.**

Heron argues that because the specifications recite that the emulsifier could be "13 wt/wt % to 20 wt/wt %" egg lecithin and "about 20:1 to 25:1" egg lecithin-to-aprepitant, that is sufficient

to satisfy 35 U.S.C. 112. Heron Br. at 16. But Heron applies the wrong standard. The specification must "notif[y] the public about the boundaries and scope of the claimed invention *and* show [] that the inventor possessed all the aspects of the claimed invention." *Nuvo Pharms. (Ireland) Designated Activity Company v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368, 1382 (Fed. Cir. 2019) (court's italics). In *Unicorn Energy AG v. Tesla Inc.*, relied on by Heron, the court described the written description requirement:

> Nevertheless, it implies a documentary function: the inventor must not only know how to practice the invention, but must prove that understanding through the disclosure in the specification. *Id.* Otherwise, if written description was not required, a patentee could claim a "mere wish or plan" without having fully invented anything, and thus improperly exclude others from the field. *See Regents of the U. of Cal. v. Eli Lilly & Co.,* 119 F.3d 1559, 1566 (Fed. Cir. 1997); *Ariad,* 598 F.3d at 1352–53 ("[R]equiring a written description of the invention plays a vital role in curtailing claims ... that have not been invented, and thus cannot be described."); *O'Reily v. Morse,* 56 U.S. 62, 120–21 (1853) (explaining the "evil" of lack of written description as "prevent[ing] others from attempting to improve upon the manner and process which [the patent owner] has described in the specification").

*Unicorn Energy AG v. Tesla Inc.,* 740 F. Supp. 3d 930, 951 (N.D. Cal. 2024).

This is precisely the failure of Heron's generic disclosures—they are a mere "wish or plan" as to any formulation except the specific ingredients utilized in the working examples and formulations above 14.3 wt/wt % emulsifier content or ratios other than 20:1. Although the asserted claims are commensurate with the generic disclosures, the specifications, inventor testimony, and intrinsic evidence all fail to demonstrate that Heron actually possessed the full scope of the claims. The specifications provide no guidance or instruction for modifying the amount of ingredients or utilizing alternative ingredients which also fall within the scope of the asserted claims, but not demonstrated by the working examples. For example, Heron itself acknowledges the numerous variables in the specification, but the specifications only include working examples with specific exemplar ingredients. *See, e.g.*, Heron Br. at 9 (acknowledging the numerous options for oils and tonicity agents). Instead, Heron asks this Court to simply take

Dr. Little's word that any and all such changes would be within the skill of a POSA (*id*. at 31-32 (summarizing Little testimony), despite the fact that his opinion is directly contradicted by Dr. Han's testimony that changes to the formulation requires a POSA "to reevaluate the concentrations of other excipients in the formulation" "[y]ou have to test the different emulsifiers, oils, and other excipients to determine if it will make a stable emulsion" and "everything affects each other. You cannot just increase one concentration and expect to have the same result." Tr. at 157:7-25 and 137:18-138:6 (Han); *see also id*. at 128:22-129:3 (conceding that testing is required to determine if different amounts and ratios of components afforded a stable emulsion) (Han); *id*. at 137:1-17 (identity and amounts of components may or may not impact emulsion stability) (Han); *id*. at 139:11-16 ("You have to make a range of emulsions to determine which one is physically stable") (Han).

The level of detail necessary in the specification is dependent on the existing knowledge in the field and the content of the prior art. *See Ariad*, 598 F.3d at 1351. According to the '520 patent, the technical field is "emulsion formulations and systems for the intravenous or parenteral administration of aprepitant for treatment of emesis." JTX-3.0008 at 1:23-25. However, aprepitant exhibited formidable solubility properties that had to be overcome to prepare an injectable formulation. *See* JTX-24 at 44 ("The sparing water solubility of aprepitant precluded its formulation in a vehicle acceptable for intravenous administration in humans."). An emulsion formulations were known to be "very complex." *See* Tr. at 169:25. They needed to be stable. *See id*. at 166:14-20 (acknowledging that it was known that emulsion formulations must be physically stable), 218:17-219:13 (acknowledging that stability less than 1 week is not physically stable or a viable formulation). Further, as discussed above, it is established that the prior art did not contain guidance on how to make injectable aprepitant emulsions with emulsifier concentrations above 10 wt/wt%. The disclosure in the asserted patents needs to more than a "wish or plan" that the

proposed emulsions will work in the full range of the current asserted claims – but the generic disclosures fail to do. *See Unicorn Energy,* 740 F. Supp. 3d at 951.

**3. The claimed formulations of the '255 patent must be "emulsions"**

Heron concedes that the asserted patents are directed to stable emulsions of aprepitant. Heron Br. at 18. The claims of the '255 patent require that the product of the asserted claims result in an "emulsion," which is defined as "a colloidal dispersion of two immiscible liquids in the form of droplets, whose diameter, in general, is between 10 nanometers and 100 microns." JTX-2.0011 at 9:63-66. While the parties disagree over the amount of time that such product must remain in that chemical state, it is clear that an emulsion must successfully form as it is required by the asserted claim s of the '255 patent. Accordingly, the specification of the '255 patent must demonstrate both possession of the invention and enable a POSA to predict successful *emulsion* formulations (let alone injectable emulsions) over the full scope of the asserted claims.

The few working examples (all using the same ingredients) at the bottom of the claimed range are inadequate for the "emulsion" requirement across the full scope of the asserted claims because those examples do not demonstrate that the inventors had possession of formulations that formed emulsions with alternative ingredients or different concentrations and ratios.

**4. The claimed formulations of the '520 patent must be "physically stable"**

The written description and enablement hurdles are even higher for the '520 patent because asserted claim 8 expressly requires that the resulting product be "physically stable" for 7 days under conditions similar to USP <729> testing standards. D.I. 145, ¶ 26. The few working examples at the bottom of the claimed range are inadequate for the "physically stable" requirement. As the inventors testified, a POSA would have to make a proposed formulation to determine if it would be stable. *See, e.g.,* Tr. at 128:22-129:3, 137:18-138:6, 139:11-16.

### 5. Heron belittles the changes that it previously characterized as significant.

With obviousness of the patents not at issue, Heron now makes light of how easy it is to simply increase the amount of emulsifier in the claimed formulation. Heron Br. at 20 ("a POSA would only need to increase the egg lecithin by a small amount to inhabit the rest of the claimed range"). This argument flies in the face of the inventors' sworn statements made during prosecution in exchange for the first issued patent. The Ottoboni Declaration, filed during the prosecution of U.S. Patent No. 9,561,229 claimed that aprepitant emulsions containing 13-15 wt/wt % lecithin (an emulsifier) "possessed unexpected and unpredictable properties relative to Zhou." JTX-10.0337. Zhou had approximately 10 wt/wt % concentration emulsifier. A POSA reviewing the intrinsic record would understand that small changes (3 wt/wt %) result in unexpected results and were a patentable invention. Thus, Heron's assertion that a POSA would have no hesitation in increasing the emulsifier to "the rest of the claimed range" does not follow – either the emulsifier content about 10 wt/wt % is very sensitive (and patentable) …. or it is routine. Heron cannot have it both ways.

Heron argues that there was a "paradigm shify" with the disclosure in the specification. *See* Tr. at 454:4-456:9, 556:3-15; Heron Br. at 27. Heron contends that the claimed emulsifier range "was not in the conventional range that was thought of before" but that "[i]t's now in this higher range that the inventors have discovered." *See id*. at 454:8-12, 455:11-15, 503:23-504:10, 556:3-15, 582:8-583:8. But this is a circular chicken and the egg argument —the disclosure only changed the fundamental knowledge of the POSA if it satisfies 35 USC 112 by showing that the inventors demonstrated possession of aprepitant emulsions over the full scope of an unconventional range of emulsifier. The inventors failed to show possession and thus, the specifications of the asserted patents did not change the understanding of a POSA. Further, even if Heron's patents had changed the understanding of a POSA, there is nothing to suggest that the

understanding would be so fundamentally changed as to eliminate the bias created by all the long established prior art Dr. Little testified about during the Fresenius trial.

### B. Heron's Research and Development Work Demonstrates that the Inventors Did Not Have Possession of the Full Scope of the Asserted Claims.

Heron argues that "[a]lthough [the inventors] do not recall testing concentrations higher than 18 wt/wt %, based on their work, they were confident that up to at least 20 wt/wt % was still within their "zone of stability." Heron Br. at 33 (citing Tr. at 174:21-175:1, 176:3-7, 238:10-19 (Ottoboni).)" Mere confidence is not enough. Yet, none of these citations support the position that the inventors had possession of an emulsifier concentration of 20 wt/wt % or even had confidence that the 20 wt/wt % was within the zone of stability. To the contrary, Dr. Ottoboni testified that "the essential part of the Cinvanti formulation is – is the specific combination of all the ingredients at their respective levels to provide a pharmaceutical product that could be injected in to humans." Tr. at 195:20-24. This testimony does not remotely suggest that the inventors felt comfortable extrapolating from the working examples to a formulation that had significantly different concentrations or ratios, such as the 13-20 wt/wt % and 20:1-25:1 ratio in the current claims. Rather, it clearly demonstrates that the inventors only had possession of the "little island of stability."

Heron also contends that research examples of formulations utilizing approximately 17 or 18 wt/wt % emulsifier concentration in Heron's lab notebooks were stable despite indicating creaming. Heron Br. at 33. While the experts may agree that creaming may be reversible, it is what the inventors thought that is most probative. And the inventors differed on whether such conditions resulted in a successful formulation. *Compare* Tr. at 231:18-233:22 (Ottoboni) *with* Tr. at 119:24-120:3 (Han) ("In the case of an aprepitant emulsion that we developed, if we observed creaming, then we determined it to be unstable."). Dr. Ottoboni further went on to say that he could not say whether this experiment was successful because "we would need the – the – the USP 729 tests" to determine if the visible particles were aprepitant crystals (which would be unstable) or some other particle. Tr. 232:7-233:1. Thus, the one set of experiments that Heron relies on to assert that there

is real-world evidence that the inventors were in possession of the broader scope of the current asserted claims, does not demonstrate that the inventors regarded 18 wt/wt% emulsifier as within their possession. Rather, according to inventors, it clearly and convincingly demonstrates that they did not regard an emulsifier concentration of 18 wt/wt % to be within the scope of their invention.

### C. The Inventors Confirmed that the Claimed Emulsions are Unpredictable.

Regarding unpredictability, Heron largely ignores the testimony of Dr. Han, the inventor with primary responsibility for making dozens of test formulations or oddly suggests that her testimony should be disregarded, despite her PhD. This telling given that it was her opinion that the stability and nature of the aprepitant emulsion was unpredictable. She testified that when one component's concentration changes "we'll have to reevaluate the concentrations of other excipients in the formulation" because "everything affects each other. ***You cannot just increase one concentration and expect to have the same result***." Tr. at 157:7-25 (emphasis added); *id*. at 128:22-129:3 (conceding that testing is required to determine if different amounts and ratios of components afforded a stable emulsion); *id*. at 137:1-17 (identity and amounts of components may or may not impact emulsion stability); *id*. at 137:18-138:6 ("You have to test the different emulsifiers, oils, and other excipients to determine if it will make a stable emulsion.") (Han); *id*. at 139:11-16 ("You have to make a range of emulsions to determine which one is physically stable").

Heron simply ignores inventor Dr. Han's testimony, focusing instead on Drs. Little and Ottoboni, who Heron alleges testified that a POSA would not actually need to make *every* permutation within the asserted claims to know that a particular permutation is or can easily be made stable. *See* Heron Br. at 30. Heron prioritizes Drs. Little and Ottoboni's testimony, stating that they are each "quite experienced with emulsions." *Id.* Yet, Dr. Han is also the chemical engineer charged with the primary day to day responsibility for developing a stable injectable aprepitant product. Her testimony was crystal clear that there is no way to predict the characteristics of an aprepitant emulsion outside the examples except by making and testing every

one of them. Tr. at 107:19-25. Heron may not simply disregard her testimony because it is inconsistent with their faulty narrative.

### D. Claim 8 of the '520 Patent is a Broad Genus Claim and a POSA Would Have to Test Many Species

Heron's position that the asserted claims are not broad also does not withstand scrutiny. Claim 8 of the '520 patent for example, allows:

- any amount of aprepitant;
- 13 wt/wt % to 20 wt/wt % of an egg lecithin;
- a ratio of egg lecithin to aprepitant is between 16:1 to 30:1 (when the definition of "about" is applied);
- 9 wt/wt % to 10 wt/wt % of soybean oil;
- 2-3 wt/wt% ethanol
- any tonicity modifier at any amount
- sodium oleate at any amount
- any pH ranging from about 7.5 to 9.0

Mathematically, this equates to thousands or perhaps millions of possible aprepitant formulations. The only limitation the claim places on this large list of formulations is that the resulting product must be an emulsion and must be physically stable and the specification only provides Dr. Amiji testified that only approximately 30% at the bottom end of the permitted emulsifier concentration was addressed in the working examples. Approximately 71% of the egg lecithin range recited in claim 8 is "untested and unknown" from the patent disclosure. *See* Tr. 274:15-22 (Amiji). With respect to the ratio of emulsifier to aprepitant, there is only one data point disclosed in the specification—20:1. This again is at the lower end of the claimed range and there is no evidence that the inventors ever even experimented with a different ratio. *See* Tr. at 302:14-303:5 (Amiji).

Heron's reliance on *Unicorn Energy AG* is misplaced. In that case, the court faulted an expert report for "missing [] any explanation of the claim's breadth or analysis of other factors such as quantity and routineness of experimentation and guidance in the field" and therefore could not rule as matter of law. *Unicorn Energy*, 740 F. Supp. 3d at 957; Heron Br. at 23.[1] That criticism – in the summary judgment context – is not true of Dr. Amiji's trial testimony, which was subject to both cross examination and examination by the Court. As noted above, Dr. Amiji discussed the breadth of the claims and then compared the amount of the disclosed ranges were tested and how much were not. *See* Tr. 274:15-22 (Amiji) (71%. of the egg lecithin range recited in claim 8 is "untested and unknown" from the patent disclosure).

Dr. Little's trial testimony in the *Fresenius* case was that a POSA would be cautious of changing the concentration of the ingredients, especially the emulsifier. There, Dr. Little told this Court that "if you are working with an emulsifier, you don't just go up, okay, because you could have a stability problem if you go up, as well. And there's lots of scientific reasons as to why that would be the case.". *See* DTX-37 at 1282:8-12; *see also id*. at 1288:7-13 ("As a formulation scientist, what you're doing is you're trying to decrease it, to get the lowest amount that you can for it to be stable. Because if you add any more than that, you're going to cause problems with other design parameters that you have and potentially cause instabilities."). Recognizing the inherent inconsistency between its arguments in the *Fresenius* case and its present position, Heron contends that the world magically changed on the effective filing date of the patents in suit such that a POSA who allegedly would have been reluctant to increase the 10% lecithin content in the prior art would now be completely comfortable increasing it from 14.3% to 20%. *See* Tr. at 454:4-456:9, 556:3-15; Heron Br. at 27. Arguing that the previous well understood scientific reasons

[1] Heron's reliance on *Irise v. Azure Software Sols., Inc.*, is similarly limited as it is in the summary judgment context and not trial context. *See* Heron Br. at 23 (citing 2009 WL 3615075 at *44 (C.D. Cal. Sept 11, 2009)).

disappear because of the issuance of the Heron patents. This argument is utter nonsense. Dr. Little's undisputed testimony in *Fresenius* was that increasing the lecithin content above a certain unknown level could destabilize an aprepitant emulsion. *See* DTX-37 at 1282:8-12. The asserted patents do not provide a POSA with an answer to this problem. They merely recite a "wish list" of emulsifier concentrations capped at the arbitrary number of 20 % that purportedly can be used in the claimed formulations in combination with a large list of possible excipients.

But there is no example in the patents that exceeds 14.3 % in combination with specified quantities of particular ingredients. Moreover, although not strictly relevant to written description because it is outside the specification, there is no evidence in the record that the inventors ever experimented with 20% emulsifier, let alone made a stable aprepitant formulation at this level. Indeed, had the inventors had evidence that emulsions containing more than about 15% emulsifier would have the same stability and other properties as the formulations used in the examples, there is every reason to believe they would have said so in the Ottoboni Declaration submitted during prosecution or at trial. They did neither because they have no evidence that this was true – there are no working examples because they did not make them. The original Heron patents claims stop at 15 wt/wt % and Ottoboni Declaration stopped at 15 wt/wt % because that is where the inventive work stopped. And that is also where their invention stopped.

The specification only identifies stable aprepitant emulsions for a very similar set of components over a range of ±2.6% emulsifier (11.7-14.3 wt/wt %) using a ratio of 20:1 emulsifier to aprepitant. Given the limited range and scope of the working examples, the specification leaves the upper region of the claimed range of 13-20% wt/wt emulsifier entirely unexplored and thus, lacking in written description.

**E. Azurity's Post-Filing Conduct Is Irrelevant.**

**1. Azurity's Meloxicam Patent is Irrelevant.**

Heron's attempt to salvage the validity of the asserted claims also relies on Azurity's patent on meloxicam emulsions, U.S. Patent No. 11,040,008 ("'008 patent"). *See* Tr. at 406:20-412:1, 565:21-579:23. This argument is also fails. A patent filed in 2018 on a different drug is wholly irrelevant to the validity of Heron's asserted claims to aprepitant emulsions filed years before the Azurity work. *See* PTX-60.0001 at (54) ("Pharmaceutical Compositions of Meloxicam"), (30) (indicating a filing date of April 4, 2018); *see also* Tr. at 310:15-311:7. In fact, Dr. Little confirmed that he "didn't consider [the '008 patent] whenever [he] did [his] written description/enablement analysis…." on the asserted patents. Tr. at 566:3-8, 666:10-668:23. Dr. Little also did not independently analyze the '008 patent for compliance with the written description requirement, nor present any expert testimony that would warrant a conclusion by the Court that the '008 patent has adequate written description. *See* Tr. at 668:25-671:5. [redacted] Dr. Little conceded that meloxicam and aprepitant are different molecules with different properties. *See* Tr. at 684:3-11; *see also id*. at 311:17-20 (Amiji). Dr. Little admitted that structural differences existed such that the class of molecules were different. *See id*. at 684:17-22; *see also id*. at 311:20-21 (Amiji). Development work for a different molecular compound is not persuasive here. *Heron Therapeutics, Inc. v. Fresenius Kabi USA, LLC*, Case No. 22-cv-985-WCB, D.I. 193 at 37 (D. Del. Dec. 3, 2024) (discounting a reference that "does not discuss aprepitant emulsions at all").

Finally, as previously noted, the '008 patent was filed years after the effective filing date of the patents in suit. "[W]ritten description is judged based on the state of the art *as of the priority date*. Accordingly, evidence illuminating the state of the art subsequent to the priority date is not relevant to written description." *Biogen Int'l GmbH v. Mylan Pharm. Inc.*, 18 F.4th 1333, 1342 (Fed. Cir. 2021) (quoting *Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1373-74 (Fed. Cir. 2017) (emphasis added). "[B]ecause enablement is *judged as of the priority date*, later-existing state of the art may not be properly considered in the enablement analysis." *In re Entresto*, 125 F.4th 1090, 1097, 1099 (Fed. Cir. 2025); *In re Hogan*, 559 F.2d 595, 606 (CCPA 1977) (holding that enablement

must be judged in light of the state of the art at the time of filing) (emphasis added). Thus, Azurity's '008 patent is irrelevant to the issue before the Court to the extent it is intended to demonstrate the state of the prior art on the priority date. Azurity's '008 patent does not support Heron's assertion that the asserted patents satisfy written description and enablement.

**2. Azurity's development activity and statements to FDA are equally irrelevant.**

Heron relies on Azurity's development to argue that, because Azurity was able to successfully create the Azurity Proposed Product, Heron's patents are enabled. Heron Br. at 33-35. [redacted] are irrelevant to whether Heron's patents meet the enablement or written description requirement. First, all of these events occurred years after the priority date. *See In re Entresto*, 125 F.4th 1090, 1097, 1099 (Fed. Cir. 2025) (enablement analysis); *see Biogen Int'l GmbH v. Mylan Pharm. Inc.*, 18 F.4th 1333, 1342 (Fed. Cir. 2021) (written description analysis).

Second, [redacted] *See* Heron Br. at 11-12. As discussed above and in Azurity's prior brief, the working examples in the asserted patents' specifications only represent a small percentage of the many possible formulations covered by the asserted claims. The question for the Court is not whether one could follow the recipe of a specific working example, but whether a POSA could practice the remaining scope of the asserted claims without undue experimentation. [redacted].

Further, Azurity's proposed product and Azurity's description of it to the FDA does not demonstrate enablement or written description of the asserted patents. As Heron notes, Azurity's

[redacted]. Heron Br. at 12. This post-priority date success, if it is deemed relevant, does not demonstrate that the patent specifications are enabling for the *full scope* of the asserted claims. As previously discussed, asserted claim 8 of the '520 patent, allows for a large genus of possible formulation modifications:

> An injectable emulsion, comprising: aprepitant; 13 wt/wt % to 20 wt/wt % of an egg lecithin; 9 wt/wt % to 10 wt/wt % of soybean oil; a co-emulsifier which is [ethanol], wherein the [ethanol] is present in the emulsion [at a concentration of about 2-3 wt/wt%]; a tonicity modifier; a pH modifier, wherein the pH modifier is sodium oleate; and water; wherein the ratio of egg lecithin to aprepitant is between about 20:1 to 25:1; wherein the pH of the emulsion ranges from about 7.5 to 9.0; and, wherein the emulsion is physically stable.

JTX-003 at 23:11-41. [redacted]. Heron's reliance on *Atlas Powder* is unavailing because in *Altas Powder*, the district court relied on evidence that DuPont's scientists had performed experiments with "the emulsifier***s*** and fuel/oxidizer system***s*** listed in the []patent" – with both categories listed in plural. *Atlas Powder Co. v. EI Du Pont De Nemours & Co.*, 588 F. Supp. 1455, 1468 (N.D. Tex. 1983). Here, the development work relied on by Heron involves the same listed ingredients as the ones used in the working examples.

[redacted] "[B]ioequivalency and equivalent infringement are different inquiries. Bioequivalency is a regulatory and medical

concern aimed at establishing that two compounds are effectively the same for pharmaceutical purposes. In contrast, equivalency for purposes of patent infringement requires an element-by-element comparison of the patent claim and the accused product, requiring not only equivalent function but also equivalent way and result." *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 [CITE] (Fed. Cir. 2009). [redacted]

Accordingly, Heron's post-priority date real-world evidence is not relevant and does not demonstrate that the specifications are enabling or that that the inventors had possession of the full scope of the asserted claims.

**CONCLUSION**

For all the above reasons, Azurity respectfully request the Court to issue judgment in its favor.

Dated: February 6, 2026

*Of Counsel:*

Andrew J. Miller
Contance H. Huttner
Robyn As-Gmoser
Elham F. Steiner
Colby Davis
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
(973) 966-3200

*/s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19801
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants Azurity Pharmaceuticals, Inc., Azurity Pharmaceuticals India LLP, and Slayback Pharma LLC*